**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| OTERRA A/S and OTERRA, LLC,<br><br>        Plaintiffs<br><br>   v.<br><br>WILD FLAVORS, INC. and ARCHER-<br>DANIELS-MIDLAND CO.,<br><br>        Defendants. | C.A. No. 23-1376-JHS<br><br>**JURY TRIAL DEMANDED** |
| WILD FLAVORS, INC.,<br><br>        Counterclaim Plaintiff,<br><br>   v.<br><br>OTERRA A/S and OTERRA, LLC,<br><br>        Counterclaim Defendants. | |

**WILD FLAVORS, INC. AND ARCHER-DANIELS-MIDLAND CO.'S
<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................. 1

II.  BACKGROUND .................................................................................................. 1

    A.  Wild Flavors' Patented Invention ................................................. 1

    B.  Oterra's Accused Product .............................................................. 3

III.  LEGAL STANDARDS ....................................................................................... 3

    A.  Claim Construction Principles ...................................................... 3

    B.  The Person of Ordinary Skill in the Art ....................................... 5

    C.  Invalidity Based on Indefiniteness ............................................... 5

IV.  CLAIM CONSTRUCTION OF DISPUTED CLAIM TERMS ............................. 5

    A.  "color having an increased -b value based on the CIE LAB scale" /
        "processed mixture defined in step (c)" / "the desired color" [Claim
        45] ................................................................................................... 5

    B.  "other juice or material" / "a suitable food-grade source that contains
        at least one component capable of providing the desired color when
        combined with the Genipa americana fruit juice defined in (a)(i),
        wherein the food-grade source comprises an amino acid" [Claim 45] ......... 9

    C.  "stable, natural colors" [Claim 45] / "stable natural juice-based
        colorant" [Claims 53, 54] ........................................................... 15

    D.  "Predetermined period of time" [Claims 46-50] ......................... 17

    E.  "Genipa americana fruit juice" [Claim 45] ................................ 19

V.  CONCLUSION ................................................................................................ 20

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    **Page(s)**

*ACTV, Inc. v. Walt Disney Co.*,
    346 F.3d 1082 (Fed. Cir. 2003)..................................................................10

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    457 F.3d 1293 (Fed. Cir. 2006)..................................................................4, 6

*Deere & Co. v. Bush Hog, LLC*,
    703 F.3d 1349 (Fed. Cir. 2012)..................................................................4

*Elantech Devices Corp. v. Synaptics, Inc.*,
    2007 WL 1056782 (N.D. Cal. Apr. 6, 2007) ..........................................19

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
    815 F.3d 1314 (Fed. Cir. 2016)..................................................................8

*Equil IP Holdings LLC v. Akamai Techs., Inc.*,
    2024 WL 3273494 (D. Del. July 2, 2024) ...............................................14

*Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*,
    93 F.3d 1572 (Fed. Cir. 1996) ..................................................................19

*HID Glob. Corp. v. Vector Flow, Inc.*,
    2023 WL 2655117 (D. Del. Mar. 27, 2023) ............................................4

*Homeland Housewares, LLC v. Whirlpool Corp.*,
    865 F.3d 1372 (Fed. Cir. 2017)..................................................................19

*Invitrogen Corp. v. Biocrest Mfg.*,
    424 F.3d 1374 (Fed. Cir. 2005)..................................................................5

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
    933 F.3d 1345 (Fed. Cir. 2019)..................................................................5

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
    175 F.3d 985 (Fed. Cir. 1999) ..................................................................10

*K-2 Corp. v. Salomon S.A.*,
    191 F.3d 1356 (Fed. Cir. 1999)..................................................................13

*Mark IV Indus. Corp. v. Transcore Holdings, Inc.*,
    2011 WL 13381026 (D. Del. Mar. 28, 2011) ..........................................19

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)..................................................................5

*Omega Eng'g Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2002)................................................................15, 20

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................... *passim*

*SRI Intern. v. Matsushita Elec. Corp. of Am.*,
  775 F.2d 1107 (Fed. Cir. 1985) (*en banc*) ...........................................................15

*Starhome GmbH v. AT&T Mobility LLC*,
  743 F.3d 849 (Fed. Cir. 2014)..............................................................................4

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
  358 F.3d 870 (Fed. Cir. 2004)..............................................................................4

*Takeda Pharm. Co. v. Zydus Pharm. USA, Inc.*,
  743 F.3d 1359 (Fed. Cir. 2014)............................................................................5

*Thorner v. Sony Comp. Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)............................................................................4

*Vederi, LLC v. Google, Inc.*,
  744 F.3d 1376 (Fed. Cir. 2014)..........................................................................14

*Wi-LAN, Inc. v. Apple Inc.*,
  811 F.3d 455 (Fed. Cir. 2016)..............................................................................4

*Woods v. DeAngelo Marine Exhaust, Inc.*,
  692 F.3d 1272 (Fed. Cir. 2012)..........................................................................11

*All "Decl.____" cites are to the Declaration of Expert Alireza Abbaspourrad, Ph.D. Regarding Claim Construction filed herewith.

*All "Ex.____" cites are to the Declaration of Thatcher Rahmeier filed herewith.

*Emphases in cited materials are added and citations are omitted, unless noted.

## I.     INTRODUCTION

Applying basic principles of Federal Circuit law, Wild Flavors, Inc. and Archer-Daniels-Midland Co. (collectively, "ADM") propose constructions of the disputed terms of U.S. Patent No. RE46,695 ("'695" or "Asserted Patent") that are consistent with how a person of ordinary skill in the art ("POSITA") would have understood the terms based on the language of the claims, specification, and prosecution history. This starkly contrasts with Oterra's approach, which ignores the plain language of the claims, simultaneously reads out and reads in limitations, attempts to create ambiguity where none exists, and violates established principles of Federal Circuit law. As explained herein, far from having any ambiguity, the claims of the '695 Patent use common words that were well understood to a POSITA. Accordingly, ADM respectfully requests that the Court adopt ADM's proposed constructions and reject Oterra's proposed constructions.

## II.     BACKGROUND

### A.     Wild Flavors' Patented Invention

The '695 Patent claims a novel invention in the field of natural colorants. Prior to Wild Flavors' invention, there was a lack of commercially available natural blue colorants that were stable enough to be used in a broad range of applications. (*See* '695, 1:36-44.) The '695 Patent solved this problem by providing a method for creating a blue colorant that was (1) derived from a natural source, (2) stable over a broad pH range and resistant to heat and light, (3) made using commercially scalable processes, and (4) suitable for use in foodstuffs, drugs, nutritional supplements, personal care products, and animal feeds. (*Id.*, Abstract, 1:36-44, 2:15-29.)

More specifically, the methods and products claimed in the '695 Patent utilize Genipa americana fruit (also known as jagua or huito fruit) as the source of the natural blue color. Genipa americana fruit juice contains genipin, genipin derivatives, or pre-genipin compounds. ('695, 1:25-

27; Decl. ¶¶39-42.)[1] As explained in the patent, the inventors discovered that when these naturally existing compounds are mixed with a co-processing material that contains a nitrogenous compound (such as an amino acid, polypeptide, protein, or compound with a primary amine), and heated within a pH range, the result is a natural, stable blue color. ('695, 2:59-66; Decl. ¶¶43-44.) The patent also explains how the invention provides for blue colorants that are useful in a variety of applications, such as baked crackers or ice cream. ('695, 10:14-39; Decl. ¶¶62-72.)

Claim 45 is the only independent claim asserted in this case. It recites a method for preparing the colorant:

45. A method of preparing stable, natural colors, the method resulting in a color having an increased -b value based on the CIE LAB scale when the mixture defined in step (a) is compared with the processed mixture defined in step (c), comprising

a. forming a mixture comprising:
   (i) Genipa americana fruit juice which contains sufficient genipin or derivatives of genipin, selected from genipin gentiobioside, geniposide, geniposidic acid, and gardenoside, capable of reacting with the juice or liquefied material defined in (a)(ii) to produce a product of the desired color;

   (ii) other juice or material from a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid;

b. processing said mixture using conventional juice processing methods selected from milling, blending, mixing, pressing, extracting, and combinations of those processing methods, at a pH of from about 3 to about 8;

c. stabilizing the mixture against microbial growth, oxidation, organoleptic deterioration and to provide a stabilized color intensity, by applying a heat treatment; and

d. drying the mixture, wherein the drying is selected from the group consisting of spray drying, freeze drying, and vacuum drying, and combinations thereof.

In addition to asserting Claim 45, Wild Flavors asserts dependent Claims 46-62, which recite additional processing steps, colorants that result from the process, and uses for the colorants.

---

[1] Citations to "Decl. ___" are to the concurrently filed expert declaration of Dr. Alireza Abbaspourrad, Ph.D., who is a leading expert and tenured Associate Professor of food chemistry and ingredient technology at Cornell University.

Wild Flavors was the first company to sell a Genipa americana fruit-derived colorant in the United States. (D.I. 26, ¶16.) Wild Flavors' commercial embodiment of the '695 Patent is sold under the name "Huito Blue." (Ex. 1 at -00001020; Ex. 10; D.I. 26, ¶¶16, 18.)

### B.    Oterra's Accused Product

Wild Flavors accuses Oterra's "Jagua Blue," a.k.a. "Jungle Blue," colorant ("Accused Product") and the process by which it is made ("Accused Process") of infringing Claims 45-62 of the '695 Patent ("Asserted Claims"). Consistent with the claims of the '695 Patent, the Accused Process uses the juice of the Genipa americana fruit to create a natural blue colorant. The Accused Process, for example, uses "the *juice of the unripe fruit of Genipa americana*." (Ex. 2 at -01087.) "The *juice contains genipin*, an iridoid, which is mixed with an equivalent amount of glycine, *an amino acid*, at 70 °C for at least two hours." (*Id.*) "The *dark blue liquid* is concentrated by evaporation and pasteurized to produce the liquid form of the color additive or is *spray dried* after mixing." (*Id.*) This process results in a blue "*natural colorant* that is *stable* at different stability conditions." (*See* Ex. 3; *see also* Exs. 4-9.) Accordingly, the Asserted Claims directly read on the Accused Process and resulting Accused Product. In view of the clear evidence of infringement, it appears that Oterra's constructions are directed at injecting ambiguity or improperly carving out claim scope to create invalidity or noninfringement defenses where none would otherwise exist. In contrast, as discussed in detail below, ADM submits that the language of the claims is clear and that the Court should reject Oterra's efforts to rewrite the claims.

## III.    LEGAL STANDARDS

### A.    Claim Construction Principles

"It is a bedrock principle of patent law that the claims of a patent define the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). "[C]laim construction must

3

begin with the words of the claims themselves." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006). "The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014); *HID Glob. Corp. v. Vector Flow, Inc.*, 2023 WL 2655117, at *4 (D. Del. Mar. 27, 2023) ("plain and ordinary meaning is the default"). "There are only two exceptions to this general rule:  1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Any disclaimer of subject matter otherwise covered by a claim "must be . . . clear and unmistakable." *Id.* at 1366-67. Also, "[w]hile claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012); *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (the specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language").

The prosecution history can "inform the meaning of the claim language by demonstrating how the inventor understood the invention," however, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant . . . it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. A court may consider extrinsic evidence such as expert testimony, dictionaries, and treatises, although "such evidence is generally of less significance than the intrinsic record." *Wi-LAN, Inc. v. Apple Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016).

### B.    The Person of Ordinary Skill in the Art

"Claim construction seeks to ascribe the meaning to a claim term as understood by a person of ordinary skill in the art at the time of invention." *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1350 (Fed. Cir. 2019). ADM contends that a relevant POSITA would have a bachelor's degree in chemistry, food science, or related engineering field, or equivalent practical experience. A person with less relevant education but more relevant practical experience, or more relevant education but less practical experience, may also meet this standard. (*See* Decl. ¶25.)

### C.    Invalidity Based on Indefiniteness

Patents are presumed valid, and Oterra must prove indefiniteness by clear and convincing evidence. *Takeda Pharm. Co. v. Zydus Pharm. USA, Inc.*, 743 F.3d 1359, 1366 (Fed. Cir. 2014). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). However, "a patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Invitrogen Corp. v. Biocrest Mfg.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005). Rather, as the Supreme Court explains, "the definiteness requirement must take into account . . . . '[s]ome modicum of uncertainty[.]'" *Nautilus*, 572 U.S. at 909.

## IV.    CLAIM CONSTRUCTION OF DISPUTED CLAIM TERMS

### A.    "color having an increased -b value based on the CIE LAB scale" / "processed mixture defined in step (c)" / "the desired color" [Claim 45]

| Claim Phrase | ADM's Construction | Oterra's Construction |
|---|---|---|
| "color having an increased -b value based on the CIE LAB scale" | "bluer color" | *Indefinite*; alternatively, "any color that has a decreased b/b* value at the specified time" |
| "processed mixture defined in step (c)" | "the mixture that exists after steps (a), (b), and (c) have occurred" | *Indefinite* |
| "the desired color" | "the bluer color" | *Indefinite*; alternatively, "any color" |

ADM addresses these three phrases together as they relate to the color change resulting from the claimed process.

**First**, with respect to the phrase "color having an increased -b value based on the CIE LAB scale," the CIE LAB scale is a well-known color scale that would have been readily understood by a POSITA. (Decl. ¶¶49-50, 107.) The CIE LAB scale is one way to assign a "measurement" to a color based on what the human eye perceives. It expresses color as three values: L for perceptual lightness; a* for perceptual red-green color (where -a values represent green and +a values represent red); and b* for perceptual blue-yellow color (where -b values represent blue and +b values represent yellow). (*Id.* ¶¶49-50, 107.) A POSITA would have understood "increased -b value" to indicate that a color is bluer. (*Id.* ¶¶49-50, 107-113.)

**Second**, the claims themselves make clear that the "processed mixture defined in step (c)" is the mixture that exists after steps (a), (b), and (c) have occurred, consistent with ADM's construction. (Decl. ¶¶116-121.) *Amgen*, 457 F.3d at 1301 ("[C]laim construction must begin with the words of the claims themselves."). The use of the past tense of the word "processed" relative to the phrase "mixture defined in step (c)" specifies that it is the mixture that exists after steps (a)-(c) are completed. ('695, cl. 45.) In other words, the "processed mixture defined in step (c)" is the mixture that results from carrying out step (a)—forming a mixture of the Genipa americana fruit juice and coprocessing material; step (b)—processing the mixture (e.g., milling, blending, mixing, pressing, extracting, etc.); ***and*** step (c)—applying a heat treatment to the mixture of step (b).

**Third**, the claims clarify that "the desired color" means the bluer color. For example, the method claims of the '695 Patent include "forming a mixture comprising" (i) juice from "a plant of the Rubiaceae Family" and/or "Genipa americana" and (ii) a co-processing material that is capable of providing "the desired color" when reacted together. ('695, cls. 1, 22, 45.) When read

in the context of the claims, given that the resulting color (i.e., the desired color) has an "increased -b value," the "desired color" clearly refers to the bluer color. (Decl. ¶¶124-130.) This is further shown by the fact that the ***only*** color claimed as resulting from the claimed method(s) is either blue or a shade of blue. ('695, cls. 7, 19, 28, 39, 52: "blue"; cl. 44: "teal blue or purple blue".)

ADM's constructions for all three of these terms are further supported by the specification, where the color changes of the mixtures after heating were measured and presented in Table 1. Specifically, as shown in Table 1, prior to heating, the b-values of the mixtures ranged from -0.60 to 10.16, but after heating, the b-values of the mixture all became more negative and the visual appearance had more visible blue color. (*Id.*, Table 1.) In other words, after heating, the resulting mixtures in Table 1 all had an increased -b value relative to the initial mixture—i.e., initial mixture of Genipa americana fruit juice and a co-processing material—and visual appearance of a bluer color. (*Id.*, 11:33-35 ("A ***desirable blue color*** was generated with . . . b value -3.26"); Decl. ¶111.) This aligns with the specification's disclosure that the invention is directed to making "a natural color, ***especially a natural blue colorant***." ('695, 1:36-38; 3:57-59; 6:52-53; Decl. ¶¶109-111.)

The prosecution history further supports ADM's proposed constructions. During prosecution of U.S. Patent 8,557,319 ("'319 Patent") from which '695 reissued, to overcome Section 112 rejections—including indefiniteness rejections—the patentee amended the then-pending claims to include the same limitation at issue here: "when the mixture defined in step (a) is compared with the processed mixture defined in step (c)." (D.I. 54-1 at -0178, -0081.) With this amendment, the patentee clarified that "'increased' [-b value] refers to the difference between the -b value of the mixture of step (a) and the processed mixture of step (c)." (*Id.* at -0181.) The patentee also clarified that "[c]laim 1, as presently amended, indicates that ***the reactions defined in steps (b) and (c)*** of the defined process ***results in increasing the -b value*** of the mixture ***from***

*step (a)*, meaning that **the color of the mixture gets bluer**." (D.I. 54-1 at -0201.) The patentee informed the Examiner that "the claims of the present application have been amended herein to define that the process described forms a generally blue color material" and that "the fact that the process results in an *increased -b value means that the follow includes more 'blue' tones*." (D.I. 54-1 at -0146, -0153.) Thus, the patentee made clear that "the desired color" was a "generally blue color" and that a "color having an increased -b value on the CIE Lab scale" means that the resulting color is "bluer." The Examiner withdrew the indefiniteness rejection, and acknowledged that "the fact that an increase in negative b CIELAB values *means an increase in blue*." (D.I. 54-1 at -0212, -0217.)

Oterra's arguments that these terms are indefinite have no merit. For all the reasons explained above, Oterra cannot come close to showing, by clear and convincing evidence, that the terms "read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. In addition, in his expert declaration, Dr. Abbaspourrad, a leading expert in food and ingredient science, explains how a POSITA would have understood these terms with reasonable certainty, including based on the intrinsic evidence and common knowledge regarding the CIE LAB scale. (Decl. ¶¶113, 121, 130.) Moreover, with respect to Oterra's "alternative" constructions, none of them are supported by the claims, specification, or prosecution history. As discussed above, the invention of the '695 Patent is directed to a blue colorant, and blue is the color discussed in the abstract, the claims, the specification, and the prosecution history. Thus, Oterra's proposal that the "desired color" can be "any color" "is completely untethered to the context of the invention in this case." *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1321 (Fed. Cir. 2016). As explained, nowhere in the intrinsic evidence is "color

having an increased -b value based on the CIE LAB scale" defined as any color that has a decreased b/b* value at the specified time as Oterra contends. Nor would a POSITA have understood this limitation to be defined in such a manner in view of the common understanding of the meaning of CIE LAB scale "b values." (Decl. ¶¶107-114, 124-130.)

Accordingly, the Court should adopt ADM's proposed constructions because they most closely align with the intrinsic evidence. *Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").

**B.** **"other juice or material" / "a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid" [Claim 45]**

| Claim Phrase | ADM's Construction | Oterra's Construction |
|---|---|---|
| "other juice or material" | *No construction necessary; plain and ordinary meaning* | "Juice or liquified material obtained by any means from fruits, vegetables, grains, legumes, nuts, seeds, plant materials, animal materials, microbial materials, algal materials, or by-products thereof, but not synthetic, pure chemicals" |
| "a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid" | *No construction necessary; plain and ordinary meaning* | "Fruits, vegetables, grains, legumes, nuts, seeds, plant materials, animal materials, microbial materials, algal materials, and by-products that contain an amino acid, but not isolated amino acids" |

ADM addresses together the terms "other juice or material" and "a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid" because they both relate to the co-processing limitation of step (a)(ii) of Claim 45.

9

The claims themselves support ADM's position. "[A] court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999); *Phillips*, 415 F.3d at 1314 (claims provide substantial guidance on the meaning); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("context of the surrounding words of the claim also must be considered"). Limitation (a)(ii) of Claim 45 plainly recites "(ii) other juice or material from a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the *Genipa americana* fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid." ('695, cl. 45.) A POSITA would have understood that this co-processing step is not limited to how the juice or material is made or the source of amino acid other than it must be "food-grade," as plainly recited in the claim. (*Id.*, cl. 45; Decl. ¶¶138, 152.)

This is further shown by the fact that other unasserted claims—namely, independent Claims 1 and 22—do specify additional requirements on how the co-processing material is made and the specific source of the co-processing material, as shown in the table below:

| Co-processing Material of Claim 1 | Co-processing Material of Claim 22 |
|---|---|
| "other [juice or liquefied] material [made by the chemical or mechanical liquification of a solid material,] *from a suitable food-grade source selected from fruits, grains, seeds, beans, nuts, vegetables, plant materials, milk, dairy products, egg, meat, seafood, shellfish, microbial and algal material, and by-products from such sources*, *the other material comprising juice or liquefied material made by chemical or mechanical liquification of a solid material* that contain components capable of providing the desired color when combined with the juice defined in (a)(i)" (brackets in claim) | "other material *from a suitable food-grade source selected from fruits, grains, seeds, beans, nuts, vegetables, plant materials, milk, dairy products, egg, meat, seafood, shellfish, microbial and algal material, and by-products from such sources, the other material comprising juice or liquefied material made by chemical or mechanical liquification of a solid material* that contain components capable of providing the desired color when combined with the juice defined in (a)(i), wherein the food-grade source comprises an amino acid" |

10

This shows that when the patentee wanted to specify additional processing requirements, they did so explicitly. Accordingly, in contrast with Claims 1 and 22, the fact that the patentee chose not to include additional processing requirements in Claim 45 shows that the patentee did not intend to include additional limitations in step (a)(ii) of Claim 45. (Decl. ¶¶138, 152.) *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1285 (Fed. Cir. 2012) ("This court will not construe [an] otherwise clear term to include a limitation already present in some claims but not others.").

Moreover, the specification supports ADM's position. While the specification identifies a "broad range" of exemplary co-processing juices or materials, ('695, 3:52-59), a POSITA would have understood that the common denominator is that they "contain," (*id.*, 1:23-29, 2:15-22, 2:33-39, 3:52-59), or "comprise" "amino acids, polypeptides, proteins, or compounds with one or more primary amine groups," (*id.*, 4:45-48 ("The ***co-process materials*** may be the extracts from any of the above sources and ***may comprise amino acids, polypeptides, proteins, or compounds with one or more primary amine groups***.")); (Decl. ¶¶135-36, 149-50). This makes sense in view of the process's purpose to form a natural stable blue color, which is caused by the reaction between the genipin in the Genipa americana fruit juice and amine group in the co-processing material. The specification explains: "Natural stable blue color is believed to be obtained when genipin and possibly genipin gentiobioside, which naturally exist in Genipa americana fruit, react with ***amino acids***, polypeptides, or proteins, and other compounds with primary amine groups, in the various edible materials." ('695, 2:59-66; Decl. ¶¶136, 150.)

In addition, far from excluding "isolated" or "synthetic, pure chemical" amino acids, the specification explains that the co-processing material may include "microbial and algal materials, and by-products from such sources." ('695, 3:52-59.) Dr. Abbaspourrad also explains that a POSITA would have understood that the specification's reference to microbial by-products would

11

include amino acids created through microbial fermentation, which a POSITA would have considered a synthesized chemical. (Decl. ¶¶140, 154.)

Moreover, the specification distinguishes the prior art based on the type of material used in step (a)(i)—**not** the type of co-processing material used in step (a)(ii). Specifically, the specification explains that prior art "gardenia blue is made as a chemical reaction product using **geniposide extracted from Gardenia juice, purified genipin, or genipin derivatives**, with isolated amino acids. **In contrast**, the process of the present invention utilizes **whole fruit, puree or juice of genipin-containing plants** to provide a natural color juice or concentrate." ('695, 1:50-56.) These passages do not say anything about amino acids or the types of amino acids that may be used with the invention. Indeed, in distinguishing the prior art, the specification does not say anything about amino acids, and certainly does not suggest that the claimed invention cannot use "isolated amino acids," as Oterra tries to argue. (*See* Decl. ¶¶141, 155.)

Consistent with this, during prosecution of the original '319 Patent, the patentee generally distinguished prior art from the then-pending claims on the basis of not using **the whole fruit, puree or juice of the Genipa americana fruit**, not how the co-processing material was made or its source. (Decl. ¶¶142, 156.) For example, the patentee argued that Toyama's use of "pure chemicals" or "true extracts" from the Huito fruit in reaction with "pure chemicals (including amino acids) and proteins" is different from the then-pending claims that "do not use extract/purified materials" from Huito fruit. (D.I. 54-1 at -0202.) As Dr. Abbaspourrad explains, a POSITA would have understood that the patentee's arguments during prosecution distinguished the then-pending claims from the prior art by arguing: (1) the prior art is directed to purely chemical genipin-containing compounds, as opposed to the whole fruit, puree, or juice; and/or (2) the prior art utilized chemical reactions between two purified chemical components of (a)(i) and (a)(ii).

12

(Decl. ¶¶142, 156.) The patentee did not argue that the then-claimed process somehow forbid mixing juice from Genipa americana fruit in combination with "synthetic, pure chemical" or "isolated" amino acid. (*Id.*, ¶¶142, 156.)

ADM's construction also is consistent with real-world characterizations in the industry. For example, Oterra's product literature describes the Jagua Blue product as a "***naturally*** sourced blue color" (Ex. 6 at -00001049), ***despite the fact*** that Oterra also states that it uses "***pure glycine***" in its process to make Jagua Blue. (Dkt. 1, ¶39.) This shows that in the real world, a POSITA would not carve out "synthetic, pure chemicals" or "isolated" amino acids from the category of amino acids that may be used to make a natural blue colorant. (Decl. ¶¶143, 157.)

Dr. Abbaspourrad, moreover, explains how a POSITA would have understood these terms to have their plain and ordinary meanings, consistent with ADM's proposed construction, based on the intrinsic evidence and their common knowledge. In particular, he explains that a POSITA would have understood that the co-processing material of Claim 45 is not limited to a specific way of being made or sourced beyond being "food-grade." (Decl. ¶¶138-9, 152-53.) Rather, a POSITA would have understood, based on the claims and specification, that a wide range of co-processing materials could be used, including synthetic or isolated amino acids. (*Id.*, ¶¶136, 150.) Accordingly, no further construction is necessary.

In addition to not having support in the intrinsic evidence, Oterra's constructions also violate multiple canons of claim construction.

**First**, Oterra seeks to rewrite the entire co-processing limitation (a)(ii) of Claim 45, which the law clearly does not allow. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."). In doing so, Oterra's proposed construction also eviscerates key limitations of Claim 45, including

that (1) the claim recites "food-grade source" and not "*food* source"; (2) the "food grade" source contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice; and (3) the food-grade source comprises an amino acid. (*See* '695, cl. 45.) *See Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1383 (Fed. Cir. 2014) (vacating claim construction that effectively read a word out of claims).

**Second**, Oterra seeks to both "read[] a limitation from the written description into the claims," which is a tactic the Federal Circuit describes as "one of the cardinal sins of patent law," *Phillips*, 415 F.3d at 1320, ***and*** add negative limitations into the claim, which is only appropriate in "rare circumstances" not present here, *Equil IP Holdings LLC v. Akamai Techs., Inc.*, 2024 WL 3273494, at *11 (D. Del. July 2, 2024) (observing negative limitations "are not preferred" and "are only appropriate in [] rare circumstances"). This would not only rewrite the claim, but would do so in a manner that is inconsistent with the specification. Indeed, while the specification notes exemplary sources of the claimed "juice or liquified material" that include "fruits, vegetables, grains, legumes, nuts, seeds, plant materials, animal materials including milk and eggs, microbial and algal materials, and by-products from such sources," (*e.g.*, '695, 3:52-55), the specification is clear that the "broad range of suitable edible materials" to be used as co-processing materials "may be the extracts from any of the above sources ***and may comprise amino acids***, polypeptides, proteins, or compounds with one or more primary amine groups," (*id.*, 4:45-48). As explained above, the patentee had the opportunity to specify the way in which the co-processing material was made (e.g., mechanical or chemical liquification of solid source) or its specific source in Claim 45 (e.g., fruits, vegetables, etc.), as it did in other claims. (*Id.* cls. 1, 22.) The patentee also could have clearly carved out the use of "isolated amino acids" or "synthetic, pure chemicals" in Claim 45, but did not do so. Instead, the phrases "synthetic chemicals," "pure chemicals," or "synthetic,

14

pure chemicals" never appear in the specification. And while the specification does discuss the use of "isolated amino acids" in the prior art, (*id.* at 1:50-56), it does not reject the use of "isolated amino acids" as the co-processing material used in Claim 45 step (a)(ii). Accordingly, the specification does not support importing a negative limitation. *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322-23 (Fed. Cir. 2002); (Decl. ¶¶141-42, 155-56; *see id.* ¶¶134-140, 148-154).

**Third**, "[i]t is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement." *SRI Intern. v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) (*en banc*). But as discussed above, Oterra's constructions seek to add limitations that exist in other claims to limit the sources of the co-processing materials (e.g., fruits, vegetables etc.) in those claims and how they are made. (*Compare* '695, cl. 45 *with* cls. 1 and 22.) The fact that those further limitations are present in other claims, but not Claim 45, only confirms that they should not be read into Claim 45.

Accordingly, for all these reasons, the Court should reject Oterra's constructions.

C.    **"stable, natural colors" [Claim 45] / "stable natural juice-based colorant" [Claims 53, 54]**

| Claim Phrase | ADM's Construction | Oterra's Construction |
|---|---|---|
| "stable, natural colors" | *No construction necessary; plain and ordinary meaning* | *Indefinite* |
| "stable natural juice-based colorant" | *No construction necessary; plain and ordinary meaning* | *Indefinite* |

The terms "stable, natural colors" and "stable natural juice-based colorant" should be given their plain and ordinary meanings, which are "stable, natural colors" and "stable natural juice-based colorant," respectively. No further construction is needed.

The Asserted Claims give the necessary context for these phrases. Step (c) explicitly states how the mixture is stabilized: "***stabilizing*** the mixture against microbial growth, oxidation,

organoleptic deterioration and to provide a **stabilized** color intensity, **by applying a heat treatment**." ('695, cl. 45; *see* cls. 1, 22.) Thus, the claims set forth that the "stabilization" is achieved by applying "a heat treatment," and that the mixture is stabilized "against microbial growth, oxidation, organoleptic deterioration," as well as to stabilize the "color intensity." (*Id.*) The dependent claims recite additional details regarding the time and temperature of the heat treatment. (*Id.*, cls. 46-50.) When the claims themselves are clear as to the term's meaning, no construction is necessary. *Phillips*, 415 F.3d at 1314.

Nothing in the specification or prosecution history contradicts the plain meaning of "stable, natural colors" or "stable natural juice-based colorant." ('695, Abstract; 1:19-29; 1:48-56; 2:15-66; 3:52-4:52; 5:17-21; 5:47-50; 6:51-67; Tab. 1; Examples 1-3, 9-10; Fig. 1; D.I. 54-1 at -0503-04, -0522-23, -0937-40.) Instead, the specification teaches, for example, how: (1) the "[n]atural stable blue color is believed to be obtained when genipin . . . which naturally exist in Genipa americana fruit, react with amino acids, polypeptides, or proteins, and other compounds with primary amine groups," ('695, 2:61-66); (2) the heating step "relates to enzyme reactions, color development, and color stability" and "contributes to a reproducible, stable and desired resultant color" by "control[ling] unwanted reactions," (*id.*, 5:26-33; 5:50-58); (3) the heat treatment results in "microbial stability," (*id.*, 5:2-4); and (4) the "[g]enipa-based natural colorants, especially blue color, have excellent thermal and acidic pH stability," (*id.*, 6:52-56). Thus, as shown by the intrinsic evidence, the claimed "stable natural juiced-based colorant" is a product of the claimed process, wherein the resulting stability—as recited in step (c)—is achieved by applying the claimed heat treatment to the Genipa americana juice-based mixture.

This is further supported by Dr. Abbaspourrad, who explains that a POSITA would have understood that heat treatment stabilizes a natural color by optimizing the reaction between genipin

16

and primary amines; deactivating certain enzymes, which would prevent color loss due to enzymatic oxidation; and degrading bacteria or other microbes. (Decl. ¶¶161-165, 171-175.)

Oterra's indefiniteness argument is again without merit and certainly not supported with clear and convincing evidence. As an initial matter, during the prosecution of the '695 and '319 Patents, the Examiner never rejected these limitations as indefinite. Additionally, as Dr. Abbaspourrad opines, a POSITA would have understood the phrases "stable, natural colors" and "stable natural juice-based colorant" with reasonable certainty, including in view of Claim 45's step (c)—which plainly states how the claimed stabilization is achieved—and the specification's disclosures discussed above. (Decl. ¶¶168, 179.)

Furthermore, the record again shows that Oterra understands how to use these common terms, including in reference to its own accused products that use Genipa americana fruit ("huito" or "jagua"). Specifically, both Oterra and its manufacturing partner (Ecoflora S.A.S.), consistently and repeatedly refer to their *own* product as "natural" and "stable" in consumer facing documents. (Ex. 3 ("best source of a *natural* blue color"; "*natural colorant* that is *stable* at different stability conditions"; "temperature stable"; "pH stable"); Ex. 5 ("Jagua (genepin glycine) blue fills a gap for *naturally sourced* blue colors").) This further shows that these are well understood terms.

Accordingly, the Court should reject Oterra's position and adopt the plain and ordinary meaning of the disputed claim terms, which require no further construction.

### D.    "Predetermined period of time" [Claims 46-50]

| ADM's Construction | Oterra's Construction |
|---|---|
| "period of time determined in advance" | *Indefinite*; alternatively, "any period of time determined in advance" |

ADM's proposed construction that the plain and ordinary meaning of "predetermined period of time" is "period of time determined in advance" is supported by the claims. Claim 46 of the '695 Patent recites "wherein the heat treatment comprises heating the mixture for a

17

predetermined period of time." Claims 47-50 also set forth a "predetermined period of time" of "about 0.1 to 8 hours," "about 0.1 to 4 hours," "about 0.1 to 1 hours," and "about 1 to 4 hours," respectively. The claims recite that the heat treatment is applied to "stabiliz[e] the mixture against microbial growth, oxidation, organoleptic deterioration and to provide a stabilized color intensity." ('695, cl. 45.) As such, a POSITA would have understood in view of the wording of the claims that the heat treatment time directly relates to the time it takes to "stabilize" the mixture. (Decl. ¶¶182-84.)

The specification—like the claims—specifies that heat treatment can be applied to the mixture of Genipa americana juice and co-processing material for given periods to achieve stable color. (*E.g.* '695, 7:19-20 (Example 1 "heated to 80° C for 0.5-2.5 hours until the color was stable."); 7:57-59 (Example 2 "heated in a hot-water bath (80° C) for 1.5 hours; after which the solution was blue in color."); 8:9-11 (Example 3 "heated to about 75-80° C for 1.5 hours . . . result[ing] [in a] blue solution"); Table 1.) Thus, the specification supports a plain and ordinary meaning of the term "predetermined period of time," wherein the heat treatment is applied for a predetermined period of time to achieve the noted stability and color. (Decl. ¶¶182-184.)

Oterra's indefiniteness position has no merit for all the reasons explained above. Indeed, in view of the intrinsic evidence, Dr. Abbaspourrad explains that a POSITA would have understood this term with reasonable certainty and to have a plain and ordinary meaning consistent with ADM's proposed construction. (Decl. ¶¶184-185.) Dr. Abbaspourrad further explains that, given standard practices in the field, a POSITA would have understood that the time for applying a heat treatment to provide stabilization would have been determined in advance. (Decl. ¶¶182-183.)

Moreover, other courts have found that "predetermined period of time" should be given its plain and ordinary meaning without finding the term indefinite. *Mark IV Indus. Corp. v. Transcore*

*Holdings, Inc.*, 2011 WL 13381026, at *2 (D. Del. Mar. 28, 2011) (construing "the predetermined period of time being of sufficient length to permit the storage in said storage means of data derived from said second message" to have its plain and ordinary meaning); *Elantech Devices Corp. v. Synaptics, Inc.*, 2007 WL 1056782, at *6 (N.D. Cal. Apr. 6, 2007) (construing "maintaining said signal for a predetermined period of time" as "to continue, retain, or repeat the signal for a period of time that was determined before."); *see Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375 (Fed. Cir. 2017) (plain meaning of "predetermined" is "determine[d] beforehand").

Oterra's alternative construction, which is consistent with ADM's construction but adds the word "any," does not make sense in the context of the claims. Claims 47-50 recite specific ranges for the "predetermined period of time" of "about 0.1 to 8 hours," "about 0.1 to 4 hours," "about 0.1 to 1 hours," and "about 1 to 4 hours," which confirms that the term cannot mean ***any*** period of time in these claims. *Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996) (construction rejected when "plain meaning of the claim will not bear [such] a reading"). In addition, "predetermined period of time" cannot mean ***any*** period of time because the amount of time is tied to the time for applying the heat treatment to "stabiliz[e] the mixture against microbial growth, oxidation, organoleptic deterioration and to provide a stabilized color intensity." (Decl. ¶184.) The "period of time" is the time for applying the heat treatment to stabilize the mixture, not just "any" period of time. Accordingly, the Court should reject Oterra's arguments and adopt ADM's proposed construction.

### E.    "Genipa americana fruit juice" [Claim 45]

| ADM's Construction | Oterra's Construction |
|---|---|
| "Juice from Genipa americana fruit" | "Juice from Genipa americana fruit, but not as an extract" |

The parties agree that the plain and ordinary meaning of the phrase "Genipa americana

19

fruit juice" includes "juice from Genipa americana fruit." (Dkt. 54 at 5.) However, Oterra further seeks to add the negative limitation "but not as an extract." Oterra's "additional negative limitation finds no anchor in the explicit claim language." *Omega Eng'g*, 334 F.3d at 1322. Nor is it supported by the specification, which instead states: "[a]ll known and practiced ***juice extraction techniques*** and operations and processing technologies . . . are considered suitable to prepare the color juices of this invention . . . ." ('695, 2:66-3:4; 4:54-57 ("Genipa americana are co-processed with other fruits . . . by conventional methods well known in the art in order to ***extract juice*** from fruit.").) Thus, far from being a negative limitation, the specification makes clear that "extraction" is a contemplated way to obtain juice. Additionally, during prosecution of the original '319 Patent, the patentee clarified that "in the context utilized, the term 'extract' meant the product of a squeezing action to pull juice out of the defined material or of liquifying the defined material . . . the words juice and extract were meant to encompass similar things." (D.I. 54-1 at -0202.) In addition, Dr. Abbaspourrad explains that a POSITA would have understood that the plain and ordinary meaning of "Genipa americana fruit juice" would not exclude juice obtained "as an extract," including because the intrinsic evidence discusses "extraction" in the context of obtaining juice and a POSITA would have understood extraction as a common juicing method. (Decl. ¶¶188-192.)

Accordingly, the Court should reject Oterra's proposed negative limitation.

## V.    CONCLUSION

For the foregoing reasons, ADM respectfully requests the Court reject Oterra's claim construction positions and adopt ADM's proposed constructions of the disputed terms.

Respectfully submitted,

Dated: March 10, 2025

*/s/ Thatcher A. Rahmeier*
Thatcher A. Rahmeier (#5222)
**FAEGRE DRINKER BIDDLE & REATH LLP**
222 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
(302) 467-4200
thatcher.rahmeier@faegredrinker.com

David J.F. Gross (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
4800 North Scottsdale Road, Suite 2200
Scottsdale, AZ 85251
(480) 643-1850
david.gross@faegredrinker.com

Timothy E. Grimsrud (*pro hac vice*)
Lauren J.F. Barta (*pro hac vice*)
Andrea I. Savageau (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
(612) 766-7000
tim.grimsrud@faegredrinker.com
lauren.barta@faegredrinker.com
andrea.savageau@faegredrinker.com

Lisa Carlson (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
320 South Canal Street, Suite 3300
Chicago, IL 60606
(312) 569-1000
lisa.carlson@faegredrinker.com

***Attorneys for Defendants/Counterclaimant,
Wild Flavors, Inc. and Archer-Daniels-Midland
Co.***