**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| OTERRA A/S and OTERRA, LLC, | |
| Plaintiffs | |
| v. | |
| WILD FLAVORS, INC.  and ARCHER-DANIELS-MIDLAND CO., | |
| Defendants. | C.A.  No.  23-1376-JHS |
| | **JURY TRIAL DEMANDED** |
| WILD FLAVORS, INC., | |
| Counterclaim Plaintiff, | |
| v. | |
| OTERRA A/S and OTERRA, LLC, | |
| Counterclaim Defendants. | |

**DECLARATION OF EXPERT ALIREZA ABBASPOURRAD, PH.D.,
<u>REGARDING CLAIM CONSTRUCTION</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................. 1

II.     COMPENSATION .................................................................................................. 1

III.    EXPERIENCE AND QUALIFICATIONS............................................................. 2

IV.     LEGAL STANDARDS AND LEVEL OF ORDINARY SKILL IN THE ART ................ 3

        A. Claim Construction ........................................................................................ 4

        B. Person of Ordinary Skill in the Art ............................................................... 5

V.      MATERIALS REVIEWED .................................................................................... 6

VI.     SUMMARY OF OPINIONS................................................................................... 6

VII.    OVERVIEW OF THE TECHNOLOGY ................................................................ 7

        A. Natural Colors and Colorants........................................................................ 8

        B. Natural Blue Colors and Colorants ............................................................. 11

             i.   *Genipa americana* fruit is a source of natural blue color ...................... 12

             ii.  Stability of natural blue color derived from *Genipa americana* fruit................... 15

        C. CIE LAB Color Scale.................................................................................... 16

VIII.   OVERVIEW OF THE ASSERTED '695 PATENT ............................................. 18

        A. Overview of the '695 Specification ............................................................. 18

        B. The Asserted Claims of the '695 Patent...................................................... 25

IX.     OVERVIEW OF THE '319 AND '695 PATENT PROSECUTION HISTORIES .......... 27

        A. Summary of the Original '319 Patent Prosecution History............................. 27

        B. Original Claims of the '319 Patent.............................................................. 33

        C. Summary of the '695 Patent Prosecution History ....................................... 34

X.      OTERRA'S ACCUSED JAGUA BLUE PRODUCT............................................. 36

XI.     WILD FLAVORS' HUITO BLUE PRODUCT ................................................... 38

XII.    OPINIONS ON CLAIM CONSTRUCTION......................................................... 39

        A. "Color Having An Increased -b Value Based On The CIE LAB Scale" ...................... 39

        B. "Processed Mixture Defined in Step (c)"..................................................... 43

        C. "The Desired Color"...................................................................................... 45

        D. "Other Juice or Material" ............................................................................ 48

        E. "A Suitable Food-Grade Source that Contains at Least One Component Capable of
           Providing the Desired Color When Combined with the Genipa americana Fruit Juice
           Defined in (a)(i), Wherein the Food-Grade Source Comprises an Amino Acid" .............. 56

        F. "Stable, Natural Colors"............................................................................... 63

G. "Stable Natural Juice-Based Colorant" ........................................................... 68

H. "Predetermined Period of Time" ................................................................. 73

I. "Genipa americana Fruit Juice" .................................................................. 75

XIII.  CONCLUSION ................................................................................. 77

I, Alireza Abbaspourrad, Ph.D., hereby declare and state as follows:

## I.    INTRODUCTION

1.    I have been asked by counsel for the Defendants, Wild Flavors, Inc. and Archer-Daniels-Midland Co.  (collectively, "ADM"), to submit this Declaration providing analysis and expert opinions relating to issues of claim construction with regard to certain terms in U.S. Patent No. RE46,695 ("the '695 Patent" or "the Asserted Patent").

2.    In particular, for the purposes of this Declaration, I have been asked to provide, relative to the state of the art as of the effective filing date of the Asserted Patent, an analysis of the scope and meaning of certain terms and phrases in the Asserted Patent.

3.    This Declaration states and summarizes the opinions that I have formed to date. The opinions I state herein are based on my personal knowledge, skill, and experience, and my review and analysis of materials and information read and considered in connection with this Declaration. I may modify my opinions if necessary, based on further review and analysis of information provided to me subsequent to the serving of this Declaration. If called to testify in a deposition or at a hearing before the Court regarding the contents of this Declaration, I will do so.

4.    I reserve the right to supplement this Declaration and my opinions herein as permitted, and/or to provide a further declaration to address any issues raised by expert(s) engaged by Oterra or resulting from further discovery.

## II.    COMPENSATION

5.    For my work on this case, I am being compensated at a rate of $1,000 per hour, which is my standard hourly consulting rate. I am not receiving any compensation that is contingent on my performance, my opinions, the outcome of this matter, or any other issues involved in or related to this matter.

### III.    EXPERIENCE AND QUALIFICATIONS

6.    I am currently the Yongkeun Joh Associate Professor of Food Chemistry and Ingredient Technology, Food Science at Cornell University, College of Agriculture and Life Sciences.  I have served in this role since 2015.

7.    A copy of my *curriculum vitae* is attached hereto as **Exhibit A**, which sets forth additional information on my experience and qualifications.

8.    I have extensive experience researching, studying, developing, and working with natural colors and colorants, processes used to create and stabilize them, and processes used to test different qualities and characteristics of them.

9.    In 1998, I graduated from Ferdowsi University in Mashhad, Iran with a bachelor's degree in chemistry.

10.    In 2000, I obtained my master's degree in organic chemistry also from Ferdowsi University.   During my master's program, my dissertation focused on synthesis of benzoxazine 2,4-dithione derivatives using solvent-free condition.

11.    In 2006, I received my Ph.D. in organic chemistry from Isfahan University of Technology in Isfahan, Iran. While a Ph.D. candidate, my research focused on vapor-phase organic reactions using surface-modified zsm-5 zeolites.

12.    Following my Ph.D., I had two postdoctoral fellowships.  My first fellowship was at the University of Campinas in Campinas, Brazil from 2008-2009.  My research focused on design and fabrication of gas microsensors using decorated carbon nanotubes.  From 2009-2015, I completed my second fellowship at Harvard University in the School of Engineering and Applied Sciences (SEAS).  The focus of my research included engineering soft materials at liquid-liquid

interfaces using microfluidics. At Harvard university, I developed an encapsulation technique for protection and delivery of beta-carotene as a natural colorant replacing synthetic orange color.

13.     Upon the completion of my fellowships, I served as an assistant professor (2015-2022) and was promoted to tenured associate professor (2022-present) of food chemistry and ingredient technology at Cornell University and have remained in that position through present day.

14.     I have authored over 280 peer-reviewed journal articles.  Of those, 22 of my articles relate to natural colorants, processes used to create natural colorants and stabilize natural colorants. In addition, 12 of my articles specifically relate to natural blue colorants and processes used to create natural blue colorants.

15.     I also lead a laboratory, The Abbaspourrad Lab (https://abbaspourradlab.com/), at Cornell University where our research focuses on food chemistry and ingredient technology.   As part of our research, we have worked on natural colorants, processes used to create and stabilize natural colorants, and have evaluated certain characteristics and qualities of them.

16.     As a result of my collective experience, I have ample knowledge and experience in food chemistry, food additives, and food colorants, including stable, natural colors and colorants.

17.     I have never been deposed or testified at trial as an expert.

IV.    LEGAL STANDARDS AND LEVEL OF ORDINARY SKILL IN THE ART

18.     I understand that the issues of claim construction must be considered in view of certain applicable legal standards.   I am not a lawyer.   The following is a summary of my general understanding of certain legal principles and standards that I have used in forming my opinions expressed below.

## A. Claim Construction

19.      It is my understanding that in construing words and phrases in a claim, those words and phrases are to be given their ordinary and accustomed meaning that a person having ordinary skill in the art would give them at the time of the invention, unless (1) the patentee has acted as its own lexicographer by clearly setting forth a specific definition for the claim term or phrase and/or (2) the patentee has clearly and unmistakably disavowed the full scope of the claim term or phrase in the specification or during prosecution.

20.      I understand that claim terms are to be construed in the context of the entire patent, including the claims in which they are found and the specification as a whole. I further understand that the specification is often the single best guide to the meaning of a disputed claim term.[1]

21.      I understand that the patent's prosecution history should also be considered in construing the claims.   I understand that a patent's prosecution history includes the complete record of the proceedings before the USPTO and the prior art cited during the original examination of the patent.

22.      It is also my understanding that extrinsic evidence such as expert testimony, technical treatises and publications, and dictionaries may be consulted to determine the meaning of claim language. However, I further understand that such evidence is typically given less weight than the intrinsic evidence, which includes the patent itself and the related prosecution history.

---

[1] I understand that Oterra contends that certain claim phrases are indefinite.  I understand that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.  I reserve the right to specifically address any indefiniteness analysis provided by Oterra and/or any expert witness who provides a declaration on which Oterra relies.

4

### B. Person of Ordinary Skill in the Art

23.     I understand that the knowledge level of a person having ordinary skill in the art ("POSITA") is determined by considering various factors, including the type of problems encountered in the art; prior art solutions to those problems; the rapidity with which innovations are made; the sophistication of the technology; and the educational level of active workers in the field.

24.     The '695 Patent relates to the field of natural colors and colorants, and more specifically methods of preparing a stable color by processing *Genipa americana* fruit juice with other co-processing materials; colorants that results from such methods; and products that include such colorants.

25.     I understand that ADM's definition of a POSITA as of March 28, 2008 (which is the earliest effective filing date of the '695 Patent) is a person having a bachelor's degree in chemistry, food science, or a related engineering field, or equivalent practical work experience. However, a person with less relevant education but more relevant practical experience, or more relevant education but less practical experience, may also meet this standard. In my opinion, and based on my experience and understanding of the Asserted Patent, this is a reasonable definition of a POSITA.

26.     I qualify as a POSITA under ADM's proposed definition, including as of the effective filing date of March 28, 2008. I am not aware of any different definition of the relevant POSITA that has been provided by Oterra; however, I reserve the right to consider Oterra's definition of the relevant POSITA, as well as whether it has any impact on my opinions set forth herein.

## V.    MATERIALS REVIEWED

27.    In providing the information and opinions in this Declaration, I have reviewed the '695 Patent, the original '319 Patent of which the '695 Patent is a reissue, the prosecution histories for the '695 Patent and the '319 Patent, Oterra's proposed claim constructions and ADM's proposed claim constructions as set forth in the parties' Joint Claim Construction Statement, and any additional sources cited in the body of this Declaration and/or in **Exhibit B** to this Declaration ("Materials Reviewed List").

## VI.    SUMMARY OF OPINIONS

28.    The following is a summary of my opinions as to how, as of the effective filing date of the Asserted Patent, a POSITA would have understood various terms from the Asserted Patent, including in particular in view of the intrinsic evidence:

- A POSITA would have understood that the plain and ordinary meaning of the claim phrase "color having an increased -b value based on the CIE LAB scale" is a "bluer color."

- A POSITA would have understood that the plain and ordinary meaning of the claim phrase "the desired color" is "the bluer color."

- A POSITA would have understood that the plain and ordinary meaning of the claim phrase "processed mixture defined in step (c)" is the "mixture that exists after steps (a), (b), and (c) have occurred."

- A POSITA would have understood that the plain and ordinary meaning of the claim phrase "other juice or material" is "other juice or material" and, accordingly, the phrase does not require additional construction.

6

- A POSITA would have understood that the plain and ordinary meaning of the claim phrase "a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid" is "a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid" and, accordingly, the phrase does not require additional construction.

- A POSITA would have understood that the plain and ordinary meaning of the claim phrase "stable, natural colors" is "stable, natural colors" and, accordingly, the phrase does not require additional construction.

- A POSITA would have understood that the plain and ordinary meaning of the claim phrase "stable natural juice-based colorant" is "stable natural juice-based colorant" and, accordingly, the phrase does not require additional construction.

- A POSITA would have understood that the plain and ordinary meaning of the phrase "predetermined period of time" is "period of time determined in advance."

- A POSITA would have understood that the plain and ordinary meaning of the claim phrase "*Genipa americana* fruit juice" is "juice from *Genipa americana* fruit."

## VII.   OVERVIEW OF THE TECHNOLOGY

29.    Below, I provide an overview of natural colors and colorants, and more specifically natural blue colors and colorants.   While I have also cited to sources that support my statements, my statements are based on my own experience, knowledge, education, and understanding of certain fundamental principles governing this field.

### A.  Natural Colors and Colorants

30.    Recently, there has been an increased consumer interest in natural colors and a shift away from potentially harmful artificial colors.  Artificial colors are man-made colors that are not present in nature, such as FD&C Red No.  40, FD&C Yellow No.  6,  FD&C Blue No.  1, FD&C Yellow No.  5, and FD&C Red No.  40.  (*See* Mortensen, A., *Carotenoids and other pigments as natural colorants*, Pure Appl.  Chem.  78(8), 1477–1491 (2006).)

31.    Natural colors provide visual appeal and have been recognized as a healthy source of antioxidants, as well as having anticarcinogenic and nutraceutical attributes.  (*See* Sajilata, MG, *Isolation and stabilisation of natural pigments for food applications*, Steward Postharvest Review 5(11), 1-2 (2006).)

32.     There are a number of hurdles to using natural colors for commercial purposes, including that applications can be limited by lower stability and color vibrance, interactions with food ingredients or changes under processing conditions, and difficulty in matching specific color hues.  (*See* Sigurdson, G.T., et al., *Natural Colorants: Food Colorants from Natural Sources*, Annu.  Rev.  Food Sci.  Technol.  (8), 261-280 (2017); *see also* Sajilata, MG, *Isolation and stabilisation of natural pigments for food applications*, Steward Postharvest Review 5(11), 1-2 (2006) ("[T]hese exempt colours need to be used at higher levels than their synthetic counterparts, and their low stability in food applications pose a challenge to food manufacturers."))

33.    Most natural colorants can be created from plants, animals, insects, algae, fungi, and mineral sources.  (*See* Sajilata, MG, *Isolation and stabilisation of natural pigments for food applications*, Steward Postharvest Review 5(11), 1-2 (2006).) Common sources include grape skin extract, fruit juice, carrot oil, paprika, and saffron, among others. (*See id.*) Natural colors are derived from compound within the natural color source. (*See id.*) There are many natural

compounds that impart a range of colors, including hues of red, orange, yellow, green and blue. The below chart includes examples of common natural pigments:

| Table. 2. Key features of naturally derived pigments. | | |
|---|---|---|
| Pigment | Sources | Colour shade |
| Anthocyanin | Black grape skin, elderberries, black carrots and red cabbage | Pink/red to mauve/blue depending on pH |
| Betanin | Red table beet root | Pink to red |
| Bixin/norbixin | *Bixa orellana* bush seeds | Orange |
| Capsanthin/capsorubin | Paprika | Red orange |
| Carmine | Cochineal pigments (insects) | Pink to red |
| Carminic acid | Cochineal pigments (insects) | Orange to red |
| Chlorophyll | Grass, Lucerne, nettle | Olive green |
| Copper Chlorophyll | Grass, Lucerne, nettle | Bluish green |
| Crocin | Saffron/gardenia fruit | Yellow |
| Curcumin | Turmeric rhizome (roots) | Bright lemon yellow |
| Lutein | *Tagetes erecta* (marigold) and alfalfa | Golden yellow |
| Lycopene | Tomatoes | Orange red |

Sajilata at 3, Table 2.

34.     Additionally, as stated in the reference shown below, some "natural food colorants" can be "synthetically prepared" in a laboratory, which are chemically identical to colorants existing in nature (i.e., nature-identical).  For example, see β-carotene and Canthaxanthin highlighted in the below table:

9

**Box 4. The natural sources of some currently permitted natural food colorants**

**Anthocyanins (E163)** are a chemical class of red to blue pigments that are commonly found in mature fruit (e.g. strawberries, blueberries, cherries, grapes), vegetables (e.g. onions, cabbages), seeds (e.g. purple sunflower) and flowers

**Betanin (E162)** is the predominant pigment in red beets (beetroots)

**Caramel color (E150)**, which is equivalent to caramelized sugar, is obtained by careful heating of food-grade carbohydrates in the presence of catalysts

**Carminic acid or carmine (E120)** is an extract of the female cochineal insect; cochineal is commonly cultivated in Peru, Ecuador and the Canary Islands. Approximately 70 000 insects are required to produce 500 g of 50% carminic acid lake

**Carotenoids (E160)** are a chemical class of pigments, which are widely distributed in nature (the annual production by nature has been estimated at 100 million tons)
- **β-carotene (E160a)** exists abundantly in nature; however, several companies now manufacture synthetic β-carotene and the annual output exceeds 500 tons
- **Bixin, norbixin or annatto extract (E160b)** is an extract from a seed (*Bixa orellana*) that grows in South America, East Africa and the Caribbean
- **Lycopene (E160d)** is a pigment found in a variety of fruit (e.g. tomatoes, watermelons, pink grapefruit); not listed in the USA as a color additive
- **Lutein (xanthophyll) (E161b)**
- **Canthaxanthin (E161g)** can be synthetically prepared, but occurs naturally in salmon, shrimp and flamingos

**Chlorophyll and chlorophyllin (E140 and E141):** chlorophyll is the natural green pigment participating in the photosynthetic process (1 billion tons are naturally degraded each year); chlorophyllin is a water-soluble derivative

**Curcumin (E100)**, the major pigment of turmeric, is an extract of a plant rhizome (*Curcuma longa*) that grows predominantly in India

**Malt extracts (no E number)** are dark-brown liquids or powders that are obtained by the processing of barley malts; used as flavors and not permitted for use solely as a color additive

**Monascus (no E number)** is a pigment that is produced by a type of fungus (*Monascus* spp.) that was originally grown on steamed rice; it is commercially produced in China and Japan, but it is not permitted as a colorant in either the USA or Europe

Wissgott, U., Bortlik, K., *Prospects for new natural food colorants*, Trends in Food Science & Technology (7), 298-302 (1996).

35.     Additionally, as stated in the reference below, additional "major colorants from natural sources (or nature identical)" include: astaxanthin, β-Apo-8'-carotenal, iron oxide, mica pearlescent, titanium dioxide, ultramarine blue, ferrous gluconate, and ferrous lactate.  These are reflected in the highlighted table below:

Table 1   Major colorants from natural sources (or nature identical): chemical classification sources, colors, and regulatory status in the United States and European Union (CFR 2016, Food Stand. Agency 2014)

| Chemical classification | Additive | Source | Color | Use in the United States | CFR section | E number |
|---|---|---|---|---|---|---|
| Anthocyanin | Grape skin extract | Grapes (marc from pressing) | Red ro purple to blue | Beverage food | 73.170 | E163 |
| | Grape color extract | Concord grapes (*Vitis labrusca*) | | Non-beverage | 73.169 | |
| | Fruit juice | Berries | | General | 73.250 | |
| | Vegetable juice | Carros, cabbage, and others | | General | 73.260 | |
| Betalain | Beet powder | Beet (*Beta vulgaris*) | Pink to red | General | 73.40 | E162 |
| Caramel | Caramel | Heaing of sugars | Brown | General | 73.85 | E150 |
| Carminic acid | Cochineal extract | *Dactylopius coccus* | Orange to red | General | 73.100 | E120 |
| Carotenoid | Annato | *Bixa orellana* L. | Yellow to orange to red | General | 73.30 | E160b |
| | Astaxanthin | Synthesized, bacterium (*Paracoccus carinifaciens*), yeast (*Phaffia rhodozyma*), algae (*Haematococcus pluvialis*) | | Fish feed | 73.35 73.355 73.185 | |
| | β-Carotene | Natural (carrots) or synthesized | | General | 73.95 | E160a |
| | Canthaxanthin | Synthesized | | Fish feed and chicken skin | 73.75 | E161g |
| | Carrot oil | Carros (*Daucus carrota* L.) | | General | 73.300 | NA |
| | Corn endosperm oil | Yellow corn (*Zea mays*) | | Chicken feed | 73.315 | NA |
| | Paprika (oleoresin) | Paprika (*Capsicum annum* L.) | | General | 73.345 | E160c |
| | Paprika | Paprika | | General | 73.340 | E160c |
| | Saffron | Stigma (*Crocus sativus* L.) | | General | 73.500 | NA |
| | Tagetes | Aztec marigold (*Tagetes erecta* L.) | | Chicken feed | 73.295 | NA |
| | Tomato lycopene | Tomato (*Solanum lycopersicum*) | | General | 73.585 | E160d |
| | β-Apo-8′-carotenal | Synthesized | | General | 73.90 | E160a |
| Chlorophyll | Sodium copper chlorophyllin | Alfalfa (*Medicago sativa*) | Green | Citrus-based dry beverage mixes | 73.125 | E141 |
| Curcuminoid | Turmeric (oleoresin) | Rhizome (*Curcuma longa* L.) | Yellow | General | 73.600 73.615 | E100 |

*(Continued)*

Table 1   *(Continued)*

| Chemical classification | Additive | Source | Color | Use in the United States | CFR section | E number |
|---|---|---|---|---|---|---|
| Mineral | Iron oxide | Synthesized | Yellow to orange to red to brown to black | Confections, casing, pet feed | 73.200 | E172 |
| | Mica pearlescent | Synthesized | Pearlescent | General, restricted | 73.350 | NA |
| | Titanium dioxide | Synthesized | White | General (<1%) | 73.575 | E171 |
| | Ultramarine blue | Synthesized | Deep blue | Animal feed | 73.50 | NA |
| | Ferrous gluconate | Synthesized | Yellowish-gray | Ripen olives | 73.160 | E579 |
| | Ferrous lactate | Synthesized | Greenish-white | Ripen olives | 73.165 | E585 |
| Phycocyanin | Spirulina extract | Algae (*Arthrospira platensis*) | Blue-green | General, restricted | 73.530 | NA |
| Vitamin | Riboflavin | Microbial fermentation | Yellow | General | 73.450 | E101 |
| Other | Toasted partially defatted cooked cononseed flour | Cottonseed (*Gossypium hirsutum*) | Light to dark brown | General | 73.140 | NA |

Sigurdson, at 4-5, Table 1.

## B. Natural Blue Colors and Colorants

36.     Nature provides a range of colors, but blue is the most infrequent color in nature and is often sensitive to environmental factors. For example, anthocyanins are a natural blue

pigment that can be sourced from grapes, berries, and cabbage; however, anthocyanins are sensitive to changes in pH. Anthocyanins appear pink or red when in acidic conditions and blue when in more basic conditions. (*See* Szmagara, A., *Blue in Food and Beverages – A Review of Socio-Cultural, Economic, and Environmental Implications*, Sustainability (16), 8142 (2024); *see also* Sajilata, MG, *Isolation and stabilisation of natural pigments for food applications*, Steward Postharvest Review 5(11), 1-2 (2006).) This color instability limits the use of anthocyanins in a number of food, beverage, and cosmetic applications that require acidic conditions. Similarly, a blue colorant can be extracted from spirulina, a blue-green algae. Spirulina produces a pigment called phycocyanin, which has lower stability to heat and light, but it can be used to color ice cream, chewing gum, drinks, and cosmetics. I have personal experience studying and working with these natural blue pigments and applications using them as well as anthocyanins, beta-carotenes, and betalains.

### i. *Genipa americana* fruit is a source of natural blue color

37.    Another less commonly used source of natural blue color is from the fruit of *Genipa americana*, which belongs to the *Rubiaceae* family and is also known as "Huito" or "Jagua." The *Genipa americana* plant is native to South America. (*See* Bentes, A.D., Souza, H.A., Amaya-Farfan, J., Lopes, A.S., & Faria, L.J., *Influence of the composition of unripe genipap (Genipa americana L.) fruit on the formation of blue pigment.* Journal of Food Science and Technology, 52(6), 3919–3924 (2014); *see also* Ono, M., Ueno, M., Masuoka, C., Ikeda, T., Nohara, T., Iridoid *Glucosides from the Fruit of Genipa americana*. Chem. Pharm. Bulletin. 53(10), 1342-1344 (2005).)

38.    In South America, *Genipa americana* fruit has traditionally been used to dye skin, textiles, and ceramics blue. (*See id.*)

39.     The unripe fruit is generally used for its dye, whereas ripe fruit is used mostly for medicinal and dietary purposes. This is because the unripe fruit contains more iridoids than the ripe fruit. (*See* Bentes, A.D., & Mercadante, A.Z., *Influence of the Stage of Ripeness on the Composition of Iridoids and Phenolic Compounds in Genipap (Genipa americana L.)*, Journal of Agricultural and Food Chemistry, 62(44), 10800–10808 (2014); *see also* Ono, M., Ueno, M., Masuoka, C., Ikeda, T., Nohara, T., Iridoid *Glucosides from the Fruit of Genipa americana*. Chem. Pharm. Bulletin. 53(10), 1342-1344 (2005).) Iridoids are found in the inside meat of the unripe Genipa americana fruit. (*See id*.)  Iridoids are active, natural compounds found in a variety of plants and some animals. (*See id*.)  Certain biological activities have been attributed to iridoids, such as anti-inflammatory activity and the ability to react with amino acids or proteins to form pigments. (*See id*.)

40.     Genepin is the specific iridoid, which serves as the blue pigment in the fruit of *Genipa americana* and allows for the blue color.  (*See id*.)

41.     Genepin is naturally colorless when the *Genipa americana* fruit is uncut. (*See id.*) When the fruit of *Genipa americana* is cut and the inside flesh is exposed to oxygen, the fruit becomes blue and continues to get darker blue with increased exposure to oxygen. (*See* Bentes, A.D., Souza, H.A., Amaya-Farfan, J., Lopes, A.S., & Faria, L.J., *Influence of the composition of unripe genipap (Genipa americana L.) fruit on the formation of blue pigment.* Journal of Food Science and Technology, 52(6), 3919–3924 (2014); *see also* Ono, M., Ueno, M., Masuoka, C., Ikeda, T., Nohara, T., Iridoid *Glucosides from the Fruit of Genipa americana*. Chem. Pharm. Bulletin. 53(10), 1342-1344 (2005).)

42.     A specific chemical reaction must first occur in order for genipin to be released in its free form. A precursor to genipin called geniposide must undergo an enzymatic reaction to

release genipin. More specifically, geniposide undergoes enzymatic hydrolysis by β-glucosidase

to release genipin. (*See* Szmagara, A., *Blue in Food and Beverages – A Review of Socio-Cultural,*

*Economic, and Environmental Implications*, Sustainability (16), 8142 (2024); *see also* Paik, Y.;

Lee, C.; Cho, M.; and Hahn, T.  in J.  Agric.  Food Chem. 49, 403-432 (2001).)



Chemical structures of (a) genipin; and (b) geniposide

Bentes, at Figure 1.

43.    A second reaction then occurs in which genipin reacts with primary amine groups

and proteins in an oxygenated environment to form the blue color. (*See id*.)

44.    Genipin reacts with amino acids and proteins to form water-soluble blue pigments.

More specifically, genepin crosslinks with primary amine groups donated by amino acids and

proteins.  (*See* Szmagara, A., *Blue in Food and Beverages – A Review of Socio-Cultural,*

*Economic, and Environmental Implications*, Sustainability (16), 8142 (2024); *see also* Paik, Y.;

Lee, C.; Cho, M.; and Hahn, T.  in J.  Agric.  Food Chem. 49, 403-432 (2001).)



14

Lee, S.W., Lim, J.M., Hee, S., Paik, Y.S., & Hahn, T.R. *Colorimetric determination of amino acids using genipin from Gardenia jasminoides.* Analytica Chimica Acta, 480(2): 267-274 (2003), Figure 1

45.    Genipin is capable of reacting with a variety of amino acids. For example, amino acids found as components within fruits, vegetables, or other materials, as well as pure amino acids, such as glycine, lysine, and valine. (*See* Bentes, A.D., Souza, H.A., Amaya-Farfan, J., Lopes, A.S., & Faria, L.J., *Influence of the composition of unripe genipap (Genipa americana L.) fruit on the formation of blue pigment.* Journal of Food Science and Technology, 52(6), 3919–3924 (2014); *see also* Paik, Y.; Lee, C.; Cho, M.; and Hahn, T. in J. Agric. Food Chem., 49, 403-432 (2001).)

46.    Additionally, blue color formation increases with increasing amino acid concentration up to a certain saturation point. Therefore, to create a specific hue of blue it is necessary to find the correct ratio of genipin to amino acid. (*See* Brauch, J.E., Zapata-Porras, S.P., Buchweitz, M., Aschoff, J.K., & Carle, R. *Jagua blue derived from Genipa americana L. fruit: a natural alternative to commonly used blue food colorants?* Food Research International, 89: 391-398 (2016); *see also* Lee, S.W., Lim, J.M., Hee, S., Paik, Y.S., & Hahn, T.R. *Colorimetric determination of amino acids using genipin from Gardenia jasminoides.* Analytica Chimica Acta, 480(2): 267-274 (2003).)

ii. **Stability of natural blue color derived from *Genipa americana* fruit**

47.    The blue color derived from the fruit of *Genipa americana* exhibits unique properties in that it shows stability to heat, light, and pH changes. (*See* Bentes, A.D., Souza, H.A., Amaya-Farfan, J., Lopes, A.S., & Faria, L.J., *Influence of the composition of unripe genipap (Genipa americana L.) fruit on the formation of blue pigment.* Journal of Food Science and Technology, 52(6), 3919–3924 (2014); *see also* Paik, Y.; Lee, C.; Cho, M.; and Hahn, T. in J.

Agric. Food Chem., 49, 403-432 (2001).) This is unlike some other natural colorants, which have limitations that include color instability to heat, light, oxygen, and pH. (*See* Mortensen, A., *Carotenoids and other pigments as natural colorants*, Pure Appl. Chem. 78(8), 1477–1491 (2006).)

48.     In particular, the use of a heat treatment can improve color stability in genipin-derived blue colors. High temperatures can enhance color stability and intensity. (*See* Paik, Y.; Lee, C.; Cho, M.; and Hahn, T. in J. Agric. Food Chem., 49, 403-432 (2001).) Additionally, the application of heat can degrade many strains of bacteria that can impact color reactions, safety, and shelf life of the end product for consumption.

### C. CIE LAB Color Scale

49.     The CIE Lab color space is a well-known international standard color space that measures changes in color coordinates that correspond to the range of human color perception. (*See* ADMWILD_00001121; *see also* Hill, B.; Roger, Th.; Vorhagen, F.W., *Comparative Analysis of the Quantization of Color Spaces on the Basis of the CIELAB Color-Difference Formula*, ACM Trans. On Graphics, 16(2), 109-154 (1997).) The Lab values are calculated based on a three-coordinate system and the location of a color is defined by its location in a three-dimensional coordinate system. (*See* ADMWILD_00001121) The three-coordinate system is described in the figure below: "L* determines whether a sample is bright (high L*) or dark (low L*)." "a* and b* indicate the sample's chromaticity (hue and chroma)." "a* = red to green (+a = redder, -a = greener)." "b* = yellow to blue. (+b = yellower, -b = bluer)."



A color's location is its position in a three-dimensional, rectangular coordinate system where:

- **L\*** determines whether a sample is bright (high L\*) or dark (low L\*).
- **a\*** and **b\*** indicate the sample's chromaticity (hue and chroma).
- **a\*** = red to green (+a = redder, -a = greener).
- **b\*** = yellow to blue. (+b = yellower, -b = bluer).
- The intersection of the two "color" axes yields neutral gray.

ADMWILD_00001121

50.    Using the values on the CIE Lab coordinate system allows one to calculate the differences between colors and, therefore, the ability to replicate colors.

51.    The CIE and Hunter Lab scales are color measurement systems that represent color in a perceptually uniform way, meaning equal numerical differences should correspond to visually equal color differences; however, while they share similar axes (L, a, b representing lightness, red-green, and blue-yellow respectively), the Hunter Lab scale is considered a precursor to the CIE Lab scale, with the key difference being that CIE Lab is generally considered more accurate, especially for very dark colors, due to its mathematical calculations being designed for better uniformity across the color space. The formulas are calculated differently with Hunter L, a, and b using square roots and using CIELAB is calculated using cube roots of CIE XYZ. The CIELAB scale generally gives better approximation to visual evaluation of color difference for very dark colors. (*See* Hunter, R.S., and Harold, R.W., *The Measurement of Appearance*, 2nd ed., John Wiley

17

and Sons, Inc. New York, NY USA, 1987.) A POSITA would have understood that an increase in -b value on the Hunter scale would generally correlate to an increase in the -b value in CIE scale.

## VIII.   OVERVIEW OF THE ASSERTED '695 PATENT

52.     United States Patent No. RE46,695 ("'695 Patent"), entitled "Stable Natural Color Process, Products and Use Thereof," was issued by the United States Patent and Trademark Office on February 6, 2018 and is a reissue of the original U.S. Patent No. 8,557,319 ("'319 Patent"). The '319 Patent issued from U.S. Patent Application No. 12/399,223 (the "'223 Application"), which was filed on March 6, 2009. The '223 Application claims priority to U.S.  Provisional Application No. 61/040,208, which was filed on March 28, 2008. I understand that Wild Flavors contends that the '695 Patent's effective filing date is, therefore, March 28, 2008.

53.     The inventors named on the '695 Patent are Shaowen Wu, Chad Ford, and Gregory Horn. (*See* '695 cover page.)

54.     I understand that Wild Flavors, Inc., a wholly-owned subsidiary of Archer-Daniels-Midland, Co., is the assignee of both the '319 Patent and the '695 Patent. (*See id.*)

### A. Overview of the '695 Specification

55.     The specification of the '695 Patent describes methods of preparing stable, natural colors by processing *Genipa americana* fruit, which contains genipin or genipin derivatives, with another edible materials containing nitrogenous compounds such as amino acids, polypeptides, or proteins for use in a variety of products and applications.

56.     The specification describes the demand for natural colorants due to a decreasing number of people willing to eat or drink foodstuffs that have been colored with synthetic colorants. (*See* '695 at 1:33-36.) More specifically, there is a demand for natural blue colorants that are stable

18

at low pH and high temperatures as there are not many commercially feasible options currently available in the United States. (*See* '695 at 1:36-44.)

57.    The specification acknowledges that genipin is a known source of natural blue color. More specifically, "genipin is a key compound contributing to the gardenia blue whenever it reacts with amino acids (U.S. Pat. No. 4, 878,921)" and "gardenia blue is made as a chemical reaction product using geniposide extracted from Gardenia juice, purified genipin, or genipin derivatives, with isolated amino acids." ('695 at 1:48-53.) The specification then contrasts the present invention to what is disclosed in the prior art by drawing the distinction that "the process of the present invention utilizes whole fruit, puree or juice of genipin-containing plants to provide a natural color juice or concentrate," ('695 at 1:53-56), which allows the process to occur without the need for tedious and costly purification steps. The specification does not distinguish the prior art from the present invention based on the prior art's use of "isolated amino acids."

58.    The specification further defines that the starting materials "may be whole fruit, fruit juice, fruit puree, fruit juice concentrate, dried powder from fruits or juice, and the water-insoluble part of fruits from Genipa americana" and a co-process "edible materials compris[ing] fruits, vegetables, grains, legumes, nuts, seeds, plant materials, animal materials including milk and eggs, microbial and algal materials, and by-products from such sources, which contain amino acids, polypeptides, and proteins." ('695 at 3:21-23; 3:53-56.) The specification further states that the co-process material "may comprise amino acids, polypeptides, proteins, or compounds with one or more primary amine groups." ('695 at 4:46-48.)

59.    The specification describes different processing techniques such as how to prepare the starting materials, conventional juicing techniques, processing at different pH ranges, heating, and different drying techniques.

19

60.     As to heating, the specification states that "[h]eating in the process relates to enzyme reactions, color development, and color stability" as "it is believed that genipin, or genipin gentiobioside and geniposidic acid are hydrolyzed to genipin and genipin derivatives by heating or the action of beta-glucosidases that exist naturally in the Genipa americana fruits, reacts with proteins and amino acids in the fruits to produce the resultant color" during heat treatment. ('695 at 5:26-33.) Additionally, "[h]eat may also control unwanted reactions" like "the endogenous enzymes polyphenol oxidase and peroxidase which cause unwanted color and flavor changes." ('695 at 5:51-54.) Therefore, the "heating regime contributes to a reproducible, stable and desired resultant color." ('695 at 5:56-58.) The specification explains that heating the mixture "may take place for up to about 8 hours, preferably about 0.1 to 4 hours, and more preferably about 0.1 to 1 hours, at a temperature of about 20-45° C" and heated to a "higher temperature of about 50-95° C for about 1 to 4 hours with suitable mixing." ('695 at 4:62-67.)

61.     The specification explains that "Genipa-derived natural colorants . . . may be used in a broad range of foodstuff applications including but not limited to various beverages and drinks, breakfast cereals, bakery products, pasta/noodles, confectionery, dairy products, processed meat, poultry, and seafood products, different dressings, ice creams, pickles, crackers, and so on." ('695 at 6:61-67.)

62.     The specification includes ten examples. I discuss the examples that relate to a natural color and colorant derived from Genipa americana fruit (i.e., Huito) that has an increased -b value below:

63.     In **Example 1**, Genipa americana fruit was peeled, blended, and filtered and then mixed with different exemplary co-processing materials including fruit, vegetable, milk, soy, and

meat. (*See* '695 at 7:7-18.) The samples were first placed at room temperature for 16 hours and then heated to 80° C for 0.5-2.5 hours "until the color was stable." (*See* '695 at 7:18-21.)

64.   The color changes for all tested samples before and after the 80° C heat treatment are included in below Table 1, which were measured by a Hunter Lab calorimeter. Note, that the b value after the reaction (boxed in blue) and heating is more negative than the b value before the reaction (boxed in yellow); and the visual color for all samples after the reaction range from dark green to blue to black.

TABLE 1

| Co-Process Materials | Before Reaction | | | Heating | After Reaction | | | |
|---|---|---|---|---|---|---|---|---|
| | L | a | b | hours | L | a | b | Visual Color |
| Watermelon concentrate, 65 Brix | 26.83 | 7.13 | 2.92 | 2.0 | 24.67 | 0.11 | -1.38 | Dark Blue |
| Pineapple juice | 34.46 | 5.41 | 10.16 | 2.5 | 25.96 | -0.35 | -1.14 | Forest green |
| Lychee juice concentrate, 29 Brix | 59.94 | 0.53 | 8.29 | 2.0 | 24.70 | 0.04 | -1.40 | Vibrant blue |
| Passion fruit clarified, 50 Brix | 25.90 | 6.15 | 1.61 | 2.0 | 24.65 | 0.19 | -0.95 | Dark brown |
| Peach juice concentrate, 68 Brix | 23.55 | 0.62 | -0.60 | 2.0 | 24.54 | 0.13 | -1.04 | Black |
| Cantaloupe juice | 33.66 | 5.24 | 6.48 | 0.5 | 24.58 | 0.03 | -1.09 | Dark blue/puiple |
| Banana puree | | | | 2.5 | 31.39 | -0.35 | -1.51 | Grayish blue |
| Green bean sprout solution | 44.53 | 0.64 | 7.79 | 0.5 | 24.59 | 0.06 | -1.22 | Dark blue/purple |
| Celery juice | 29.69 | 9.22 | 5.30 | 1.0 | 24.62 | 0.04 | -1.24 | Dark blue |
| Green cabbage powder | | | | 2.0 | 24.56 | 0.04 | -1.14 | Purplish blue |
| Sweet yellow onion solution | 40.00 | -1.46 | 7.17 | 1.0 | 25.33 | 0.18 | -1.38 | Grayish purple |
| Milk, 2% | 87.80 | -2.13 | 7.37 | 2.0 | 29.00 | -1.12 | -6.96 | Creamy bright blue |
| Soy milk | 79.17 | 0.13 | 8.33 | 2.0 | 27.92 | -0.97 | -4.44 | Creamy teal blue |
| Chicken meat slurry | 74.96 | 0.62 | 9.22 | 2.0 | 24.59 | 0.09 | -1.03 | Bright purplish blue |

'695 at 7:26-48.

65.   **Example 2** discloses the method using peeled and diced *Genipa americana* fruit that is pureed with fresh watermelon for one minute in a blender. Then the puree/juice was heated in a water bath (40° C.) for 1 hour. The puree/juice was then centrifuged for 20 min, and filtered. The filtrate was then heated in a water bath (80° C.) for 1.5 hours; after which the solution was

blue in color. The blue solution then was concentrated and subsequently diluted. (*See* '695 at 7:51-67.)

66. **Example 3** discloses the method using peeled Genipa americana fruit that is pureed with fresh watermelon for one minute in a blender. (*See* '695 at 8:3-5.) The puree was stirred at 37-40° C for one hour, then passed through a screen, and the filtrate heated again to about 75-80° C for 1.5 hours with vigorous stirring. (*See* '695 at 8:5-9.) The result was a blue solution, which was then concentrated by evaporation through the use of a Rotavapor. (*See* '695 at 8:11-13.) The method of Example 3 is diagrammed in Figure 1 below.



67.    **Example 9** involved creating a blue color juice concentrate from mixing diced Huito fruit with pumpkin juice concentrate and water. The mixture was blended to a puree, then heated to 42° C for 30 minutes, centrifuged to obtain the filtrate, and then the filtrate was heated to 60° C for 1.5 hours. This resulted in a blue color solution. (*See* '695 at 11:24-39.)

68.    **Example 10** involved the preparation of a blue/green juice from Huito fruit, yellow bell pepper juice concentrate, and water. This solution was heated to boiling and then filtered. The filtrate was mixed with Huito fruit and then blended. The mixture was heated at 42° C for 30 minutes, filtered, and then heated again at 62° C for one hour. A blue/green color was created by this process. (*See* '695 at 11:43-61.)

69.    Examples 4-6 disclose stability and application tests using the blue colors. **Example 4** discloses a series of stability tests for low pH beverage applications of the claimed process. More specifically, an 8 week accelerated shelf-life stability test was performed on three beverages: a dairy-based beverage, a vitamin-enhanced water, and a lemonade. (*See* '695 at 8:22-25.) After the 8-week period, the dairy-based beverage had a color fade of about 20-25%, which resulted in a change from light blue to a grayish blue. (*See* '695 at 8:58-60.) The lemonade showed an approximate color fade of 30-35% with browning of 20-25% and a change from grayish blue to green.  (*See* '695 at 8:60-62.) The vitamin-enhanced water had a color fade of about 20-25% with browning of 20% and a slight change towards green. (*See* '695 at 8:65-68.)

70.    **Example 4** also included a light stability test for the same three beverages: a dairy-based beverage, a vitamin-enhanced water, and a lemonade.  The light stability test consisted of a 6-hour accelerated light exposure using simulated daylight, which resulted in less than 30% fading in all three beverages.  (*See* '695 at 8:67-09:4.)

71.    The results of these tests are reflected in Tables 2-5 reproduced below:

23

TABLE 2

| Beverage | 8 Week Accelerated Stability DEcmc (RSIN Mode) | 6 Hour Light Stability DEcmc (RSIN Mode) |
|---|---|---|
| Dairy Base | 2.90 | 0.93 |
| Lemonade | 4.81 | 1.22 |
| Enhanced water | 4.00 | 2.39 |

TABLE 3

| Beverage | 8 Week Accelerated Stability DEcmc (RS IN Mode) | 6 Hour Light Stability DEcmc (RSIN Mode) |
|---|---|---|
| Sugar-acid tasting solution | 1.30 | 0.43 |

TABLE 4

| Beverage | 8 Week Accelerated Stability DEcmc (TTRAN Mode) | 6 Hour Light Stability DEcmc (TTRAN Mode) |
|---|---|---|
| Sugar-acid tasting solution | 3.37 | 4.17 |

TABLE 5

| Beverage | 8 Week Accelerated Stability DEcmc (TTRAN Mode) | 6 Hour Light Stability DEcmc (TTRAN Mode) |
|---|---|---|
| Enhanced Water with Vitamin C | 7.85 | 3.13 |
| Enhanced Water without Vitamin C | 3.53 | 5.21 |

24

72.    **Examples 5 and 6** disclose application tests where the blue color made by the claimed method was added to various products and applications. Application test 1 involved adding the blue color to a typical ice cream base, which resulted in a light blue shade of ice cream. (*See* '695 at 10:14-16.)  Application test 2 involved adding the blue color to a cracker and then baking the cracker in the oven, which resulted in a medium blue color with a slight greenish/brown tint and an extrusion process to create a cereal base. (*See* '695 at 10:17-20.) Application test 3 involved adding the blue color to a gummy and pectin base, which resulted in a deep blue. (*See* '695 at 10:25-27.)

## B. The Asserted Claims of the '695 Patent

73.    I understand that Wild Flavors, Inc. has asserted Claims 45 through 62 (the "Asserted Claims") against Oterra A/S and Oterra LLC (collectively, "Oterra").

74.    Claim 45 is the only independent claim at issue in this case. Claim 45 recites:

45.  A method of preparing stable, natural colors, the method resulting in a color having an increased -b value based on the CIE LAB scale when the mixture defined in step (a) is compared with the processed mixture defined in step (c), comprising

a.  forming a mixture comprising:

(i) Genipa americana fruit juice which contains sufficient genipin or derivatives of genipin, selected from genipin gentiobioside, geniposide, geniposidic acid, and gardenoside, capable of reacting with the juice or liquified material defined in (a)(ii) to produce a product of the desired color;

(ii) other juice or material from a food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid;

b.  processing said mixture using conventional juice processing methods selected from milling, pressing, extracting, and combinations of those processing methods, at a pH  from about 3 to about 8;

c.  stabilizing the mixture against microbial growth, oxidation, organoleptic deterioration and to provide a stabilized color intensity, by applying a heat treatment; and

25

d.  drying the mixture, wherein the drying is selected from the group consisting of spray drying, freeze drying, and vacuum drying, and combinations thereof.

75.      Claims 46 through 62 are dependent claims, and depend from Claim 45. Claims 46

through 62 are recited below:

46. The method according to claim 45 wherein the heat treatment comprises heating the mixture for a predetermined period of time.

47. The method according to claim 46 wherein the predetermined period of time is about 0.1 to 8 hours.

48. The method according to claim 46 wherein the predetermined period of time is about 0.1 to 4 hours.

49. The method according to claim 46 wherein the predetermined period of time is about 0.1 to 1 hours.

50. The method according to claim 45 wherein the heat treatment comprises heating the mixture at about 50-95 degrees Centigrade for a predetermined period of time of about 1 to 4 hours.

51. The method according to claim 45, wherein food grade source (a)(ii) is selected from concentrates, purees, extracts, pastes and dried forms, and combinations thereof.

52. The method according to claim 45, wherein the color is blue.

53. A stable natural juice-based colorant made according to the method of claim 45.

54. A stable natural juice-based colorant made according to the method of claim 50.

55. A food product comprising the colorant of claim 53.

56. A food product comprising the colorant of claim 54.

57. The method according to claim 45 wherein step (b) takes place at a pH of from about 3.5 to about 7.

58. The method according to claim 45 wherein step (b) takes place at a pH of from about 4 to about 6.

59. The method according to claim 45 wherein the Genipa americana fruit juice is obtained by peeling Genipa americana fruit from its skin to obtain a skinless Genipa

americana fruit, and obtaining the Genipa americana fruit juice from the skinless Genipa americana fruit.

60. The method according to claim 59 wherein the obtaining the Genipa americana fruit juice from the skinless Genipa americana fruit comprises milling or pureeing the skinless Genipa americana fruit.

61. The method according to claim 60 wherein the obtaining the Genipa americana fruit juice from the skinless Genipa americana fruit further comprises processing selected from the group consisting of filtering, centrifuging, or pressing the milled or pureed skinless Genipa americana fruit.

62. The method according to claim 61 wherein the processing comprises filtering or pressing the milled or pureed skinless Genipa americana fruit against a mesh.

## IX.    OVERVIEW OF THE '319 AND '695 PATENT PROSECUTION HISTORIES

### A. Summary of the Original '319 Patent Prosecution History

76.    As stated above, the '695 Patent is a reissue of the '319 Patent, which issued from the '223 Application, filed on March 6, 2009, and claims priority to a provisional application filed on March 28, 2008. (*See* ADMWILD_00000001.) Below, I provide a summary of certain relevant portions of the prosecution history for the application that issued as the '319 Patent.

77.    The first office action issued by the USPTO during prosecution was filed on February 3, 2011. (*See* ADMWILD_00000118.) The Examiner rejected pending Claims 1-6, 9-13, 15 and 16 as obvious under 35 U.S.C. 103(a) over U.S. Patent No. 4,247,698 ("Toyama"). (*See* ADMWILD_00000128-130.) The Examiner also rejected pending Claims 7, 8, 14, and 17 as obvious under 35 U.S.C. 103(a) over Toyama and in further view of U.S. 2004/0131733 ("Rey") and U.S. Patent No. 4,878,921 ("Koga"). (*See* ADMWILD_00000130-132.) Additionally, the Examiner rejected then-pending Claim 1 as failing to comply with the enablement requirement as the Examiner stated that it was unclear how a POSITA would practice the claim and reach a "desired color." The Examiner also rejected Claims 1, 3-5, 7, 8 and 10 as being indefinite. (*See* ADMWILD_00000123-127.)

27

78.    On May 3, 2011, the Applicant responded to the office action and amended certain claim limitations. (*See* ADMWILD_00000145.) In response to the Examiner's §112 arguments, the applicant amended Claim 1 to list a specific group of materials from which the co-processing material is derived so that a "desired color" could be created. (*See* ADMWILD_00000151.)  In response to the Examiner's indefiniteness rejection, the Applicant amended the claims to overcome this rejection.  In response to the Examiner's obviousness rejections, the applicant distinguished the pending claims from Toyama by remarking "The Toyama reference describes the formation of a reddish coloring compound by the reaction of an iridoid compound with a substance containing a primary amino group .  .  .  Although the iridoid can be obtained from geniposide, geniposidic acid, genipin, or genipinic acid, the iridoid is separated out from the original geniposide-containing juice materials and purified; the juices themselves are not reacted in the reaction described in Toyama." (ADMWILD_00000153.) The Applicant also distinguished Toyama by showing that the present application was amended "to define that the process described forms a generally blue color material (the fact that the process results in an increased -b value means that the follow includes more 'blue' tones. . .) as opposed to the red color formation defined in the Toyama patent." (ADMWILD_00000153.) Regarding Rey, the applicant remarked that Rey "defines a process for making an organic solvent-free lycopene concentrate by contacting a lycopene source with a supercritical fluid under conditions that permit the solubilization of lycopene in the supercritical fluid, followed by separation out of the lycopene concentrate by depressurization of the supercritical fluid loaded with lycopene." (ADMWILD_00000154.)  Lastly, Koga "teaches the formation of natural blue dye by reacting the pure chemical genipin with taurine." (*Id.*)

79.    On July 8, 2011, the Examiner issued a final office action rejecting Claims 1-4 and 6-17. (*See* ADMWILD_00000159.) More specifically, the Examiner again rejected Claims 1-4, 6,

9-13, 15, and 16 as obvious under 35 U.S.C. 103(a) over Toyama; and Claims 7, 8, 14, and 17 as obvious under 35 U.S.C. 103(a) over Toyama and further in view of Rey and Koga. (*See* ADMWILD_00000166-170.) The Examiner also rejected Claim 1 under §112 for indefiniteness related to "the method resulting in a color having an increased -b value based on the CIE lab scale. . ." (ADMWILD_00000163.)

80.    On September 29, 2011, the Applicant made the following amendments to the pending independent Claim 1:

---

Amendments to the Claims

1.    (currently amended)   Method of preparing stable, natural colors, the method resulting in a color having an increased –b value based on the CIE ~~Lab~~ LAB scale when the mixture defined in step (a) is compared with the processed mixture defined in step (c), comprising

    a.    forming a mixture comprising:

        (i)    juice ~~or extract~~ from fruit of a plant of the Rubiaceae Family, which contains sufficient genipin or derivatives of genipin, selected from genipin gentiobioside, geniposide, geniposidic acid, and gardenoside, capable of reacting with the juice or liquified material ~~extract~~ defined in (a)(ii) to produce a product of the desired color;

        (ii)    other juice or ~~extract~~ liquefied material from a suitable food-grade source selected from fruits, grains, seeds, beans, nuts, vegetables, plant materials, milk, dairy products, egg, meat, seafood, shellfish, microbial and algal material, and by-products from such sources, that contain components capable of providing the desired color when combined with the juice ~~or extract~~ defined in (a)(i);

    b.    processing said mixture using conventional juice processing methods selected from milling, pressing and/or extracting, at a pH of from about 3.5 to about 7; and

    c.    stabilizing the mixture against microbial growth, oxidation, organoleptic deterioration and to provide a ~~consistent~~ stabilized color intensity, by applying a heat treatment.

---

ADMWILD_00000197.

---

81.    In response to the Examiner's §112 arguments, the Applicant stated that the amendments to the preamble of Claim 1 "indicate that 'increased' refers to the difference between -b value of the mixture of step (a) and the processed mixture of step (c)" (ADMWILD_00000200) and "that the reactions defined in steps (b) and (c) of the defined process results in increasing the -b value of the mixture from step (a), ***meaning that the color of the mixture gets bluer***. This is taught in Table 1, as supplemented by the knowledge of those skilled in the art with regard to the meaning of the -b value." (ADMWILD_00000201 (emphasis added).)

82.    The Applicant also clarified that "Claim 1 has been amended to delete the phrase 'or extract' from the claims and, with regard to (a)(ii), replace it with 'liquified material.' This should not really affect the scope of the claims since, in the context utilized, the term 'extract' meant the product of a squeezing action to pull juice out of the defined material or of liquifying the defined material . . . the words juice and extract were meant to encompass similar things and . . . are clearly distinguished from the 'extract' utilized in the Toyama application (i.e., the extraction of a specific component or components from the juice)." (ADMWILD_00000202.)

83.    In response to the Examiner's prior art based rejections, the Applicant also highlighted that "in example I of Toyama, ***the pure geniposide material is reacted*** . . . [i]n examples II and II of Toyama, ***an aqueous methanol extract of gardenia fruit*** which was separated into distinct fractions by column chromatography . . . [and] [i]n example IV of Toyama, ***an extract of genipa americana fruit, which was then ionic exchanged*** on Amberlight IR-120, H+4, was the reactant. . . ." (ADMWILD_00000202 (emphasis added).)

84.    The Applicant again made clear the differences between Toyama and the pending application in that the "Toyama reaction utilizes pure chemicals or selected true extracts from Gardenia/Genipa americana in reaction with pure chemicals (including amino acids) and proteins.

In contrast, ***the claims of the present application*** do not use extract/purified materials, but rather utilize fruit juices or liquified versions of the defined food-grade sources.  Toyama does not in any way teach or suggest the formation of blue color materials or the use of the juices themselves, rather than the pure chemicals taught in Toyama." (ADMWILD_00000202 (emphasis added).)

85.    On October 19, 2011, the Applicant also submitted a request for continued examination. (ADMWILD_00000194.)

86.    On March 15, 2012, the Examiner again issued an office action rejecting Claims 1-4, 6-17 and 23-26. (ADMWILD_00000211.) More specifically, Claims 1-4, 6, 9-13, 15, 16 and 23-26 were rejected as obvious under 35 USC 103(a) over Toyama (ADMWILD_00000215); and Claims 7, 8, 14 and 17 were rejected as obvious under 35 USC 103(a) over Toyama in view of Rey and Koga. (ADMWILD_00000217.) Based on the Applicant's amendments, the Examiner withdrew its §112 indefiniteness rejection going to "the method resulting in a color having an increased -b value based on the CIE lab scale. . ." (ADMWILD_00000213.)

87.    On August 31, 2012, the Applicant responded to the office action and made similar arguments in response to the examiner's rejections. (ADMWILD_00000232.) The Applicant argued, "[t]he ***claims of the present application utilize the phrases 'juice' and 'liquified material made by chemical or mechanical processes'*** to clearly define the face that the reactant utilized in the present invention is either a simple juice or a solid material which is liquified (for example, by application of enzymes or mechanical forces), both of which clearly distinguish over the purified extract utilized in the Toyama application (i.e., made by the extraction of a specific component or components from a juice)." (ADMWILD_00000237 (emphasis added).)

88.    The Applicant also argued that "[i]t should be noted that one of the commercial advantages of the present invention is that it utilizes simple juices **or** liquefied forms of the defined

foods, rather than the pure chemical reactants required in Toyama, Rey et al or Koga, which are more expensive and process-intensive to obtain.  .  .  .    Again, to summarize one of the critical differences with Toyama, Toyama utilizes as a key reactant an extract which is very specifically purified and is then reacted with the genipa derivative. Clearly, such a purified material is not a simple "juice" or a "liquefied material", ***as defined in the claims of the present application***. This is a critical and very clear difference between the reaction described in Toyama and that ***claimed in the present application***." (ADMWILD_00000239 (emphasis added).)

89.    Of note, the Examiner did not issue any rejections as indefinite under Section 112 relating to any of the following terms: "stable, natural colors" or "stable, natural juice-based colorant."  (*See*  ADMWILD_00000123-127;  ADMWILD_00000162-165;  ADMWILD_00000213-214.)

90.    On June 11, 2013, the Examiner issued a Notice of Allowance that stated the following reasons for allowance:

Although purple has higher negative b CIELAB values than red, *Toyama* fails to disclose of attaining coloring composites with negative b CIELAB values by mixing juice from the fruit of a plant of the Rubiaceae Family with other juice or liquified material made by the chemical or mechanical liquification of a solid material from the food-grade sources as recited in claim 1.

Furthermore, while *Rey* et al (US 2004/0131733) discloses of using lycopene concentrate from watermelon as a food colorant that provides a range of colors from yellow to red (see *Rey* paragraphs 1, 2 and 16), neither prior art reference alone or in combination discloses using watermelon juice in combination with juice from the fruit of a plant of the Rubiaceae Family to attain a blue food colorant as recited in the claims.

In light of the above, the rejections of record are untenable and thus, the present claims are passed to issue.

ADMWILD_00000251-253.

## B. Original Claims of the '319 Patent

91.    The original '319 Patent has 21 claims.  Claim 1 is the only independent claim, and Claims 2-21 depend from Claim 1.

92.    Claim 1 of the original '319 Patent recites:

1.  Method of preparing stable, natural colors, the method resulting in a color having an increased -b value based on the CIE LAB scale when the mixture defined in step (a) is compared with the processed mixture defined in step (c), comprising

a.  forming a mixture comprising:

   (i) juice from fruit of a plant of the Rubiaceae Family, which contains sufficient genipin or derivatives of genipin, selected from genipin gentiobioside, geniposide, geniposidic acid, and gardenoside, capable of reacting with the juice or liquefied material defined in (a)(ii) to produce a product of the desired color;

33

(ii) other juice or liquefied material made by the chemical or mechanical liquification of a solid material, from a suitable food-grade source selected from fruits, grains, seeds, beans, nuts, vegetables, plant materials, milk, dairy products, egg, meat, seafood, shellfish, microbial and algal material, and by-products from such sources, that contain components capable of providing the desired color when combined with the juice defined in (a)(i);

b. processing said mixture using conventional juice processing methods selected from milling, pressing, extracting, and combinations of those processing methods, at a pH of from about 3.5 to about 7; and

c. stabilizing the mixture against microbial growth, oxidation, organoleptic deterioration and to provide a stabilized color intensity, by applying a heat treatment.

## C. Summary of the '695 Patent Prosecution History

93.    The reissue application of the '695 Patent was filed within two years of the issuance of the original '319 Patent. The Applicant characterized this reissue application as a broadening reissue application because the applicant believed "the original patent to be partly inoperative or invalid by reason of the patentee claiming less than patentee had a right to claim in the patent." (ADMWILD_00000301.)

94.    The reissue application did not seek to amend Claims 1-21 issued in the '319 Patent, but to add Claims 22-65. (*See* ADMWILD_00000315.)

95.    In its July 18, 2016 office action, the Examiner rejected Claim 44 for lack of written description and Claims 1-44 for indefiniteness under §112. The Examiner also rejected Claims 1-6, 8-12, 18-20, 22-26, 29-32, 38-40, 42-54, 57, and 58 under §103(a) as being unpatentable over U.S. Publication No. 2008/0260668 ("Vidalenc") in view of U.S. Patent No. 5,853,728 ("Tanabe") and JP 07111896A ("Mae"). The Examiner also rejected Claims 6 and 27 under §103(a) as being unpatentable over Vidalenc, Tanabe, and Mae in further view of U.S. Patent No. 5, 776,478 ("Jain"). (ADMWILD_00000414-417.)

34

96.     In the Applicant's September 2, 2016 response to the Examiner's July 18, 2016 office action, the Applicant distinguished the reissue application from prior art reference Vidalenc. The Applicant noted that "Vidalenc discloses extracting and separating the juice from the fruit [*Genipa americana*] **before** adding a thickener to form a substantially creamy mixture and **before** any addition of a color-increasing component to the creamy mixture." (ADMWILD_00000451-452) (emphasis in original).) The Applicant also stated "Vidalenc's disclosure involves ***extract*** from *Genipa Americana*.  In contrast, and as described above, the subject matter claimed in claims 1-44 do not use such extract, but rather use a mixture of the fruit and other recited material, which are processed together using conventional juice processing methods." (ADMWILD_00000452.) (emphasis in original.)  The Applicant also distinguished Tanabe by highlighting that "Tanabe discloses preparing of pressed juice or the extracts of fruits" but "Tanabe's disclosure does not in any way teach the formation of the color compositions as defined in the present claims." (ADMWILD_00000452.)  The Applicant stated that "Mae discloses iridoid powder derived from Gardenia jasminoides and taurine being dissolved in water. Mae, like Vidalenc, involves ***extracts***, not co-processing of fruit of *Genipa Americana* with a color-increasing component." (ADMWILD_00000453 (emphasis in original).) Lastly, the Applicant argued that "Jani was cited in the Office Action solely for disclosing that lemon juice is a natural source of both citric acid and ascorbic acid," but "Jani does not remedy the above described deficiencies of Vidalenc alone, or the combination of Vidalenc with Tanabe or Mae." (ADMWILD_00000453-454.)

97.     On September 11, 2017, the Examiner issued a notice of allowance providing the following reasons for allowance:

Independent **claims 1 and 22** recite a method of preparing a stable, natural color having an increased -b value based on the CIE LAB scale wherein the claims require forming a mixture comprising (a) fruit of a plant of the Rubiaceae Family, the fruit comprising juice containing sufficient genipin or derivatives of genipin as claimed, and (b) a material comprising juice or liquefied material that contain components capable of reacting with the juice from the Rubiaceae family; and wherein the mixture formed is processed using conventional juice processing methods.  Independent **claim 45** recites forming a mixture of *Genipa americana* juice and other juice or material capable of providing the desired color when combined with the *Genipa americana* juice, processing and heat stabilizing the mixture, and drying the mixture, wherein the drying is selected from the group consisting of spray drying, freeze drying, vacuum drying, and combinations thereof.

The closest prior art cited in the Information Disclosure Statements filed with the Request for Continuation is US 7,927,637 to Echeverry et al. (hereinafter *Echeverry*) and US 2010/0196298 to Andre et al. (hereinafter *Andre*).

Echeverry discloses mixing the juice of *Genipa americana* with glycine liquid to produce a blue colorant.  However, the filing date of Echeverry is 3 October 2008.  As the instant patent (US 8,557,319) has an effective filing date of 28 March 2008, Echeverry is not prior art to the instant patent.

Andre teaches a blue colorant obtained by mixing juice of *Genipa americana* with an amino acid.  The filing date of Andre is 29 December 2009.  As the instant patent has an effective filing date of 28 March 2008, Andre is not prior art to the instant patent.

ADMWILD_00000940

## X.    OTERRA'S ACCUSED JAGUA BLUE PRODUCT

98.    The accused product in this case is a blue colorant called "Jagua Blue" or "Jungle Blue" that Oterra sells and that is manufactured by Ecoflora. (*See* ADMWILD_00001049.)

99.    Oterra's public product literature states that Jagua Blue is "derived from the fruit of the jagua tree (also known as **huito**), offers a safe and vibrant, ***naturally sourced blue color***." (*Id.* (emphasis added).) Oterra represents that its "natural blue" Jagua Blue product exhibits "robustness towards heat, light, and acidity." (*Id.* at ADMWILD_00001049-1050.)

100.    Ecoflora represents that "[t]he ***Jagua (Genipa americana) is a fruit*** native to the American tropics, within which lies the ***best source of a natural blue color***" and that its Jagua Blue product fills the need for a "***natural colorant that is stable at different stability conditions***." (*See* ADMWILD_00001038 (emphasis added).) Ecoflora represents that it is temperature and pH stable, and has high coloring power.  (*Id.*) Ecoflora's literature also includes a photo of its Jagua Blue product, a food application of its Jagua Blue, and cut huito fruit:



ADMWILD_00001038.

37

101.    I also reviewed the U.S. Food & Drug Administration's (FDA) memorandum in response to Ecoflora's January 31, 2019 Petition. (ADMWILD_00001086.) The memorandum confirms that Ecoflora's Petition identifies the "proposed color additive as jagua (genipin-glycine) blue is prepared from the juice of the unripe fruit of Genipa americana." (ADMWILD_00001087.) The memorandum further explains the process Ecoflora uses to make the jagua (genipin-glycine) blue. More specifically, the "pulp is crushed and the juice is collected by filtering with water. . . the juice contains genipin, an iridoid, which is mixed with an equivalent amount of glycine, an amino acid, at 70 °C for at least two hours . . . [t]he dark blue liquid is concentrated by evaporation and pasteurized to produce the liquid form of the color additive or is spray dried after mixing with a food-grade carrier [] to produce the powder form of the color additive." (*Id*.)

## XI.    WILD FLAVORS' HUITO BLUE PRODUCT

102.    Wild Flavors, Inc., which was acquired by Archer-Daniels-Midland, Co. (collectively, "ADM"), sells a natural blue colorant from the juice of the Huito (*Genipa americana*) fruit. (*See* ADMWILD_00001020.) Wild Flavors secured patent protection for its acid, light, and heat-stable blue color from the juice of the Huito fruit. (*See id.*)

103.    Wild Flavors states that its Huito blue product is unique in the natural color industry in that it is suitable for nearly all food, beverage, and cosmetic applications. (*See id.*) Huito blue can be used to color beverages, baked goods, confections, dairy products, frozen desserts, general foodstuffs, pet products, and dietary supplements. (*See* ADMWILD_00001021-1022.)

104.    Wild Flavors represents that the stability of its Huito blue product allows for it to be blended to create various shades of blue, green, purple, and brown in most any applications. (*See* ADMWILD_00001020.)

## XII.    OPINIONS ON CLAIM CONSTRUCTION

### A. "Color Having An Increased -b Value Based On The CIE LAB Scale"

105.    I understand that in this case the parties dispute the construction of the phrase "color having an increased -b value based on the CIE LAB scale." Below are the positions identified by the parties for the proposed construction of this claim phrase:

| Term | ADM's Construction | Oterra's Construction |
|---|---|---|
| "color having an increased -b value based on the CIE LAB scale" | "bluer color" | *Indefinite*; alternatively, "any color that has a decreased b/b* value at the specified time" |

106.    In my opinion, a POSITA would have understood that the plain and ordinary meaning of the claim phrase "color having an increased -b value based on the CIE LAB scale" is a "bluer color."

107.    As discussed above, a POSITA would have understood that the CIE LAB color scale is a standard color scale that allows colors to be measured based on what is visually perceived. The CIE LAB assigns three values to a color: (1) L for lightness; (2) a* for red-green color (where -a values represent green and +a values represent red); and (3) b* for blue-yellow color (where -b values represent blue and +b values represent yellow). (*See* https://www.hunterlab.com/blog/what-is-cielab-color-space/.) Thus, in my opinion, in view of this commonly used color scale, it is well known in the art that a "color having an increased -b value based on the CIE LAB scale" indicates a bluer color.

108.    My opinion is supported by the '695 Patent, including based on how the claim phrase is used in the claims and how the claim phrase is used throughout the specification. For example, each of the independent claims of the '695 Patent include the same language in the preamble. ('695 at cls. 1, 22, 45.)  Additionally, several dependent claims of the '695 Patent

39

describe the color "resulting" from the claimed method(s) is a shade of blue.  (*See id.*, cls. 7, 19, 28, 39, 44, 52.)

109.    Furthermore, the specification supports my opinion by describing the color derived from the claimed method(s) as a blue color.  For example, a POSITA would have understood that the '695 Patent is directed to "a natural color, especially a natural blue colorant that is stable at low pH and to temperatures used in processing" ('695 at 1:36-38.)   The specification further describes the blue color derived from *Genipa americana* fruit:

- "Natural stable ***blue*** color is believed to be obtained when genipin and possibly genipin gentiobioside, which naturally exist in Genipa americana fruit, react with amino acids, polypeptides, or proteins, and other compounds with primary amine groups, in the various edible materials" ('695 at 2:59-66 (emphasis added));

- "These materials can be co-processed with the fruit or fruit juice of Genipa americana to produce natural stable colorants, especially ***blue*** color" (*id*. at 3:57-59 (emphasis added));

- "[A] brilliant ***blue*** generated by the Genipa americana fruit with watermelon . . ." (*id.* at 6:22-27 (emphasis added));

- "Natural colorants that are produced by using Genipa americana and co-processed edible materials have maximum absorptions varying from 360 to 800 nm. Specifically, the brilliant ***bluish colorants*** that are produced from Genipa fruit juice and watermelon juice have a maximum absorption in a spectrophotometer (Perkin Elmer UVNIS spectrophotometer, Lambda 20, USA) in the wavelength range from 585 to 600 nm, depending on the concentration of the reactants. The Lab-values that were determined in a Hunter Color Lab calorimeter (Color Quest XE, USA)

are L from 20 to 40; a-value from 5 to -2; and b-value from -5 to -25 for concentrated colorants with a color value of 2.0-10.0." (*id.* at 6:33-44 (emphasis added));

- "The natural colorants generated from this disclosure resist heat very well. After boiling at pH 3 for 30 minutes, ***Genipa blue color*** obtained with watermelon juice or fresh watermelon shows no significant visual changes." (*id.* at 6:46-50 (emphasis added)); and

- "Genipa-based natural colorants, especially ***blue*** color, have excellent thermal and acidic pH stability" (*id.* at 6:52-53 (emphasis added)).

110.    The specification also supports my opinion by correlating a bluer color to an increased -b value based on the CIE LAB scale. For example, the specification states "Specifically, the brilliant bluish colorants that are produced from Genipa fruit juice and watermelon juice have a maximum absorption in a spectrophotometer (Perkin Elmer UV / VIS spectrophotometer, Lambda 20 , USA) in the wavelength range from 585 to 600 nm, depending on the concentration of the reactants. The Lab – values that were determined in a Hunter Color Lab calorimeter (Color Quest XE , USA ) are L from 20 to 40; a – value from 5 to – 2 ; and b – value from 5 to – 25 for concentrated colorants with a color value of 2.0 – 10.0." (*Id.* at 6:35-44.) Additionally, Table 1 of the specification demonstrates the increased -b values of the CIE LAB as associated with a blue visual color given that a POSITA would have understood that an increased -b value on the Hunter lab scale would correlate with an increased -b value on the CIE LAB scale:

TABLE 1

| Co-Process Materials | Before Reaction | | | Heating | After Reaction | | | Visual Color |
|---|---|---|---|---|---|---|---|---|
| | L | a | b | hours | L | a | b | |
| Watermelon concentrate, 65 Brix | 26.83 | 7.13 | 2.92 | 2.0 | 24.67 | 0.11 | –1.38 | Dark Blue |
| Pineapple juice | 34.46 | 5.41 | 10.16 | 2.5 | 25.96 | –0.35 | –1.14 | Forest green |
| Lychee juice concentrate, 29 Brix | 59.94 | 0.53 | 8.29 | 2.0 | 24.70 | 0.04 | –1.40 | Vibrant blue |
| Passion fruit clarified, 50 Brix | 25.90 | 6.15 | 1.61 | 2.0 | 24.65 | 0.19 | –0.95 | Dark brown |
| Peach juice concentrate, 68 Brix | 23.55 | 0.62 | –0.60 | 2.0 | 24.54 | 0.13 | –1.04 | Black |
| Cantaloupe juice | 33.66 | 5.24 | 6.48 | 0.5 | 24.58 | 0.03 | –1.09 | Dark blue/puiple |
| Banana puree | | | | 2.5 | 31.39 | –0.35 | –1.51 | Grayish blue |
| Green bean sprout solution | 44.53 | 0.64 | 7.79 | 0.5 | 24.59 | 0.06 | –1.22 | Dark blue/purple |
| Celery juice | 29.69 | 9.22 | 5.30 | 1.0 | 24.62 | 0.04 | –1.24 | Dark blue |
| Green cabbage powder | | | | 2.0 | 24.56 | 0.04 | –1.14 | Purplish blue |
| Sweet yellow onion solution | 40.00 | –1.46 | 7.17 | 1.0 | 25.33 | 0.18 | –1.38 | Grayish purple |
| Milk, 2% | 87.80 | –2.13 | 7.37 | 2.0 | 29.00 | –1.12 | –6.96 | Creamy bright blue |
| Soy milk | 79.17 | 0.13 | 8.33 | 2.0 | 27.92 | –0.97 | –4.44 | Creamy teal blue |
| Chicken meat slurry | 74.96 | 0.62 | 9.22 | 2.0 | 24.59 | 0.09 | –1.03 | Bright purplish blue |

'695 at 7:26-48.

111. Additionally, Examples 1-3, 9, and 10 of the specification further support my opinion by referring to a blue color result. For example, the results of Example 1 are shown in Table 1, and Examples 2 and 3 result in a "blue solution." ('695 at 7:59, 8:11.) Examples 9 and 10 report a "desirable blue color was generated" and a "blue/green color was generated" at the end of the experiment, respectively. (*Id.* at 11:33; 11:55-56.)

112. The prosecution history also supports my opinion. In the Applicant's May 3, 2011 Office Action response during prosecution of the original patent, in support of amending the claims to add the language "the method resulting in a color having an increased -b value based on the CIE Lab scale," the Applicant informed the Examiner that "the claims of the present application have been amended herein to define that the process described *forms a generally blue color material*" to rebut the Examiner's §112 rejection going to "desired color" and that "the fact that the process results in an increased -b value means that the follow includes *more 'blue' tones.*"

42

(ADMWILD_00000146, 153 (emphasis added).) Therefore, in my opinion a POSITA would have understood that the Applicant made clear that "an increased -b value on the CIE Lab scale" means that the resulting blue color is a "bluer color" than at the start of the claimed method. (*See also id.*, at ADMWILD_00000217 (Examiner acknowledging "the fact that an increase in negative b CIELAB values ***means an increase in blue***") (emphasis added).)

113.    For at least the reason above, a POSITA would have understood the meaning of the claim phrase "color having an increased -b value based on the CIE LAB scale" with reasonable certainty as "bluer color."

114.    I understand that Oterra contends that this phrase is indefinite, which I disagree with for at least the reasons discussed above. I also reserve the right to respond to any such position by Oterra.

## B. "Processed Mixture Defined in Step (c)"

115.    I understand the parties also dispute the meaning of the phrase "processed mixture defined in step (c)." Below are the positions identified by the parties for the proposed construction of this claim phrase:

| Term | ADM's Construction | Oterra's Construction |
|---|---|---|
| "processed mixture defined in step (c)" | "the mixture that exists after steps (a), (b), and (c) have occurred" | *Indefinite* |

116.    In my opinion, a POSITA would have understood that the plain and ordinary meaning of the claim phrase "processed mixture defined in step (c)" is "the mixture that exists after steps (a), (b), and (c) have occurred."

117.    My opinion is supported by how the claim phrase is consistently used in the asserted and unasserted claims, as well as how the claim phrase is used throughout the specification. For

example, in my opinion a POSITA would have understood that the claims make clear that the "processed mixture defined in step (c)" is the mixture that exists after steps (a), (b), and (c) have occurred. The claim language of independent Claims 1 (unasserted), 22 (unasserted), and 45 (asserted) use the past tense of the word "processed" relative to the phrase "mixture in step (c)," which a POSITA would have understood clarifies that the process step (c) has occurred for the purposes of comparing the -b values. In other words, the "processed mixture defined in step (c)" is the mixture that occurs ***after*** forming a mixture of Genipa americana fruit juice and the coprocessing material (step (a)); processing the mixture of step (a) (e.g., milling, blending, mixing, pressing, extracting, etc.) (step (b)); and applying a heat treatment to the mixture of step (b) (step (c)). The mixture resulting after step (c) and before the drying in step (d)), is the "processed mixture defined in step (c)."

118.    The Figure in the specification further supports that the "processed mixture defined in step (c)" is "the mixture that exists after steps (a), (b), and (c) have occurred" as it details a "Color Check" by the "Hunter Lab Colorimeter" after the mixture is subjected to "High Temp. Heating" (i.e., step (c)).   Table 1 of the specification also supports my opinion in that the b values "After Reaction" are more negative compared to the b values "Before Reaction," which a POSITA would consider in light of Figure 1 to be after the interposed heating step (step (c)).

119.    Furthermore, Examples 1-3, 9, and 10 all describe checking for color changes after the heating step (c). For example, Example 1 states "[c]olor changes of co-processed materials before and after incubation were measured in a Hunter Lab calorimeter (Color Quest XE, USA), and results are shown in Table 1." ('695 at 7:23-25.)

120.    In addition, the prosecution history supports my opinion. For example, the Applicant's September 29, 2011 response to the Examiner's Office Action rejecting the phrase "a

method resulting in a color having an increased -b value" as indefinite made clear that "Claim 1 has now been amended . . . to indicate that 'increased' refers to the ***difference between the -b value of the mixture of step (a) and the processed mixture of step (c)***." (ADMWILD_00000181 (emphasis added).) The Applicant explained that the comparison is made with the mixture after the reactions of steps (b) and (c) are complete: "Claim 1, as presently amended, ***indicates that the reactions defined in steps (b) and (c) of the defined process results in increasing the -b value of the mixture from step (a), meaning that the color of the mixture gets bluer***. This is taught in Table I, as supplemented by the knowledge of those skilled in the art with regard to the meaning of the -b value." (*Id.* (emphasis added).) The Applicant reiterated this in its October 19, 2011 response. (ADMWILD_00000200-201.) The Examiner then accepted Applicant's arguments and withdrew its objections based on this limitation. (*See* ADMWILD_00000212.)

121.    For at least the reason above, a POSITA would have understood the meaning of the claim phrase "processed mixture defined in step (c)" with reasonable certainty as "the mixture that exists after steps (a), (b), and (c) have occurred."

122.    I understand that Oterra contends that this phrase is indefinite, which I disagree with for at least the reasons discussed above. I also reserve the right to respond to any such position by Oterra.

### C. "The Desired Color"

123.    I understand the parties also dispute the meaning of the phrase "the desired color." Below are the positions identified by the parties for the proposed construction of this claim phrase:

| Term | ADM's Construction | Oterra's Construction |
|---|---|---|
| "the desired color" | "the bluer color" | *Indefinite*; alternatively, "any color" |

45

124.    In my opinion, a POSITA would have understood that the plain and ordinary meaning of the claim phrase "the desired color" is "the bluer color."

125.    My opinion is supported by how the claim phrase is used in the claims, and how it is used throughout the specification. For example, the claim language makes clear that "the desired color" as used in the '695 Patent means the bluer color. For example, the method claims of the '695 Patent include "forming a mixture comprising" (i) juice from a "a plant of the Rubiaceae Family" and/or "Genipa americana" and (ii) a co-processing material that is capable of providing "the desired color" when reacted together. (*See* '695, cls. 1, 22, 45.) Furthermore, the color specifically claimed in the dependent claims resulting from the claimed method(s) is either blue or a shade of blue (*See* '695, Claim 7 ("the resulting color is blue"), Claim 19 ("the color prepared is blue"), Claim 28 ("the resulting color is blue"), Claim 39 ("the color prepared is blue"), Claim 44 ("the color prepared is teal blue or purple blue"), Claim 52 ("the color is blue").) Moreover, color prepared in this patent (and similar patents) are produced to be used as an ingredient added to "food product[s]" (*see, e.g.*, Claims 55 and 56), so a POSITA would have understood that the "desired color" would be a higher intensity "bluer" color additive because it may ultimately be diluted in the final application. Accordingly, when read in the context of all of the claims (as is required) because the resulting color has an "increased -b value" the resulting color (i.e. the desired color) necessarily must be the bluer color.

126.    The specification further supports that "the desired color" is the "bluer color," in particular with how it describes the purpose of the invention as achieving natural colors and especially natural blue colors. For example, the specification states:

46

- "Thus, a natural color, especially a natural **blue** colorant that is stable at low pH and to temperatures used in processing, would be of significant worldwide commercial interest." ('695 at 1:36-41 (emphasis added));

- "Natural stable **blue** color is believed to be obtained when genipin and possibly genipin gentiobioside, which naturally exist in Genipa americana fruit, react with amino acids, polypeptides, or proteins, and other compounds with primary amine groups, in the various edible materials." (*id.* at 2:59-66 (emphasis added));

- "These materials can be co-processed with the fruit or fruit juice of Genipa americana to produce natural stable colorants, especially **blue** color." (*id.* at 3:57-59 (emphasis added));

- "To produce a stable **blue** color . . ." (*id.* at 5:64-6:1 (emphasis added));

- "[A] brilliant **blue** generated by the Genipa americana fruit with watermelon . . ." (*id.* at 6:22-27 (emphasis added)); and

- "Genipa-based natural colorants, especially **blue** color, have excellent thermal and acidic pH stability." (*id.* at 6:52-53 (emphasis added)).

127.    Furthermore, Table 1 shows the mixture "After Reaction" as having a blue color. (*See* supra ¶ 64), as well as Examples 1-3, 9, and 10 reporting a "blue solution," a "desirable blue color" or a "blue/green color." (*Id.* Examples 1-3, 9, 10.)

128.    My opinion is also supported by the prosecution history. For example, the Applicant distinguished Toyama in its May 3, 2011 Office Action Response by showing that the present application was amended "to define that ***the process described forms a generally blue color material*** (the fact that the process results in an increased -b value means that the follow includes more 'blue' tones. . .) as opposed to the red color formation defined in the Toyama

patent." (ADMWILD_00000153 (emphasis added).)  Therefore, a POSITA would understand that "the desired color" would be one of "more 'blue' tones" and not a "red color" as in Toyama. (*See id.*)

129.    In my opinion, a POSITA would ***not*** have understood the plain and ordinary meaning of the claim phrase "the desired color" to include "any color" in the context of the specification, including the claims. Accordingly, in my opinion, Oterra's proposed construction of "any color" does not align with the plain and ordinary meaning of the claim phrase. For example, Example 9 reports the formation of a "desirable blue color" after performing a claimed method of mixing Huito fruit with a co-processing material. ('695 at 11:33.)  Additionally, as described above, a POSITA would have understood that the use of Huito fruit would be in furtherance of creating a blue color based on the natural properties of genipin. (*See* '695 at 2:59-66 ("Natural stable blue color is believed to be obtained when genipin and possibly genipin gentiobioside, which naturally exist in Genipa americana fruit, react with amino acids, polypeptides, or proteins, and other compounds with primary amine groups, in the various edible materials.").)

130.    For at least the reason above, a POSITA would have understood the meaning of the claim phrase "the desired color" with reasonable certainty as "the bluer color."

131.    I understand that Oterra contends that this phrase is indefinite, which I disagree with for at least the reasons discuss above. I also reserve the right to respond to any such position by Oterra.

### D.  "Other Juice or Material"

132.    I understand that the parties dispute the meaning of the phrase "other juice or material." Below are the positions identified by the parties for the proposed construction of this claim phrase:

| Term | ADM's Construction | Oterra's Construction |
|---|---|---|
| "other juice or material" | *No construction necessary; plain and ordinary meaning* | "Juice or liquified material obtained by any means from fruits, vegetables, grains, legumes, nuts, seeds, plant materials, animal materials, microbial materials, algal materials, or by-products thereof, but not synthetic, pure chemicals" |

133.    In my opinion, a POSITA would have understood the plain and ordinary meaning of "other juice or material" to be "other juice or material," without any further construction being necessary.

134.    My opinion is supported by how the claim phrase is used in the claims, and how it is used throughout the specification. For example, the term "other juice or material" is part of the broader limitation of Claim 45 relating to the co-processing material of (a)(ii): "(ii) ***other juice or material*** from a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid." (Claim 45 (emphasis added).) A POSITA reading Claim 45 would have understood that it does not limit how the other juice or material is made or the specific source of amino acid other than it must be "food-grade." In contrast, other unasserted claims specifically recite "other [juice or liquefied] material [made by the chemical or mechanical liquification of a solid material,] ***from a suitable food-grade source selected from fruits, grains, seeds, beans, nuts, vegetables, plant materials, milk, dairy products, egg, meat, seafood, shellfish, microbial and algal material, and by-products from such sources***, ***the other material comprising juice or liquefied material made by chemical or mechanical liquification of a solid material*** that contain components capable of providing the desired color

49

when combined with the juice defined in (a)(i)" (unasserted Claim 1 (emphasis added)); and "other material *from a suitable food-grade source selected from fruits, grains, seeds, beans, nuts, vegetables, plant materials, milk, dairy products, egg, meat, seafood, shellfish, microbial and algal material, and by-products from such sources, the other material comprising juice or liquefied material made by chemical or mechanical liquification of a solid material* that contain components capable of providing the desired color when combined with the juice defined in (a)(i), wherein the food-grade source comprises an amino acid" (unasserted Claim 22 (emphasis added)).

135.    In addition, the specification includes a detailed description of exemplary co-processing materials. (*See* '695 at 3:52-4:52.)  For example:

- "Specifically, the disclosure relates to the stable color products that are generated by processing Genipa americana fruit juice which contains genipin, genipin derivatives, or pre-genipin com-pounds, together with *other edible juices or extracts* which contain amino acids, polypeptides, proteins, and compounds with one or more primary amine groups." (*id* at 1:23-29 (emphasis added));

- "The present disclosure relates to the preparation of stable colorants by mixing and co-processing fruit juice, particularly from Genipa americana, with *other edible juices or extracts* from fruit, vegetable, plant materials, grain, legume, nuts seeds, animal materials including milk and egg, microbial, and algal materials, which contain amino acids, or polypeptides, or proteins." (*id.* at 2:15-22 (emphasis added));

- "The present disclosure provides a method of producing natural stable color products wherein Genipa americana fruits are co-processed with *other edible juices or extracts* from fruits, vegetables, plant materials, grains, legumes, nuts, seeds,

50

animal materials including milk and eggs, microbial, and algal materials that contain amino acids, polypeptides, and/or proteins." (*id.* at 2:33-39 (emphasis added));

- "The present disclosure provides a method of producing natural stable color products by using Genipa americana fruit juice with the ***various added edible materials***. Natural stable blue color is believed to be obtained when genipin and possibly genipin gentiobioside, which naturally exist in Genipa americana fruit, react with amino acids, polypeptides, or proteins, and other compounds with primary amine groups, in the ***various edible materials***." (*id.* at 2:59-66 (emphasis added));

- "The ***broad range of suitable edible materials*** comprises fruits, vegetables, grains, legumes, nuts, seeds, plant materials, animal materials including milk and eggs, microbial and algal materials, and by-products from such sources, which contain amino acids, polypeptides, and proteins. These ***materials*** can be co-processed with the fruit or fruit juice of Genipa americana to produce natural stable colorants, especially blue color." (*id.* at 3:52-59 (emphasis added)); and

- "The ***co-process materials may be the extracts*** from any of the above sources ***and may comprise amino acids, polypeptides, proteins, or compounds with one or more primary amine groups***." (*id.* at 4:45-48 (emphasis added)).

136.    In my opinion, a POSITA reading Claim 45 in the context of the specification as a whole would have understood that the key common aspect of the disclosed co-processing "juice or material" was the "amino acids, polypeptides, or proteins, and other compounds with primary amine groups" in it because that is what reacts with the Genipa americana fruit to create the

"[n]atural stable blue color." (*Id.* at 2:59-66 ("Natural stable blue color is believed to be obtained when genipin and possibly genipin gentiobioside, which naturally exist in Genipa americana fruit, react with amino acids, polypeptides, or proteins, and other compounds with primary amine groups, in the various edible ***materials*.") (emphasis added); *see also* 5:17-21; 5:47-50.) As shown in the examples above, while the specification identifies multiple exemplary potential juices or materials, the common denominator is that they "contain," ('695 at 1:23-29, 3:52-59), or "comprise" "amino acids, polypeptides, proteins, or compounds with one or more primary amine groups" (*id.* at 4:45-48). However, the fact that the "other juice or material" "comprise[s]" "amino acid" is already separately set forth in Claim 45 so not required for the construction of "other juice or material."

137.    In my opinion, a POSITA would ***not*** have understood the plain and ordinary meaning of the claim phrase "other juice or material" to be "Juice or liquified material obtained by any means from fruits, vegetables, grains, legumes, nuts, seeds, plant materials, animal materials, microbial materials, algal materials, or by-products thereof, but not synthetic, pure chemicals" in the context of the claims. Accordingly, in my opinion, Oterra's proposed construction of "other juice or material" does not align with the plain and ordinary meaning of the claim phrase because Oterra seeks to inappropriately limit the construction.

138.    For example, as shown above the plain language of Claim 45 does not limit how the other juice or material is made or the specific source of amino acid other than it must be "food-grade," whereas the plain language of other claims in the '695 Patent do. (*Compare* unasserted Claims 1 and 22 *with* Claim 45.) In view of this, in my opinion a POSITA would have understood that the patentee did not intend to similarly limit Claim 45.

52

139.    As another example, as shown above, the specification notes exemplary sources of the claimed "other juice or material" for the co-processing material that includes "fruits, vegetables, grains, legumes, nuts, seeds, plant materials, animal materials, microbial materials, algal materials, or by-products thereof," (*see, e.g.*, '695, 3:52-55), the specification further states that the "***broad range of suitable edible materials***" to be used as co-processing materials "may be the extracts from any of the above sources ***and may comprise amino acids***, polypeptides, proteins, or compounds with one or more primary amine groups." (*Id.*, 4:45-48 (emphasis added).) A POSITA would have understood that this is consistent with how the patented invention was claimed in Claim 45.

140.    As another example, the specification explains that the co-processing material may include a "broad range of suitable edible materials comprises . . . microbial and algal materials, and by-products from such sources . . ." ('695 at 3:52-59.) In my opinion a POSITA would have understood that the specification's reference to microbial by-products would include amino acids created through microbial fermentation, which a POSITA would have considered a synthesized chemical. For example, it was well known that amino acids could be created as a by-product from microbial fermentation. (*See* Leuchtenberger, W. et al., *Biotechnological production of amino acids and derivatives: current status and prospects*. Appl. Microbiol. Biotechnol, 69, 1-8 (2005); *see also* Sanchez, S. et al., *Our microbes not only produce antibiotics, they also overproduce amino acids. J. of Antibiotics*, 71, 26-36 (2018) ("Through fermentation, micro-organisms growing on inexpensive carbon and nitrogen sources can produce a wide array of valuable products including amino acids.").)

141.    My opinion is further supported by the fact that the specification does ***not*** exclude "synthetic, pure chemicals" when distinguishing the present invention over the prior art. The

53

specification acknowledges that "genipin is a key compound contributing to the gardenia blue whenever it reacts with amino acids (U.S. Pat. No. 4,878,921)." ('695 at 1:48-51.) This prior art reference discloses "gardenia blue [] made as a chemical reaction product using geniposide extracted from Gardenia juice, purified genipin, or genipin derivatives, *with isolated amino acids*." (*Id.* at 1:50-53 (emphasis added).) "In contrast, the process of the present invention utilizes whole fruit, puree or juice of genipin-containing plants to provide a natural color juice or concentrate." (*Id.* at 1:53-56). Therefore, the specification does *not* distinguish the present invention from the use of "isolated amino acids," which in my opinion a POSITA would have considered to be a synthetic, pure chemical. The specification only distinguishes the use of "geniposide extracted from Gardenia juice, purified genipin, or genipin derivatives" from the present invention.

142.    In my opinion, this is consistent with how the Applicant distinguished the prior art during prosecution. While different claim language was at issue in the then-pending claims of the '319 Patent, in my opinion a POSITA would have understood that the Applicant generally distinguished prior art on the basis of it not using the whole fruit, puree or juice of the Genipa Americana fruit, as opposed to the specific form of the co-processing material. (*See* '695 at 1:45-56.) For example, during prosecution of the '319 Patent, the Applicant argued that Toyama's use of "pure chemicals" or "true extracts" from the Huito fruit *in* reaction *with* "pure chemicals (including amino acids) and proteins" is different from the pending claims that "do not use extract/purified materials" from Huito fruit. (ADMWILD_00000202.) A POSITA would have understood that the applicant was focused on distinguishing Toyama's use of extracts from Huito since the claimed method clearly uses Huito fruit juice. In my opinion, a POSITA would have understood that the Applicant's arguments throughout this examination as distinguishing the then pending claims from the prior art by arguing: (1) the prior art is directed to purely chemical

54

genipin-containing compounds utilized as the component of limitation (a)(i); and/or (2) the prior art utilized chemical reactions between two purified chemical components of (a)(i) and (a)(ii). The Applicant did not argue in the prosecution history that the patented invention could not include juice from a Rubiaceae Family fruit (component of limitation (a)(i)) combined with an amino acid (component of limitation (a)(ii)).

143.    In my opinion, this is also consistent with how Oterra characterizes its Jagua Blue product, which is accused of infringing Claim 45. Oterra's product literature describes the Jagua Blue product as "derived from the fruit of the jagua tree (also known as **huito**), offers a safe and vibrant, ***naturally sourced blue color***." (ADMWILD_00001049 (emphasis added).) Oterra represents that its "natural blue" Jagua Blue product exhibits "robustness towards heat, light, and acidity." (*Id.* at ADMWILD_00001050.) This is so even though Oterra has separately asserted that "pure glycine" is used as a co-processing material during the process to make the Jagua Blue. (Dkt. 1, ¶ 39.) In my opinion, a POSITA would understand these real-world industry descriptions as consistent with the intrinsic evidence above that do not carve out "synthetic, pure chemicals."

144.    For at least the reasons above, a POSITA would have understood the meaning of the claim phrase "other juice or material" as "other juice or material" without further construction.

145.    To the extent Oterra contends that the patentee acted as its own lexicographer by expressly providing a special definition to "other juice or material" and/or clearly and unmistakably disavowed portions of the scope of that claim phrase, I have seen no evidence of that based on my review of the specification and file history. However, I reserve the right to respond to any such position from Oterra.

**E. "A Suitable Food-Grade Source that Contains at Least One Component Capable of Providing the Desired Color When Combined with the *Genipa americana* Fruit Juice Defined in (a)(i), Wherein the Food-Grade Source Comprises an Amino Acid"**

146.    I understand that the parties dispute the meaning of the phrase "a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid." Below are the positions identified by the parties for the proposed construction of this claim phrase:

| Term | ADM's Construction | Oterra's Construction |
|---|---|---|
| "a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid" | *No construction necessary; plain and ordinary meaning* | "Fruits, vegetables, grains, legumes, nuts, seeds, plant materials, animal materials, microbial materials, algal materials, and by-products that contain an amino acid, but not isolated amino acids" |

147.    In my opinion, a POSITA would have understood the plain and ordinary meaning of "a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid" to be "a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid" without any further construction necessary.

148.    My opinion is supported by how the claim phrase is used in the claims, and how it is used throughout the specification. For example, this phrase is part of the broader limitation of Claim 45 relating to the co-processing material of (a)(ii): "(ii) other juice or material from *a*

56

*suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid.*" (Claim 45 (emphasis added).) A POSITA reading Claim 45 would have understood that it does not limit the specific source of amino acid other than it must be "food-grade." In contrast, other unasserted claims specifically recite "other [juice or liquefied material] [made by the chemical or mechanical liquification of a solid material,] *from a suitable food-grade source selected from fruits, grains, seeds, beans, nuts, vegetables, plant materials, milk, dairy products, egg, meat, seafood, shellfish, microbial and algal material, and by-products from such sources*, the other material comprising juice or liquefied material made by chemical or mechanical liquification of a solid material that contain components capable of providing the desired color when combined with the juice defined in (a)(i)" (unasserted Claim 1 (emphasis added)); and "other material *from a suitable food-grade source selected from fruits, grains, seeds, beans, nuts, vegetables, plant materials, milk, dairy products, egg, meat, seafood, shellfish, microbial and algal material, and by-products from such sources*, the other material comprising juice or liquefied material made by chemical or mechanical liquification of a solid material that contain components capable of providing the desired color when combined with the juice defined in (a)(i), wherein the food-grade source comprises an amino acid" (unasserted Claim 22 (emphasis added)).

149.    In addition, the specification includes a detailed description of exemplary co-processing materials. (*See* '695 at 3:52-4:52.)  For example:

- "Specifically, the disclosure relates to the stable color products that are generated by processing Genipa americana fruit juice which contains genipin, genipin derivatives, or pre-genipin compounds, together with *other edible juices or extracts*

57

which contain amino acids, polypeptides, proteins, and compounds with one or more primary amine groups." (*id* at 1:23-29 (emphasis added));

- "The present disclosure relates to the preparation of stable colorants by mixing and co-processing fruit juice, particularly from Genipa americana, with ***other edible juices or extracts*** from fruit, vegetable, plant materials, grain, legume, nuts seeds, animal materials including milk and egg, microbial, and algal materials, which contain amino acids, or polypeptides, or proteins." (*id.* at 2:15-22 (emphasis added));

- "The present disclosure provides a method of producing natural stable color products wherein Genipa americana fruits are co-processed with ***other edible juices or extracts*** from fruits, vegetables, plant materials, grains, legumes, nuts, seeds, animal materials including milk and eggs, microbial, and algal materials that contain amino acids, polypeptides, and/or proteins." (*id.* at 2:33-39 (emphasis added));

- "The present disclosure provides a method of producing natural stable color products by using Genipa americana fruit juice with the ***various added edible materials***. Natural stable blue color is believed to be obtained when genipin and possibly genipin gentiobioside, which naturally exist in Genipa americana fruit, react with amino acids, polypeptides, or proteins, and other compounds with primary amine groups, in the ***various edible materials***." (*id.* at 2:59-66 (emphasis added));

- "The ***broad range of suitable edible materials*** comprises fruits, vegetables, grains, legumes, nuts, seeds, plant materials, animal materials including milk and eggs,

microbial and algal materials, and by-products from such sources, which contain amino acids, polypeptides, and proteins. These ***materials*** can be co-processed with the fruit or fruit juice of Genipa americana to produce natural stable colorants, especially blue color." (*id.* at 3:52-59 (emphasis added)); and

- "The ***co-process materials may be the extracts*** from any of the above sources ***and may comprise amino acids, polypeptides, proteins, or compounds with one or more primary amine groups***." (*id.* at 4:45-48 (emphasis added)).

150.    In my opinion, a POSITA reading Claim 45 in the context of the specification as a whole would have understood that the key common aspect of the disclosed co-processing "juice or material" was the "amino acids, polypeptides, or proteins, and other compounds with primary amine groups" in it because that is what reacts with the Genipa americana fruit to create the "[n]atural stable blue color." (*Id.* at 2:59-66 ("Natural stable blue color is believed to be obtained when genipin and possibly genipin gentiobioside, which naturally exist in Genipa americana fruit, react with amino acids, polypeptides, or proteins, and other compounds with primary amine groups, in the various edible ***materials***.") (emphasis added); *see also* 5:17-21; 5:47-50.) As shown in the examples above, while the specification identifies multiple exemplary potential juices or materials, the common denominator is that they "contain," ('695 at 1:23-29, 3:52-59), or "comprise" "amino acids, polypeptides, proteins, or compounds with one or more primary amine groups" (*id.* at 4:45-48). However, the fact that the "other juice or material" "comprise[s]" "amino acid" is already included in this limitation of Claim 45 so not required for the construction of "a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid."

151.    In my opinion, a POSITA would ***not*** have understood the plain and ordinary meaning of the claim phrase "a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid" to be "Fruits, vegetables, grains, legumes, nuts, seeds, plant materials, animal materials, microbial materials, algal materials, and by-products that contain an amino acid, but not isolated amino acids" in the context of the claims. Accordingly, in my opinion, Oterra's proposed construction does not align with the plain and ordinary meaning of the claim phrase because Oterra seeks to inappropriately limit the construction.

152.    For example, as shown above the plain language of Claim 45 does not limit how the other juice or material is made or the specific source of amino acid other than it must be "food-grade," whereas the plain language of other claims in the '695 Patent do. (*Compare* unasserted Claims 1 and 22 *with* Claim 45.) In view of this, in my opinion a POSITA would have understood that the patentee did not intend to similarly limit Claim 45.

153.    As another example, as shown above, the specification notes exemplary sources of the claimed co-processing material that includes "fruits, vegetables, grains, legumes, nuts, seeds, plant materials, animal materials, microbial materials, algal materials, or by-products thereof," (*see, e.g.*, '695, 3:52-55), the specification further states that the "***broad range of suitable edible materials***" to be used as co-processing materials "may be the extracts from any of the above sources ***and may comprise amino acids***, polypeptides, proteins, or compounds with one or more primary amine groups." (*Id.*, 4:45-48 (emphasis added).) A POSITA would have understood that this is consistent with how the patented invention was claimed in Claim 45.

154.    As another example, the specification explains that the co-processing material may include a "broad range of suitable edible materials comprises . . . microbial and algal materials, and by-products from such sources . . ." ('695 at 3:52-59.) In my opinion a POSITA would have understood that the specification's reference to microbial by-products would include amino acids created through microbial fermentation, which a POSITA would have considered an isolated amino acid. For example, it was well known that amino acids could be created as a by-product from microbial fermentation. (*See* Leuchtenberger, W. et al., *Biotechnological production of amino acids and derivatives: current status and prospects*. Appl. Microbiol. Biotechnol, 69, 1-8 (2005); *see also* Sanchez, S. et al., *Our microbes not only produce antibiotics, they also overproduce amino acids. J. of Antibiotics*, 71, 26-36 (2018) ("Through fermentation, micro-organisms growing on inexpensive carbon and nitrogen sources can produce a wide array of valuable products including amino acids.").)

155.    My opinion is further supported by the fact that the specification does ***not*** exclude "isolated amino acids" when distinguishing the present invention over the prior art. The specification acknowledges that "genipin is a key compound contributing to the gardenia blue whenever it reacts with amino acids (U.S. Pat. No. 4,878,921 [("Koga")])." ('695 at 1:48-51.) This prior art reference discloses "gardenia blue [] made as a chemical reaction product using geniposide extracted from Gardenia juice, purified genipin, or genipin derivatives, ***with isolated amino acids***." (*Id.* at 1:50-53 (emphasis added).) "In contrast, the process of the present invention utilizes whole fruit, puree or juice of genipin-containing plants to provide a natural color juice or concentrate." (*Id.* at 1:53-56). Therefore, in my opinion a POSITA would have understood that both Koga and the present invention are natural colors, but Koga uses "geniposide extracted from Gardenia juice, purified genipin, or genipin derivatives" whereas the present invention uses "whole

fruit, puree or juice of genipin-containing plants." (*Id.*). The specification does ***not*** distinguish the present invention from the use of "isolated amino acids," only the use of "geniposide extracted from Gardenia juice, purified genipin, or genipin derivatives."

156.    In my opinion, this is consistent with how the Applicant distinguished the prior art during prosecution. While different claim language was at issue in the then-pending claims of the '319 Patent, in my opinion a POSITA would have understood that the Applicant generally distinguished prior art on the basis of it not using the whole fruit, puree or juice of the Genipa Americana fruit, as opposed to the specific form of the co-processing material. (*See* '695 at 1:45-56.) For example, during prosecution of the '319 Patent, the Applicant argued that Toyama's use of "pure chemicals" or "true extracts" from the Huito fruit ***in*** reaction ***with*** "pure chemicals (including amino acids) and proteins" is different from the pending claims that "do not use extract/purified materials" from Huito fruit. (ADMWILD_00000202.) A POSITA would have understood that the applicant was focused on distinguishing Toyama's use of extracts from Huito since the claimed method clearly uses Huito fruit juice. In my opinion, a POSITA would have understood that the Applicant's arguments throughout this examination as distinguishing the then pending claims from the prior art by arguing: (1) the prior art is directed to purely chemical genipin-containing compounds utilized as the component of limitation (a)(i); and/or (2) the prior art utilized chemical reactions between two purified chemical components of (a)(i) and (a)(ii). The Applicant did not argue in the prosecution history that the patented invention could not include juice from *Genipa americana* fruit (component of limitation (a)(i)) combined with an amino acid (component of limitation (a)(ii)).

157.    In my opinion, this is also consistent with how Oterra characterizes its Jagua Blue product, which is accused of infringing Claim 45. Oterra's product literature describes the Jagua

Blue product as "derived from the fruit of the jagua tree (also known as **huito**), offers a safe and vibrant, **naturally sourced blue color**." (ADMWILD_00001049 (emphasis added).) Oterra represents that its "natural blue" Jagua Blue product exhibits "robustness towards heat, light, and acidity." (*Id.* at ADMWILD_00001050.) This is so even though Oterra has separately asserted that "pure glycine" is used as a co-processing material during the process to make the Jagua Blue. (*See* Dkt. 1 at ¶39.) In my opinion, a POSITA would understand these real-world industry descriptions as consistent with the intrinsic evidence above that do not carve out "isolated amino acids."

158.    To the extent Oterra contends that the patentee acted as its own lexicographer by expressly providing a special definition to the phrase "a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid" and/or clearly and unmistakably disavowed scope from that claim phrase I have seen no evidence of that based on my review of the specification and file history. However, I reserve the right to respond to any such position by Oterra.

### F.   "Stable, Natural Colors"

159.    I understand that the parties dispute the meaning of the phrase "stable, natural colors." Below are the positions identified by the parties for the proposed construction of this claim phrase:

| Term | ADM's Construction | Oterra's Construction |
|------|--------------------|-----------------------|
| "stable, natural colors" | *No construction necessary; plain and ordinary meaning* | *Indefinite* |

160.    In my opinion, a POSITA would have understood the plain and ordinary meaning of "stable, natural colors" to be "stable, natural colors" and no further construction is necessary.

161.    The claims of the '695 Patent support my opinion. For example, Claim 45 (and Claims 46-62, which depend therefrom) includes step (c) which specifies how the natural color is stabilized. In particular, step (c) recites "stabilizing the mixture against microbial growth, oxidation, organoleptic deterioration and to provide a stabilized color intensity, by applying a heat treatment." (Claim 45; *see also* Claims 1, 22.) Therefore, in my opinion a POSITA would have understood that the claims set forth that the "stabilization" is achieved by applying "a heat treatment," and that the mixture is stabilized "against microbial growth, oxidation, organoleptic deterioration," as well as to stabilize the "color intensity." (*Id.*) Additionally, the dependent claims flowing from Claim 45 further define the scope of the claim phrase as these claims recite additional details regarding the time and temperature of the heat treatment. (*See* Claims 46-50.)

162.    In my opinion, the use of this claim language in the claims is consistent with how a POSITA would have understood how to stabilize a natural color as to microbial growth, oxidation, organoleptic deterioration, and color intensity. For example, a POSITA would have understood the use of a heat treatment can improve color stability in genipin-derived blue colors. For example, the specification states that "it is believed that genipin, or genipin gentiobioside and geniposidic acid that are hydrolyzed to genipin and genipin derivatives by heating or the action of beta-glucosidases that exist naturally in the *Genipa americana* fruits, reacts with proteins and amino acids in the fruits to produce the resultant color (Paik, Y.; Lee, C.; Cho, M.; and Hahn, T. in J. Agric. Food Chem. 2001, 49, 403-432)." ('695 at 5:28-34.) Additionally, a POSITA would understand that the application of heat can degrade many strains of bacteria that not only can impact color reactions, but also the safety and shelf life of the end product for consumption.

163.    The specification further explains that the end result of the process is a stable color and that the heating contributes to the stability, which supports my opinion:

- "[T]he disclosure relates to the ***stable color products*** that are generated by processing Genipa americana fruit juice which contains genipin, genipin derivatives, or pre-genipin compounds, together with other edible juices or extracts which contain amino acids, polypeptides, proteins, and compounds with one or more primary amine groups." ('695 at 1: 23-29 (emphasis added));

- "Thus, a natural color, especially a natural blue colorant that is ***stable*** at low pH and to temperatures used in processing, would be of significant worldwide commercial interest." (*id.* at 1:36-39);

- "The product colors are not those expected from simple pigment blending, and the color products ***have great stability*** to acidity and heating." (*id.* at 2:21-23);

- "The present disclosure provides a method of producing ***natural stable color products*** wherein Genipa americana fruits are co-processed with other edible juices or extracts from fruits, vegetables, plant materials, grains, legumes, nuts, seeds, animal materials including milk and eggs, microbial, and algal materials that contain amino acids, polypeptides, and/or proteins." (*id.* at 2:33-39);

- "The present disclosure further provides natural color products that have desirable organoleptic properties and excellent compatibility with foods and food components, are intrinsically acceptable to consumers due to the nature of their raw materials and have certain nutritional values, and which also have ***very good stability*** over a broad pH range and good resistance in use to heat and light. Therefore, the products are suitable for use in various applications, such as foodstuffs, drugs, nutritional supplements, personal care stuffs, cosmetic, and animal feed." (*id.* at 2:40-49);

- "The present disclosure provides a method of producing *natural stable color products* by using Genipa americana fruit juice with the various added edible materials. Natural stable blue color is believed to be obtained when genipin and possibly genipin gentiobioside, which naturally exist in Genipa americana fruit, react with amino acids, polypeptides, or proteins, and other compounds with primary amine groups, in the various edible materials." (*id.* at 2:59-66);

- "*Heating in the process relates to enzyme reactions, color development, and color stability*" as "it is believed that genipin, or genipin gentiobioside and geniposidic acid are hydrolyzed to genipin and genipin derivatives by heating or the action of beta-glucosidases that exist naturally in the Genipa americana fruits, reacts with proteins and amino acids in the fruits to produce the resultant color" during heat treatment. ('695 at 5:26-33.)

- "*Heat may also control unwanted reactions*" like "the endogenous enzymes polyphenol oxidase and peroxidase which cause unwanted color and flavor changes." ('695 at 5:51-54.)

- "In the present process, *the heating regime contributes to a reproducible, stable and desired resultant color*." (*id.* at 5:56-58 (emphasis added));

- "*In general, in stability tests, color fade and changes in hue were within acceptable limits for commercial products and of similar magnitudes to those commonly known* for anthocyanin food colorants." (*id.* at 9:63-67 (emphasis added)).

164.    Furthermore, the examples included in the specification support my opinion. For example, Examples 4-6 describe different stability and application testing. (*See* '695 8:22-10:30.)

165.    In my opinion, in view of the intrinsic evidence shown above, a POSITA would have understood that the claimed process of Claim 45 resulted in a "stable, natural color" that was stabilized against multiple factors through heating. The purpose of this stabilization was to enhance the usability of the natural color in different applications.

166.    In view of the above, in my opinion, a POSITA would have understood the plain and ordinary meaning of "stable, natural colors" in the context of Claim 45 with reasonable certainty. My opinion is further supported by the fact that during prosecution of the original '319 Patent and '695 Patent, there was no § 112 indefiniteness rejection or any discussion at all based on the bounds of the phrase "stable, natural colors."

167.    In my opinion, this is also consistent with how Oterra characterizes its Jagua Blue product, which is accused of infringing Claim 45. Oterra's product literature describes the Jagua Blue product as "derived from the fruit of the jagua tree (also known as **_huito_**), offers a safe and vibrant, **_naturally sourced blue color_**." (ADMWILD_00001049 (emphasis added).) Oterra represents that its "natural blue" Jagua Blue product exhibits "**_robustness_** towards heat, light, and acidity." (_Id._ at ADMWILD_00001050.) Ecoflora, the manufacturer of the Jagua Blue product further stated that its Jagua Blue product fills the need for a "**_natural colorant that is stable at different stability conditions_**." (_See_ ADMWILD_00001038 (emphasis added).) Ecoflora represents that it is temperature and pH stable, and has high coloring power.  (_Id._) In my opinion, a POSITA would understand these real-world industry descriptions of stable, natural colors without specific limitations on the stability conditions.

168.    For at least the reason above, a POSITA would have understood the plain and ordinary meaning of the claim phrase "stable, natural colors" as "stable, natural colors" with

reasonable certainty. I understand that Oterra contends that this phrase is indefinite and I reserve the right to respond to any such position by Oterra.

### G. "Stable Natural Juice-Based Colorant"

169.    I understand that the parties dispute the meaning of the phrase "stable natural juice-based colorant." Below are the positions identified by the parties for the proposed construction of this claim phrase:

| Term | ADM's Construction | Oterra's Construction |
|---|---|---|
| "stable natural juice-based colorant" | *No construction necessary; plain and ordinary meaning* | *Indefinite* |

170.    In my opinion, a POSITA would have understood that the plain and ordinary meaning of the claim phrase "stable natural juice-based colorant" is "stable natural juice-based colorant" and no further construction is necessary.

171.    In my opinion, the Asserted Claims provide the necessary context to this claim phrase as this is the product of the claimed method as set forth in Claim 45. Claim 45 includes step (c) which specifies how the natural color is stabilized. More specifically, step (c) recites "stabilizing the mixture against microbial growth, oxidation, organoleptic deterioration and to provide a stabilized color intensity, by applying a heat treatment." (Claim 45; *see also* Claim 1, 22.) Therefore, the claims state that the "stabilization" is achieved by applying "a heat treatment," and that the mixture is stabilized "against microbial growth, oxidation, organoleptic deterioration," as well as to stabilize the "color intensity." (*Id.*) Additionally, the dependent claims flowing from Claim 45 further define the scope of the claim phrase as these claims recite additional details regarding the time and temperature of the heat treatment. (*See* Claims 46-50.) Dependent Claims 53 and 54 then specify that the "stable natural juice-based colorant" is "made according to the method of claim 45" and 50, respectively—i.e. the resulting product of the claimed methods.

68

172.    In my opinion, the use of this claim language in the claims is consistent with how a POSITA would have understood to stabilize a natural color as to microbial growth, oxidation, organoleptic deterioration, and color intensity. For example, a POSITA would have understood the use of a heat treatment can improve color stability in genipin-derived blue colors.  For example, the specification states that "it is believed that genipin, or genipin gentiobioside and geniposidic acid that are hydrolyzed to genipin and genipin derivatives by heating or the action of beta-glucosidases that exist naturally in the Genipa americana fruits, reacts with proteins and amino acids in the fruits to produce the resultant color (Paik, Y.; Lee, C.; Cho, M.; and Hahn, T. in J. Agric. Food Chem. 2001, 49, 403-432)." ('695 at 5:28-34.) Additionally, a POSITA would understand that the application of heat can degrade many strains of bacteria that not only can impact color reactions, but also the safety and shelf life of the end product for consumption.

173.    The specification further explains that the end result of the process is a stable color and that the heating contributes to the stability, which supports my opinion:

- "[T]he disclosure relates to the ***stable color products*** that are generated by processing Genipa americana fruit juice which contains genipin, genipin derivatives, or pre-genipin compounds, together with other edible juices or extracts which contain amino acids, polypeptides, proteins, and compounds with one or more primary amine groups." ('695 at 1: 23-29 (emphasis added));

- "Thus, a natural color, especially a natural blue colorant that is ***stable*** at low pH and to temperatures used in processing, would be of significant worldwide commercial interest." (*id.* at 1:36-39);

- "The product colors are not those expected from simple pigment blending, and the color products ***have great stability*** to acidity and heating." (*id.* at 2:21-23);

69

- "The present disclosure provides a method of producing **_natural stable color products_** wherein Genipa americana fruits are co-processed with other edible juices or extracts from fruits, vegetables, plant materials, grains, legumes, nuts, seeds, animal materials including milk and eggs, microbial, and algal materials that contain amino acids, polypeptides, and/or proteins." (_id._ at 2:33-39);

- "The present disclosure further provides natural color products that have desirable organoleptic properties and excellent compatibility with foods and food components, are intrinsically acceptable to consumers due to the nature of their raw materials and have certain nutritional values, and which also have **_very good stability_** over a broad pH range and good resistance in use to heat and light. Therefore, the products are suitable for use in various applications, such as foodstuffs, drugs, nutritional supplements, personal care stuffs, cosmetic, and animal feed." (_id._ at 2:40-49);

- "The present disclosure provides a method of producing **_natural stable color products_** by using Genipa americana fruit juice with the various added edible materials. Natural stable blue color is believed to be obtained when genipin and possibly genipin gentiobioside, which naturally exist in Genipa americana fruit, react with amino acids, polypeptides, or proteins, and other compounds with primary amine groups, in the various edible materials." (_id._ at 2:59-66);

- "**_Heating in the process relates to enzyme reactions, color development, and color stability_**" as "it is believed that genipin, or genipin gentiobioside and geniposidic acid are hydrolyzed to genipin and genipin derivatives by heating or the action of beta-glucosidases that exist naturally in the Genipa americana fruits, reacts with

proteins and amino acids in the fruits to produce the resultant color" during heat treatment. ('695 at 5:26-33.)

- "*Heat may also control unwanted reactions*" like "the endogenous enzymes polyphenol oxidase and peroxidase which cause unwanted color and flavor changes." ('695 at 5:51-54.)

- "In the present process, *the heating regime contributes to a reproducible, stable and desired resultant color*." (*id.* at 5:56-58 (emphasis added));

- "*In general, in stability tests, color fade and changes in hue were within acceptable limits for commercial products* and of similar magnitudes to those commonly known for anthocyanin food colorants." (*id.* at 9:63-67 (emphasis added)).

174.    Furthermore, the examples included in the specification support my opinion. For example, Examples 4-6 describe different stability and application testing. (*See* '695 8:22-10:30.)

175.    In my opinion, in view of the intrinsic evidence shown above, a POSITA would have understood that the claimed process of Claim 45 resulted in a "stable, natural color" that was stabilized against multiple factors through heating. The purpose of this stabilization was to enhance the usability of the natural color in different applications.

176.    Furthermore, the specification supports my opinion in that it makes clear the "juice-based colorant" relates to a *Genipa americana* juice-based colorant as claimed in Claim 45, for example:

- "A method of preparing colored products from edible materials comprises processing *Genipa americana fruit juice* . . ." ('695 at Abstract);

71

- "The present disclosure provides a method of producing natural stable color products by using *Genipa americana fruit juice* with the various added edible materials." (*id.* at 2:59-61); and

- "To produce a stable, blue color, the suitable pH of *Genipa americana fruit juice* and co-process materials . . ." (*id.* at 5:64-65).

177.    In view of the above, in my opinion, a POSITA would have understood the plain and ordinary meaning of "stable natural juice-based colorant" to be "stable natural juice-based colorant" in the context of Claims 53 and 54 with reasonable certainty. My opinion is further supported by the fact that during prosecution of the original '319 Patent and '695 Patent, there was no § 112 indefiniteness rejection or any discussion at all based on the bounds of the phrase "stable natural juice-based colorant."

178.    In my opinion, this is also consistent with how Oterra characterizes its Jagua Blue product, which is accused of infringing Claims 53 and 54. Oterra's product literature describes the Jagua Blue product as "derived from the fruit of the jagua tree (also known as *huito*), offers a safe and vibrant, *naturally sourced blue color*." (ADMWILD_00001049 (emphasis added).) Oterra represents that its "natural blue" Jagua Blue product exhibits "*robustness* towards heat, light, and acidity." (*Id.* at ADMWILD_00001050.) Ecoflora, the manufacturer of the Jagua Blue product further stated that its Jagua Blue product fills the need for a "*natural colorant that is stable at different stability conditions*." (*See* ADMWILD_00001038 (emphasis added).) Ecoflora represents that it is temperature and pH stable, and has high coloring power. (*Id.*) In my opinion, a POSITA would understand these real-world industry descriptions of stable, natural colorants without specific limitations on the stability conditions.

72

179.    For at least the reason above, a POSITA would have understood the plain and ordinary meaning of the claim phrase "stable natural juice-based colorant" as "stable natural juice-based colorant" with reasonable certainty. I understand that Oterra contends that this phrase is indefinite and I reserve the right to respond to any such position by Oterra.

## H. "Predetermined Period of Time"

180.    I understand that the parties dispute the meaning of the phrase "predetermined period of time." Below are the positions identified by the parties for the proposed construction of this claim phrase:

| Term | ADM's Construction | Oterra's Construction |
|---|---|---|
| "predetermined period of time" | "period of time determined in advance" | *Indefinite*; alternatively, "any period of time determined in advance" |

181.    While the term "predetermined period of time" is clear, in my opinion, a POSITA would have understood that the plain and ordinary meaning is "period of time determined in advance."

182.    My opinion is supported by how the claim phrase is used in the claims, and how it is used throughout the specification. For example, dependent Claim 46 states "The method according to claim 45 wherein the heat treatment comprises heating the mixture for a predetermined period of time." Claims 47-49 depend from Claim 46 and further define the scope of the phrase "predetermined period of time." For example, where the predetermined period of time is about 0.1 to 8 hours (*see* Claim 47); 0.1 to 4 hours (*see* Claim 48); and 0.1 to 1 hours (*see* Claim 49).

183.    The specification—like the claims—support my opinion by specifying that a heat treatment can be applied to the mixture of Genipa americana juice and a co-processing material

for a period of time determined in advance, which stabilizes the mixture. (*See* '695, 4:65-67; *see also, e.g.*, Fig. 1; Table 1; 7:19-21 ([Example #1] "Samples were . . . then heated to 80° C for 0.5-2.5 hours until the color was stable."); 7:57-59 ([Example #2] "[T]he filtrate was heated in a hot-water bath (80° C) for 1.5 hours; after which the solution was blue in color."); 8:9-11 ([Example #3] "The filtrate was returned to the cleaned kettle and heated to about 75-80° C for 1.5 hours . . . result[ing] [in a] blue solution").) Applying a heat treatment can not only improve color stability in genipin-derived blue colors, but also degrade many strains of bacteria that can impact color reactions, safety, and shelf life of the end product for consumption. (*See* Paik, Y.; Lee, C.; Cho, M.; and Hahn, T. in J. Agric. Food Chem. (2001), 49, 403-432.) Additionally, a POSITA would generally understand that when performing the claimed method(s) a period of time to subject the mixture to a heat treatment would be selected in advance by the person conducting the process as this is standard practice.

184.    In my opinion, a POSITA would not have understood the plain and ordinary meaning of the claim phrase "predetermined period of time" to include "any" amount of time. Accordingly, in my opinion, Oterra's proposed construction does not align with the plain and ordinary meaning of the claim phrase. For example, a POSITA would have understood that a specific range of time is required to achieve the identified purpose of the step in the process, which in my experience is general practice in any color forming process. Here, the identified purpose of step (c) of Claim 45, which is the heat treatment step, is "stabilizing the mixture against microbial growth, oxidation, organoleptic deterioration and to provide a stabilized color intensity, by applying a heat treatment." Moreover, specific time ranges are recited in Claims 46-50, which depend from Claim 45. Applying a construction in which those dependent Claims 46-50 also

include "any" would run counter to the claim language, as well as the specific timeframes disclosed in Claims 46-50, Figure 1, Table 1, and Examples 1-3, 7, 9-10.

185.    For at least the reason above, a POSITA would have understood the plain and ordinary meaning of the claim phrase "predetermined period of time" to be "period of time determined in advance" with reasonable certainty.

186.    I understand that Oterra contends that this phrase is indefinite, which I disagree with for at least the reasons above, but I reserve the right to respond to any such position by Oterra.

## I. "Genipa americana Fruit Juice"

187.    I understand that the parties dispute the meaning of the phrase "*genipa americana fruit juice*." Below are the positions identified by the parties for the proposed construction of this claim phrase:

| Term | ADM's Construction | Oterra's Construction |
|---|---|---|
| "*Genipa americana* fruit juice" | "Juice from *Genipa americana* fruit" | "Juice from *Genipa americana* fruit, but not as an extract" |

188.    While the term "*Genipa americana* fruit juice" is clear on its face, in my opinion, a POSITA would have understood that the plain and ordinary meaning is "juice from *Genipa americana* fruit."

189.    My opinion is supported by how the claim phrase is used in the claims, and how it is used throughout the specification. For example, both independent and dependent claims of '695 make clear that it is the juice from the Genipa americana fruit that is being used in the color-forming process. (*See, e.g.*, Claim 45 ("a. forming a mixture comprising: (i) Genipa americana fruit juice . . .(ii)  other juice or material"); Claim 59-61 ("obtaining the Genipa americana fruit juice from the skinless Genipa americana fruit.").)

190.    Furthermore, the specification supports my opinion:

- "Specifically, the disclosure relates to the stable color products that are generated by processing *Genipa americana fruit juice* which contains genipin, genipin derivatives, or pre-genipin compounds, together with other edible juices or extracts which contain amino acids, polypeptides, proteins, and compounds with one or more primary amine groups." ('695 at 1:23:29 (emphasis added));

- "The present disclosure relates to the preparation of stable colorants by mixing and co-processing *fruit juice, particularly from Genipa americana*, with other edible juices or extracts from fruit, vegetable, plant materials, grain, legume, nuts seeds, animal materials including milk and egg, microbial, and algal materials, which contain amino acids, or polypeptides, or proteins." (*id.* at 2:15-22 (emphasis added));

- "The present disclosure provides a method of producing natural stable color products by using *Genipa americana fruit juice* with the various added edible materials." (*id.* at 2:59-61 (emphasis added));

- "*All known and practiced juice extraction techniques and operations*, and processing technologies associated with non juice components claimed, *are considered suitable to prepare the color juices of this invention* and are incorporated by reference herein." (*id.* at 2:66-3:4 (emphasis added));

- "These materials can be co-processed with the *fruit or fruit juice of Genipa americana* to produce natural stable colorants, especially blue color." (*id.* at 3:52-59 (emphasis added)); and

- "In order to produce the colorants of the present disclosure, the mature Genipa americana are co-processed with other fruits such as watermelon *by conventional*

76

***methods well known in the art in order to extract juice from fruit***." (*id.* at 4:54-57 (emphasis added)).

191.    In my opinion, a POSITA would ***not*** have understood the plain and ordinary meaning of the claim phrase "*Genipa americana* fruit juice" to exclude "juice from *Genipa americana* fruit" "as an extract." Accordingly, in my opinion, Oterra's proposed construction of "Juice from *Genipa americana* fruit, but not as an extract" does not align with the plain and ordinary meaning of the claim phrase. For example, the specification clearly states that "[a]ll known and practiced ***juice extraction techniques*** and operations and processing technologies . . . are considered suitable to prepare the color juices of this invention and are incorporated by reference herein." ('695 at 2:66-3:4.) To exclude an "extract" would run contrary to the plain language of the juicing techniques outlined in the specification.

192.    To the extent Oterra contends that the patentee acted as its own lexicographer by expressly providing a special definition to the phrase "*Genipa americana* fruit juice" and/or clearly and unmistakably disavowed juice "as an extract" from the scope of that claim phrase, I have seen no evidence of that based on my review of the specification and file history. However, I reserve the right to respond to any such position by Oterra.

## XIII.    CONCLUSION

193.    I reserve the right to supplement my opinions in the future to respond to any arguments that Oterra raises and to take into account new information as it becomes available to me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  March 10, 2025

_____
Alireza Abbaspourrad, Ph.D.

78