## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OTERRA A/S and OTERRA, LLC,<br><br>Plaintiffs<br><br>v.<br><br>WILD FLAVORS, INC. and ARCHER-DANIELS-MIDLAND CO.,<br><br>Defendants. | |
| WILD FLAVORS, INC.,<br><br>Counterclaim Plaintiff,<br><br>v.<br><br>OTERRA A/S and OTERRA, LLC,<br><br>Counterclaim Defendants. | C.A. No. 23-1376-JHS<br><br>**JURY TRIAL DEMANDED** |

## WILD FLAVORS, INC. AND ARCHER-DANIELS-MIDLAND CO.'S RESPONSIVE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE EXPERT REPORT OF ALIREZA ABBASPOURRAD, PH.D.

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................. 1

II.  NATURE AND STAGE OF THE PROCEEDINGS ........................................... 1

III.  SUMMARY OF THE ARGUMENT .................................................................. 2

IV.  FACTUAL BACKGROUND ............................................................................. 3

V.  RELEVANT LEGAL STANDARDS ................................................................ 4

   A.  Claim Construction ..................................................................................... 4

   B.  Admissibility Under Federal Rule of Evidence 702 and the Extreme Sanction of Striking Expert Opinion ............................................................................................. 5

VI.  ARGUMENT ...................................................................................................... 6

   A.  Oterra's Motion Does Not Come Close to Showing that It Is Entitled to the Extraordinary Relief of an Exclusionary Sanction ....................................................................... 6

   B.  Dr. Abbaspourrad's Opinion Does Not Improperly Rely on Materials Relating to the Accused Product .......................................................................................... 7

   C.  Dr. Abbaspourrad's Opinion Applies Sound Claim Interpretation Methodology ............ 10

   D.  Dr. Abbaspourrad's Declaration Does Not Exceed the Permissible Scope of Expert Testimony By Including "Inappropriate Legal Opinions" ............................................... 14

   E.  Oterra's Arguments Go to the Weight to be Afforded to the Expert's Opinions ............. 17

VII.  CONCLUSION .................................................................................................. 19

**TABLE OF AUTHORITIES**

**Cases**                                                                                    **Page(s)**

*AngioScore, Inc. v. TriReme Med., Inc.*,
   50 F. Supp. 3d 1276 (N.D. Cal. 2014) ...................................................................18

*Bayer Healthcare Pharms., Inc. v. River's Edge Pharms., LLC*,
   2015 WL 11122102 (N.D. Ga. Feb. 17, 2015), *report and recommendation*
   *adopted*, 2015 WL 11122103 (N.D. Ga. Mar. 16, 2015)...........................................18

*Biovail Lab'ys Int'l SRL v. Cary Pharms. Inc.*,
   2010 WL 2132021 (D. Del. May 26, 2010)...........................................................6, 7

*Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*,
   2010 WL 3907490 (D. Del. Sept. 21, 2010) ............................................................16

*Dasso Int'l, Inc. v. Moso N. Am., Inc.*,
   2021 WL 3476197 (D. Del. July 25, 2021), *report and recommendation*
   *adopted*, 2021 WL 4427168 (D. Del. Sept. 27, 2021) ...........................................5, 6

*Eis, Inc. v. Intihealth Ger GMBH*,
   2023 WL 346631 (D. Del. Jan. 9, 2023) ..................................................................8

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000)..................................................................................5

*Every Penny Counts, Inc. v. Am. Express Co.*,
   563 F.3d 1378 (Fed. Cir. 2009)..............................................................................8

*Genuine Enabling Tech. LLC v. Nintendo Co., Ltd.*,
   29 F.4th 1365 (Fed. Cir. 2022) .............................................................................16

*Goldenberg v. Cytogen, Inc.*,
   373 F.3d 1158 (Fed. Cir. 2004)..............................................................................17

*Heller v. Shaw Indus., Inc.*,
   167 F.3d 146 (3d Cir. 1999)....................................................................................6

*Kyowa Hakko Bio, Co., Ltd v. Ajinomoto Co.*,
   2019 WL 10092522 (D. Del. Apr. 1, 2019)..........................................................5, 8

*LG Display Co. v. AU Optronics Corp.*,
   265 F.R.D. 189 (D. Del. 2010) ............................................................................18

*Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*,
   152 F.3d 1368 (Fed. Cir. 1998)..............................................................................4

*Markman v. Westview Instrum., Inc.*,
517 U.S. 370 (1996).........................................................................................4, 18

*Markman v. Westview Instrum., Inc.*,
52 F.3d 967 (Fed. Cir. 1995)..................................................................................4

*Ondeo Nalco Co. v. EKA Chems., Inc.*,
2003 WL 1524658 (D. Del. Mar. 21, 2003) ........................................................16

*Pall Corp. v. Hemasure Inc.*,
181 F.3d 1305 (Fed. Cir. 1999).............................................................................5

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994)............................................................................5, 6, 7

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)...................................................................*passim*

*Pineda v. Ford Motor Co.*,
520 F.3d 237 (3d Cir. 2008)..................................................................................5

*Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*,
459 F.3d 1311 (Fed. Cir. 2006).....................................................................4, 7, 8

*SRI Int'l v. Matsushita Elec Corp. of Am.*,
775 F.2d 1107 (Fed. Cir. 1985).............................................................................8

*Starhome GmbH v. AT&T Mobility LLC*,
743 F.3d 849 (Fed. Cir. 2014)...............................................................................4

*Syngenta Seeds, Inc. v. Monsanto Co.*,
2004 WL 2106583 (D. Del. Sept. 8, 2004) .........................................................16

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
659 F.3d 1376 (Fed. Cir. 2011).............................................................................8

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
442 F.3d 1322 (Fed. Cir. 2006).....................................................................5, 8, 9

## Statutes, Rules & Regulations

Fed. R. Evid. 702 ..............................................................................................5, 18

Fed. R. Evid. 703 .................................................................................................10

## I.    INTRODUCTION

Unhappy with how their litigation-driven claim construction positions are positioned, Oterra A/S and Oterra, LLC (collectively, "Oterra") now seek to "strike" an entire—properly-submitted—78-page expert declaration and testimony based on very narrow and misplaced grounds. But as shown below, nothing set forth in Oterra's brief comes close to supporting such extraordinary relief. Oterra's motion does not assert any of the typical grounds for striking expert disclosures at the claim construction stage. For example, Oterra does not challenge the timeliness of the disclosure, allege a Rule 26 or other violation, claim any prejudice, or dispute Dr. Abbaspourrad's qualifications or his status as a person of ordinary skill in the art. (*See* D.I. 72.) Instead, Oterra's motion criticizes the reasoning underlying a small subset of Dr. Abbaspourrad's opinions and the weight the Court should give them during claim construction—issues more appropriately raised in Oterra's responsive claim construction brief, not in a motion to strike.

Even if any of Oterra's criticisms were valid (they are not), exclusion would not be warranted where—as here—the Court is readily able to evaluate the legal meaning of disputed claim terms under well-established precedent and framework, including consideration of expert evidence. What Oterra really seeks is more briefing before the upcoming claim construction hearing to try to bolster its arguments and discredit Archer-Daniels-Midland Co. and Wild Flavors, Inc. (collectively, "ADM"). As shown below, Oterra's motion is improper and unwarranted, and it should be denied.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

This is a one patent case between competitors relating to natural blue colorants. Oterra initiated this declaratory judgment case on December 4, 2023, to which Wild Flavors counterclaimed infringement by Oterra of Claims 45-62 of U.S. Patent No. RE46,695. (D.I. 1, 26.)

Fact discovery is proceeding and is scheduled to close on December 12, 2025, followed by expert discovery, case dispositive motions, and trial in September 2026. (*See generally* D.I. 34.)

The parties simultaneously filed opening briefs on claim construction on March 10, 2025, and responsive claim construction briefs on April 11, 2025. (D.I. 58, 61, 66, 70.) Both parties supported their briefing with expert declarations: the declaration of M. Monica Giusti, Ph.D., for Oterra (D.I. 61-2) and the declaration of Alireza Abbaspourrad, Ph.D., for ADM (D.I. 60). A claim construction hearing is scheduled for June 12, 2025. (D.I. 34, ¶ 11.)

## III.    SUMMARY OF THE ARGUMENT

1.    Oterra's request to strike Dr. Abbaspourrad's declaration and preclude his testimony is a baseless and extreme sanction unsupported by legal precedent or the record.

2.    Certain of Dr. Abbaspourrad's opinions reference the accused product and industry descriptions as additional context and support for his analysis, which is appropriate under applicable law. Moreover, each of Dr. Abbaspourrad's opinions are grounded in and consistent with the intrinsic record.

3.    Oterra's assertion that Dr. Abbaspourrad applied incorrect claim interpretation principles has no basis. His declaration sets forth the correct legal standards for claim construction and his analysis followed those standards. His analysis properly relies on the intrinsic evidence, including the specification and prosecution history. His deposition confirms his understanding of the correct approach and that he did not intend to change his written opinions. Moreover, Oterra's assertion that he "construed" Table 1 of the specification in view of the claims, as opposed to the claims in view of the specification, is meritless as the uncited portions of his declaration and deposition testimony show.

4.    Dr. Abbaspourrad's declaration in no way includes "inappropriate legal opinions," thereby exceeding the bounds of proper expert opinion. Instead, his opinions appropriately

consider and discuss the relevance of the prosecution history, unasserted claims, and claim differentiation to the meaning of the disputed claims from the perspective of a POSITA.

5.    Finally, claim construction is a legal question for the Court, not the jury. Should the Court take issue with any aspect of Dr. Abbaspourrad's opinion, the Court has discretion to evaluate and weigh expert testimony and can properly assess the relevance and reliability of expert opinions on its own accord. In view of this, there is no basis to strike his opinion in full or in part.

## IV.    FACTUAL BACKGROUND

The relevant facts are straightforward. On January 27, 2025, ADM disclosed Alireza Abbaspourrad, Ph.D. as a potential expert in this matter. Dr. Abbaspourrad is a tenured professor in the Department of Food Science at Cornell University and has extensive expertise in food chemistry, food additives, and food colorants, including stable, natural colors and colorants. (*See* D.I. 60 ¶¶ 6-16.) Oterra did not challenge Dr. Abbaspourrad as an expert in this matter. On March 10, 2025, ADM filed the Declaration of Alireza Abbaspourrad, Ph.D., Regarding Claim Construction (D.I. 60) contemporaneously with ADM's opening claim construction brief (D.I. 58). Dr. Abbaspourrad's declaration was robust and well supported, spanning 78 pages and 193 paragraphs and citing numerous resources and evidence. (*See* D.I. 60.) Oterra had a full and fair opportunity to depose Dr. Abbaspourrad regarding his declaration and expert opinions, which it did for a full day on March 31, 2025. (D.I. 70-2; D.I. 72-2.)

On April 4, 2025, a mere week before the parties' responsive claim construction briefs were due, Oterra's counsel requested an increase in page limits by 5 pages—a more than 25% increase of the 20-page limit set in the scheduling order for both initial and responsive briefs. (*See* D.I. 34, ¶ 8.) Oterra did not provide a basis for its last-minute request for such an extensive page extension, and when ADM pointed that out, Oterra withdrew its request on April 7, 2025.

On April 9, 2025—two days before responsive claim construction briefs were due—Oterra

3

indicated it intended to file a motion to strike Dr. Abbaspourrad's March 10, 2025 declaration (D.I. 60). The parties conferred on April 10 and did not reach agreement. Oterra's motion followed on April 11, 2025, the same day the parties filed their responsive claim construction briefs.

## V.    RELEVANT LEGAL STANDARDS

### A.  Claim Construction

Claim construction is a question of law. *Markman v. Westview Instrum., Inc.*, 517 U.S. 370, 384 (1996). Claim terms are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art, in view of the specification and prosecution history. *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014). As a result, claim construction begins with an analysis of intrinsic evidence, comprising the claims, the specification, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315-19 (Fed. Cir. 2005).

District courts may also rely on extrinsic evidence when construing claims. *Phillips*, 415 F.3d at 1317. In this context, extrinsic evidence consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (quoting *Markman v. Westview Instrum., Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)). The Federal Circuit has outlined that "extrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318; *see also Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1373 (Fed. Cir. 1998) (extrinsic evidence "always may be admitted by the trial court to educate itself about the patent and the relevant technology").

Furthermore, the Federal Circuit has repeatedly held that "a trial court may consult the accused device for context that informs the claim construction process." *Serio-US Indus., Inc. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1319 (Fed. Cir. 2006). "While a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326–27 (Fed. Cir. 2006); *Pall Corp. v. Hemasure Inc.*, 181 F.3d 1305, 1308 (Fed. Cir. 1999) ("Although the construction of the claim is independent of the device charged with infringement, it is convenient for the court to concentrate on those aspects of the claim whose relation to the accused device is in dispute."). Moreover, how a term is used in the industry may be relevant to claim construction. *See Kyowa Hakko Bio, Co., Ltd v. Ajinomoto Co.*, 2019 WL 10092522, at *1 (D. Del. Apr. 1, 2019).

### B. Admissibility Under Federal Rule of Evidence 702 and the Extreme Sanction of Striking Expert Opinion

Federal Rule of Evidence 702, which governs the use of expert testimony, has a "liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). Rule 702 "embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). Specifically, courts must look to "qualifications of experts, the reliability of the scientific methodologies applied, and the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Dasso Int'l, Inc. v. Moso N. Am., Inc.*, 2021 WL 3476197, at *5 (D. Del. July 25, 2021), *report and recommendation adopted*, 2021 WL 4427168 (D. Del. Sept. 27, 2021) (quotation omitted). "The question of whether an expert's testimony is admissible based on his qualifications, reliability, and fit is committed to the court's

discretion." *Id.* (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994)). Moreover, "even if the judge believes 'there are better grounds for some alternative conclusion,' and that there are some flaws in the scientist's methods, if there are 'good grounds' for the expert's conclusions, it should be admitted." *Id.* (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152-53 (3d Cir. 1999)). Accordingly, striking an expert's opinion at claim construction is an "extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Biovail Lab'ys Int'l SRL v. Cary Pharms. Inc.*, 2010 WL 2132021, at *2 (D. Del. May 26, 2010) (quoting *In re Paoli*, 35 F.3d at 791–92).

## VI.    ARGUMENT

Oterra's motion is heavily flawed and fails for several reasons. It provides no basis for the extreme relief sought of striking Dr. Abbaspourrad's entire declaration. Even if Oterra had any reasonable grounds to bring this motion to strike (which it does not), Oterra's arguments regarding the reliability of Dr. Abbaspourrad's testimony also fail on the merits because they have no sound basis in law or fact. Dr. Abbaspourrad properly considered the intrinsic and extrinsic evidence under the framework of controlling legal precedent. Finally, Oterra's motion makes clear that it has not considered the procedural posture of this case—namely, that Dr. Abbaspourrad's expert testimony is extrinsic evidence proffered to aid the Court in claim construction. Oterra's arguments at most go to the weight that the Court may provide to the expert's opinions in evaluating the issues for claim construction. Each of these issues are addressed in turn below.

### A. Oterra's Motion Does Not Come Close to Showing that It Is Entitled to the Extraordinary Relief of an Exclusionary Sanction

As a preliminary matter, Oterra's requested relief of striking Dr. Abbaspourrad's expert declaration in its entirety, and precluding his testimony at the claim construction hearing is not only baseless as discussed further below, but also an extraordinary overreach. "Exclusion of

'critical evidence'" in a patent case is an "extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Biovail*, 2010 WL 2132021 at *2. "Here, the [Abbaspourrad] Declaration is 'critical evidence,' as it supports [ADM]'s position with respect to claim construction, which is the issue to be addressed at the *Markman* hearing. Although expert declarations are extrinsic evidence, and therefore not as reliable as intrinsic evidence, they are among the materials the Court may properly consider in construing the claims of a patent." *Id.* Oterra has made absolutely no showing or argument that there was any "willful deception" or "flagrant disregard of a court order" that could merit such an extreme sanction, nor could it. *In re Paoli*, 35 F.3d at 791-92. It is thus unsurprising that Oterra fails to cite any case law in its brief that would support striking an expert report, in its entirety, under analogous circumstances. Accordingly, Oterra's requests that the Court strike Dr. Abbaspourrad's expert report in its entirety and preclude him from testifying at the hearing on claim construction should be denied.

### B. Dr. Abbaspourrad's Opinion Does Not Improperly Rely on Materials Relating to the Accused Product

Oterra's claim that Dr. Abbaspourrad's opinion must be stricken because it relies "at least in part on improper extrinsic evidence"—such as marketing materials and an FDA memorandum concerning the accused product—fails on both legal and factual grounds. Oterra ignores settled law permitting an expert's consideration of such materials in the context of claim construction, and Oterra mischaracterizes how Dr. Abbaspourrad's opinion considers such materials.

First, it was entirely proper for Dr. Abbaspourrad to reference the technology at issue, including the accused products, as such information can be useful and probative in interpreting disputed claim terms, providing relevant context for their meaning. The Federal Circuit has made clear that "a trial court may consult the accused device for context that informs the claim

construction process." *Serio-US Indus.*, 459 F.3d at 1319. The law "does not forbid awareness of the accused product or process to supply the parameters and scope of the infringement analysis, including its claim construction component," nor does it "forbid any glimpse of the accused product or process during or before claim construction." *Wilson*, 442 F.3d at 1331; *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1383 (Fed. Cir. 2011) ("It is not inappropriate for a court to consider the accused devices when construing claim terms, for the purpose of 'claim construction' is to resolve issues of infringement."); *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1384 (Fed. Cir. 2009) (explaining that a court may consider accused products to provide context for claim construction, so long as it does not prejudge infringement).[1]

Second, the law is also clear that use of a term in industry can be relevant extrinsic evidence to consider during claim construction. Indeed, "[e]xperts and courts sometimes rely on industry practice as background in determining how a person skilled in the art would have understood claim language." *Kyowa*, 2019 WL 10092522 at *1 (allowing a 30(b)(6) deposition of plaintiff's corporate witness in advance of claim construction as the plaintiffs' understanding of the industry could be probative of a term's meaning). In fact, *Phillips* explicitly states that "extrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the

---

[1] Oterra's reliance on *SRI* and *Eis* is misplaced. These cases merely reaffirm the undisputed principle that claims are not construed "to cover" or "not to cover" an accused device. *See SRI Int'l v. Matsushita Elec Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985); *see also Eis, Inc. v. Intihealth Ger GMBH*, 2023 WL 346631, at *9 (D. Del. Jan. 9, 2023) ("a claim is construed in light of the intrinsic record—including the claims themselves, the specification, and the prosecution history of the patent—not in light of the accused device"). However, as discussed herein, Dr. Abbaspourrad did not rely on the accused product to define the scope of the claims. Rather, his references to the accused product served as background context to inform the claim construction process—an approach expressly permitted under Federal Circuit precedent. *See*, *Serio-US Indus.*, 459 F.3d at 1319. The authorities Oterra cites are inapposite.

court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318.

Dr. Abbaspourrad's opinion considers the accused products according to the legal principles described above:

The majority of Dr. Abbaspourrad's references to the accused product are merely part of the background section of his declaration added for context and do not factor into Dr. Abbaspourrad's substantive opinions. (*See, e.g.*, D.I. 60 ¶ 98 (stating that "[t]he accused product in this case is a blue colorant called 'Jagua Blue' or 'Jungle Blue' that Oterra sells and that is manufactured by Ecoflora"), ¶ 99 (stating that "Jagua Blue is 'derived from the fruit of the jagua tree (also known as huito), offers a safe and vibrant, naturally sourced blue color,'" and that "Oterra represents that its 'natural blue' Jagua Blue product exhibits 'robustness towards heat, light, and acidity"), ¶ 100 (noting that "Ecoflora represents that it is temperature and pH stable, and has high coloring power," and "Ecoflora's literature also includes a photo of its Jagua Blue product, a food application of its Jagua Blue, and cut huito fruit."), ¶ 101 (referencing statements in the FDA memorandum).) Again, these sections are completely appropriate as there is no requirement that Dr. Abbaspourrad be entirely unaware of the basis of the lawsuit or the products at issue. *See Wilson*, 442 F.3d at 1331.

The few paragraphs of his opinions that reference the accused products occur ***after his detailed consideration and analysis of the intrinsic evidence***. (*See, e.g.*, D.I. 60 at ¶¶ 133-141 (opining on how a POSITA would understand the term "other juice or material" based on the intrinsic evidence); ¶¶ 147-155 (opining on how a POSITA would understand the phrase "a suitable food-grade source that contains at least one component capable of providing the desired

color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid" based on the intrinsic evidence); ¶¶ 170-177 (opining on how a POSITA would understand the term "stable natural juice-based colorant" based on the intrinsic evidence).) Dr. Abbaspourrad's declaration simply states that his claim construction related opinions—based on his analysis of the intrinsic evidence—are further "consistent" with "real-world industry descriptions." (*See* D.I. 60 at ¶¶ 143, 157, 167, 178.) How such terms are used in the industry necessarily includes how Oterra—one of two companies who sell huito-derived blue colorant in the United States—has characterized its product.[2] This is allowed under the law. Moreover, Oterra does not contend that the statements made in the marketing materials or the FDA documents were somehow inaccurate, incorrect, or otherwise unreliable. Accordingly, Dr. Abbaspourrad appropriately considered such evidence in support of his opinions. *See* Fed. R. Evid. 703.

### C. Dr. Abbaspourrad's Opinion Applies Sound Claim Interpretation Methodology

Oterra next contends that Dr. Abbaspourrad's "testimony in his expert report is unreliable," because he allegedly "did not even know or apply the correct methodology for claim interpretation." (D.I. 72 at 12.) The evidence plainly fails to support Oterra's assertion. Oterra cites only two excerpts from Dr. Abbaspourrad's deposition which, even when viewed with a generous lens, do not show that he misunderstood or applied the wrong methodology for claim construction.

First, Oterra asserts that Dr. Abbaspourrad "did not understand the proper methodology for claim construction." (*Id.*) Although Oterra's briefing on this point is rather unclear, Oterra appears to contend that Dr. Abbaspourrad failed to consider the specification and prosecution history when construing the claims. This argument fails for a number of reasons:

---

[2] The same rationale applies to the relevance of how Wild Flavors has characterized its product as part of the relevant industry.

For one, Oterra does not contest that in his declaration Dr. Abbaspourrad properly applied the legal standards for claim construction and considered the specification and prosecution in forming his opinions.

Additionally, his deposition testimony does not evince a failure to consider the specification or prosecution history. As a fundamental point, Dr. Abbaspourrad confirmed during his deposition that he was relying on his expert report and had not changed his opinions. (*See* D.I. 60, § IV. "Legal Standards and Level of Ordinary Skill in the Art"; Ex. A Abbaspourrad Dep. Tr. 10:14-17.) The excerpt selectively cited by Oterra in its briefing, at most, indicates Dr. Abbaspourrad's confusion in dealing with a repetitive line of questioning regarding a patentee's ability to define claim terms and the fact that he is not a lawyer. In response to questioning, Dr. Abbaspourrad first confirmed his general understanding that a patent applicant may act as their own lexicographer. (D.I. 72-2 at 199:18-22; 199:23-200:1.) Next, Dr. Abbaspourrad articulated his understanding that a patentee can "make an amendment to change or clear, clarify, or explain to provide support for the terms they are using" during prosecution. (*Id.* at 200:10-22.) Dr. Abbaspourrad also detailed that this "process is iterative" and "can go back and forth" until the application is granted. (*Id.*) Apparently unsatisfied with this response, counsel for Oterra asked again whether Dr. Abbaspourrad was "aware that a patent applicant can define the meaning of a term in their claim through their amendments and arguments." (*Id.* at 51, 201:3-7.) In response, Dr. Abbaspourrad articulated that an applicant would ostensibly only define a claim term if necessary (e.g., if the term is not clear by itself). (*Id.* at 201:3-25.) Dr. Abbaspourrad then, for a fourth time in response to questioning, confirmed that an applicant can define claim terms. (*Id.* at 202:1-8.) Critically, Dr. Abbaspourrad affirmed his consideration of the prosecution statements by

the applicant and how they interact with statements in the specification. (*Id*. at 202:20-203:6.)[3]

Second, Oterra makes the novel allegation that Dr. Abbaspourrad "interpreted the specification in view of the claims," which it contends is somehow a violation of claim construction principles. (D.I. 72 at 14.) Oterra's assertion is not based at all on Dr. Abbaspourrad's opinions as stated in his declaration. Rather, to support this assertion, Oterra points to a single line of deposition questioning regarding whether the "b values" reported in Table 1 of the specification ("Table 1") are based on the CIE LAB scale or the Hunter Lab scale. Oterra appears to take issue with Dr. Abbaspourrad's indication during his deposition that his understanding of Table 1 in the specification is informed by the claims' clear recitation of the "CIE LAB scale" as being used to determine the "b value." (*Id.* at 12-14.) This is irrelevant and not a basis to strike his report.

For context, in paragraph 110 of his declaration, Dr. Abbaspourrad states that "Table 1 of the specification demonstrates the increased -b values of the CIE LAB as associated with a blue visual color given that ***a POSITA would have understood that an increased -b value on the Hunter lab scale would correlate with an increased -b value on the CIE LAB scale***." (D.I. 60 ¶ 110 (emphasis added).) Said differently, Oterra's apparent concern about whether the -b values in Table 1 are "Hunter lab scale" or "CIE LAB scale" (*see* D.I. 72-2 at 230:1-8) is of no consequence because if a given experiment results in an increased in -b value as measured by the Hunter Lab scale, the experiment will also result in an increased -b value as measured by the CIE LAB scale— a reality readily understood by a POSITA. *Id.*[4]

---

[3] Oterra fails to cite (or consider) this testimony, presumably because it squarely contradicts its assertion that Dr. Abbaspourrad failed to address the prosecution history or written description.

[4] Moreover, as a practical matter, the instrument used to measure the -b values shown in Table 1 of RE'695 was a Hunter Lab calorimeter (Color Quest XE, USA). (*See* D.I. 26-1, '695 Patent at 7:23-25.) A Hunter Lab calorimeter is able to show -b values in both Hunter lab scale and CIE LAB, depending on the setting. (*See, e.g.*, D.I. 72-2 at 230:4-8.) However, as Dr. Abbaspourrad testified, whether the values in Table 1 are Hunter or CIE LAB is immaterial as the general

Oterra's brief omits the language of paragraph 110, despite that Dr. Abbaspourrad repeatedly used it to explain his understanding of Table 1. Indeed, his testimony confirmed his understanding that the -b trends observable in Table 1 apply equally to CIE LAB scale and Hunter Lab scale:

> Q: . . . Is the change in B-value, would there be an increase -b value observed using the Hunter LAB scale, which it appears is what was used here, based on L, A and B values, and also an increased -b value on the CIE scale?
>
> A: Sorry. This is CIE scale.
>
> Q: Why do you say that?
>
> A: Because the scale is defined. CIE.
>
> Q: Where?
>
> A: In previous page: "The specification also supports my opinion by correlating a bluer color to an increased -b value based on the CIE LAB scale. For example, the specification states, specifically, the brilliant bluish colorants that are produced from genipa fruit juice and watermelon juice had a maximum absorption in a spectrophotometer Lambda 20, USA in the wavelength range from 585 to 600nm depending on the concentration of the reactants. The LAB values that were determined in a Hunter Color Lab calorimeter (Color Quest XE, USA) are L from 20 to 40 and a-value from 5 to -2, and b-value from -5 to -25 concentrated colorants with a color value of 2 to 10. ***Additionally, in Table 1 of the specification demonstrates the increased -b values of the CIE LAB as associated with a blue visual color given that a POSITA would have understood that an increased -b value of the Hunter LAB scale would correlate with an increased b-value on the CIE LAB scale***."

(D.I. 72-2, at 227:20-229:2) (emphasis added).

Immediately after the deposition excerpt cited by Oterra, Dr. Abbaspourrad again articulated this correlative trend in explaining his references to the CIE scale:

> Q: Do you understand that we don't interpret the data in the application based on the claim?

─────────────────

directionality of -b trends (*i.e.*, increasing blueness with decreasing b values) is consistent between the CIE LAB and Hunter Lab scales and either would equally inform a POSITA. (*See id.* at 227:20-229:2, 231:5-232:11.)

A: Okay.

Q: Did you understand that when you –

A: Okay. Yes.

Q: Yes? So why did you just now in your deposition interpret Table 1 based on the claim language?

A: I can tell you why. When I look at this table [Table 1], what it tells me is that the change in the color value of materials before and after reaction, before and after processing, change in the color value. There are two different -- for a POSITA in this field, there are two different scales that you can use, CIE -- please let me finish my answer. CIE LAB value and Hunter. ***They are both correlated.*** They both -- in fact, CIE is generated after Hunter LAB scale. They are generated, they are basically correlated, and ***they show exact same trend. Now, a POSITA would understand, following the claim here, that if there is a -b value increasing, you are looking for bluer color, whether this is CIE or LAB, would you see the same increase.*** Now, if you are measuring with CIE, you are measuring with CIE as claim stated, which is very clear. Use CIE LAB scale, right. ***That is my understanding, that if I use CIE LAB scale, that's what I would see.***

(D.I. 72-2 at 231:5-232:11) (emphasis added).

Accordingly, the deposition testimony cited by Oterra fails to support any purported unreliability in Dr. Abbaspourrad's testimony or his "methodology" in claim interpretation. At most, Oterra identifies confusion during a line of questioning related to a distinction without a difference as to color scales. In no way does this support that Dr. Abbaspourrad's opinion uses incorrect claim interpretation principles.

### D. Dr. Abbaspourrad's Declaration Does Not Exceed the Permissible Scope of Expert Testimony By Including "Inappropriate Legal Opinions"

Oterra asserts that Dr. Abbaspourrad's declaration "exceeds the permissible scope of expertise with respect to claim construction principles and use of the prosecution history" for three reasons that are all incorrect. (D.I. 72 at 14.)

First, Oterra contends that it was impermissible for Dr. Abbaspourrad's expert report to contain an "entire section devoted to walking through various portions and statements from the

14

prosecutions histories of the original patent and the reissued patent" but also "selectively" rely on the prosecution history. (D.I. 72 at 15.) It is unclear how Oterra can fault Dr. Abbaspourrad for including statements from the prosecution history in his background on the asserted patent and throughout his opinion. Under Federal Circuit precedent, Dr. Abbaspourrad was required to consider the prosecution history. *See Phillips*, 415 F.3d at 1318 ("However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court. Similarly, a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'"). As a result, Dr. Abbaspourrad's inclusion of prosecution history in his expert report is in direct alignment with established law, and are not "subjective belief or unsupported speculation," as Oterra asserts. (D.I. 72 at 15.) Rather, his opinion provides his understanding of pertinent statements in the prosecution history from the perspective of a POSITA. Not only is this allowed under the law, Oterra's own expert, Dr. Giusti, also explained her understanding of the prosecution history and relied on selective portions of it to support her own claim construction related opinions. (*See* D.I. 61-2, ¶ 47; ¶ 50; ¶ 71 ¶¶ 130-133.) Accordingly, if Oterra contends that Dr. Abbaspourrad should be prohibited from providing his understanding of pertinent portions of the prosecution history, Dr. Giusti should also be prohibited from doing so.

Unsurprisingly, none of the cases cited by Oterra support its contention that Dr. Abbaspourrad should be barred from considering or otherwise including prosecution history in his report relating to claim construction issues. (D.I. 72 at 14-15.) The expert reports at issue in the *Brigham*, *Syngenta*, and *Ondeo* cases all concerned allegations of inequitable conduct or failure to disclose information during prosecution, where patent law experts sought to opine on the

materiality of references or disclosure requirements. *See Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*, 2010 WL 3907490, at *1 (D. Del. Sept. 21, 2010); *Syngenta Seeds, Inc. v. Monsanto Co.*, 2004 WL 2106583, at *1 (D. Del. Sept. 8, 2004); *Ondeo Nalco Co. v. EKA Chems., Inc.*, 2003 WL 1524658, at *3 (D. Del. Mar. 21, 2003). The expert reports at issue in those cases did not include opinions from the perspective of a POSITA to evaluate the prosecution history for purposes of claim construction.

Second, Oterra contends that Dr. Abbaspourrad "improperly drew conclusions on legal issues that not only should be reserved for the Court, but were also erroneous." (D.I. 72 at 16.) Specifically, Oterra asserts that Dr. Abbaspourrad failed to consider the specification or principles of claim differentiation in forming his opinions. (*Id.*) In support, Oterra cites only a portion of paragraph 125 of Dr. Abbaspourrad's expert report and vaguely claims that he "argued that the context of other claims in RE'695 supports his opinion on the meaning of 'the desired color' in claim 45." (*Id.*) While unclear, to the extent Oterra is criticizing Dr. Abbaspourrad for considering the context of other claims in the patent, such critique is contrary to controlling law. Far from being improper, Dr. Abbaspourrad's methodology aligns precisely with the approach mandated by the Federal Circuit. *Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."). Dr. Abbaspourrad's declaration also explicitly contemplates claim differentiation principles, where applicable. (*E.g.*, D.I. 60, ¶¶ 134, 148 (comparing language of claims 45, 1, and 22).) To support its meritless contentions, Oterra characterizes one of Dr. Abbaspourrad's conclusions after applying claim differentiation principles (paragraph 138) as "purporting to know Wild's intention during prosecution of the '319 patent." (D.I. 72 at 16.) Not so. He opines on a POSITA's understanding of what's expressed in the intrinsic record. *Genuine Enabling Tech. LLC v.*

*Nintendo Co., Ltd.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022) (quoting *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1166 (Fed. Cir. 2004) ("Reliance on expert testimony regarding the claim interpretation is thus permissible where the testimony is 'consistent with [the interpretation] required by the intrinsic evidence.'")). Accordingly, Oterra's critiques are unfounded.

Third, Oterra alleges that Dr. Abbaspourrad impermissibly opines about the examiner's intentions, findings of fact, or conclusions of law. (D.I. 72 at 17.) Oterra asserts that it was improper for Dr. Abbaspourrad's opinion to note that there was no indefiniteness rejection during prosecution with respect to the disputed claim terms that Oterra now contends are indefinite. (*Id.*; *see* D.I. 60 ¶¶ 89, 166, 177.) Oterra cites no legal support for its assertion, likely because it was proper for Dr. Abbaspourrad to consider this fact. In addition, Oterra suggests that Dr. Abbaspourrad improperly characterized the Examiner's statements during prosecution. This is flat wrong. His declaration quotes the Examiner's office action language verbatim. Dr. Abbaspourrad did not "characterize" an Examiner argument—the Examiner explicitly stated that "the fact that an increase in negative b CIELAB value means an increase in blue," and relied on that understanding in making a rejection of pending claims. (D.I. 54-1 Attmt. 7, ADMWILD_00000215-217.) In view of the foregoing, ADM disagrees that Dr. Abbaspourrad misstates or otherwise impermissibly characterizes the record whatsoever.

In view of the foregoing, the Court should deny Oterra's requests to strike Dr. Abbaspourrad's expert report and preclude him from testifying at the claim construction hearing.

### E.  Oterra's Arguments Go to the Weight to be Afforded to the Expert's Opinions

In addition to the reasons discussed above, Oterra's motion should be denied because the Court is capable of properly evaluating extrinsic evidence (such as expert testimony) in the context of the well-established claim construction framework.

This is not a situation where the Court must act as a gatekeeper to protect a jury from

considering unreliable or misleading expert testimony. As such, the primary concern underlying Rule 702 is not implicated here. *LG Display Co. v. AU Optronics Corp.*, 265 F.R.D. 189, 195 (D. Del. 2010) (recognizing that "courts in this circuit and others have acknowledged that the gatekeeping obligation provided for in Daubert is less pressing in the context of a bench trial") (collecting cases). Instead, claim construction is a question for the Court. *See Markman*, 517 U.S. at 372. Thus, the Court is free to consider expert testimony to aid its analysis and may determine the appropriate weight to afford such testimony at its discretion. *See Phillips*, 415 F.3d at 1319 ("[B]ecause extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean, it is permissible for the district court in its sound discretion to admit and use such evidence. In exercising that discretion, and in weighing all the evidence bearing on claim construction, the court should keep in mind the flaws inherent in each type of evidence and assess that evidence accordingly."); *AngioScore, Inc. v. TriReme Med., Inc.*, 50 F. Supp. 3d 1276, n. 8 (N.D. Cal. 2014) (denying motion to strike expert's testimony and declarations in support of claim construction, stating "[e]xpert opinion is admissible, if at all, to aid the trier of *fact*. Claim construction, however, is a question not of fact but of *law*. Thus, during claim construction, courts enjoy 'complete discretion' in using expert opinion") (italics in original) (citations omitted).

Accordingly, because the Court can determine how much weight to give proffered expert testimony during claim construction, Oterra's motion should be denied. *E.g.*, *Angioscore*, 50 F. Supp. 3d 1276, n. 8; *Bayer Healthcare Pharms., Inc. v. River's Edge Pharms., LLC*, 2015 WL 11122102, at *11 (N.D. Ga. Feb. 17, 2015), *report and recommendation adopted*, 2015 WL 11122103 (N.D. Ga. Mar. 16, 2015) (denying motion to strike because criticisms of expert's claim construction related opinions go to weight, not admissibility).

## VII.    CONCLUSION

ADM respectfully requests that the Court deny Oterra's motion in its entirety.


Dated: April 25, 2025

/s/ Thatcher A. Rahmeier
Thatcher A. Rahmeier (#5222)
**FAEGRE DRINKER BIDDLE & REATH LLP**
222 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
(302) 467-4200
thatcher.rahmeier@faegredrinker.com

David J.F. Gross (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
4800 North Scottsdale Road, Suite 2200
Scottsdale, AZ 85251
(480) 643-1850
david.gross@faegredrinker.com

Timothy E. Grimsrud (*pro hac vice*)
Lauren J.F. Barta (*pro hac vice*)
Andrea I. Savageau (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
(612) 766-7000
tim.grimsrud@faegredrinker.com
lauren.barta@faegredrinker.com
andrea.savageau@faegredrinker.com

Lisa Carlson (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
320 South Canal Street, Suite 3300
Chicago, IL 60606
(312) 569-1000
lisa.carlson@faegredrinker.com

***Attorneys for Defendants/Counterclaimant,
Wild Flavors, Inc. and Archer-Daniels-Midland
Co.***