IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OTERRA A/S and OTERRA, LLC,<br><br>                      Plaintiffs,<br><br>   v.<br><br>WILD FLAVORS, INC. and ARCHERDANIELS-MIDLAND CO.,<br><br>                      Defendants. | CIVIL ACTION<br>NO. 23-1376 |

**OPINION**

**Slomsky, J.**                                                                                                                 **May 16, 2025**

I.     **INTRODUCTION AND BACKGROUND**

    Before the Court is Plaintiffs Oterra A/S and Oterra, LLC's (collectively, "Plaintiffs") Motion to Strike the Expert Report of Alireza Abbaspourrad, Ph.D. (Doc. No. 71.) This is a patent infringement case involving one patent, United States Patent No. RE46,695 (the "'695 Patent"), owned by Defendants Wild Flavors, Inc. and Archer-Daniels-Midland Co. (collectively, "Defendants"). (See Doc. No. 1.) On December 4, 2023, Plaintiffs filed a Complaint against Defendants seeking declaratory judgment that (1) Plaintiffs are not infringing the invention covered by the '695 Patent, and (2) the '695 Patent is invalid. (See id.) On April 26, 2024, Defendants filed a counterclaim against Plaintiffs, alleging Plaintiffs are infringing the '695 Patent. (See Doc. No. 9.) On September 3, 2024, Defendants filed an amended counterclaim. (Doc. No. 26.)

The '695 Patent covers the invention of a natural blue food colorant derived from the Genipa americana fruit, also known as the jagua or huito fruit, claimed by Defendants to be the food industry's "only patented, acid, light and heat-stable blue color." (See id. at 21.) Defendants refer to the shade of blue that the huito fruit produces as "Huito blue." (See id.) Plaintiffs, however, refer to this shade of blue as "Jagua blue" or "Jungle blue." (Id. at 24-25.)

In the amended counterclaim, Defendants allege that Plaintiffs have partnered with Ecoflora, SAS ("Ecoflora"), a Colombian producer of colorants for the food and personal care industries, to manufacture and sell a blue food colorant also made from the huito fruit. (See id.) Defendants argue that the process used by Plaintiffs to manufacture its Jagua blue food colorant (the "accused process") infringes "at least Claim 45 of the ['695 Patent]." (Id. at 25.) In addition, Defendants allege that the Jagua blue food colorant (the "accused product") infringes "at least Claim 53 of the ['695 Patent]." (Id.)

A claim construction hearing on the '695 Patent is scheduled for June 12, 2025. On February 14, 2025, the parties jointly filed a claim construction statement and chart, indicating that they dispute nine (9) terms found in Claims 45, 46-50, 53, and 54 of the '695 Patent. (See Doc. No. 54.) On March 10, 2025, both parties filed opening briefs on claim construction. (See Doc. Nos. 58, 61.) In support of their claim construction briefs, both parties also filed expert declarations. (See Doc. Nos. 59, 60, 61-2.) One of the expert declarations filed by Defendants is the declaration of Alireza Abbaspourrad, Ph.D. ("Dr. Abbaspourrad"), who offers his understanding of the disputed claim terms as a person of ordinary skill in the art. (See Doc. No. 60.) Plaintiffs subsequently deposed Dr. Abbaspourrad regarding the opinions contained in his declaration. (See Doc. No. 72-2.)

On April 11, 2025, Plaintiffs filed a Motion to Strike the Expert Report of Alireza Abbaspourrad, Ph.D., pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). (Doc. No. 71.) In the Supporting Brief, Plaintiffs argue Dr. Abbaspourrad's expert declaration should be struck in its entirety because the opinions reflected in the report are unreliable under Daubert. (See Doc. No. 72.) On April 25, 2025, Plaintiffs filed a Response in Opposition. (Doc. No. 74.) And on May 2, 2025, Defendants filed a Reply in Support of the Motion to Strike. (Doc. No. 75.) Defendants' Motion to Strike the Expert Report of Alireza Abbaspourrad, Ph.D., (Doc. No. 71) is now ripe for disposition and, for reasons stated below, will be granted in part and denied in part.[1]

## II.   STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. See FED. R. EVID. 702. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and

---

[1] The parties did not request that the Court hold a Daubert hearing on the Motion to Strike the Expert Report of Alireza Abbaspourrad, Ph.D. (Doc. No. 71). And because the Court has before it Dr. Abbaspourrad's declaration and the transcript of his deposition, it need not hold a Daubert hearing on the Motion. See Oddi v. Ford Motor Co., 234 F.3d 136, 154 (3d Cir. 2000) (upholding a district court's decision to deny a Daubert hearing where the court "already had before it the depositions and affidavits of the plaintiff's experts"); see also Sec'y United States Dep't of Lab. v. Nursing Home Care Mgmt. Inc., 128 F.4th 146, 163 (3d Cir. 2025) (noting that whether a Daubert hearing is necessary is within the sound discretion of the district court).

3

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Id.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., the United States Supreme Court provided the analytical framework to determine the admissibility of expert testimony under Federal Rule of Evidence 702. 509 U.S. 579 (1993). Daubert held that Rule 702 imposes a "gatekeeping" obligation on the trial court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 598. Also under Rule 702, the United States Court of Appeals for the Third Circuit has held that it "has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). These requirements are also referred to as "qualification, reliability and fit." Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

A.  **Qualification**

The Third Circuit has "interpreted Rule 702's qualification requirement liberally." Pineda, 520 F.3d at 244 (citing Schneider, 320 F.3d at 404; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994)). Accordingly, a "broad range of knowledge, skills, and training qualify an expert." Paoli, 35 F.3d at 741. Because both the "substantive" and "formal" qualifications of an expert are viewed liberally, the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." Id. Thus, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed

4

expert does not have specialization that the court considers most appropriate." Pineda, 520 F.3d at 244 (quoting Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996)).

### B. Reliability

Turning to the "reliability" requirement, the Third Circuit has interpreted reliability "to mean that an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." Pineda, 520 F.3d at 244 (internal quotations omitted) (quoting Paoli, 35 F.3d at 742). Notably, "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness." Id. at 744. Admissibility turns "on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined." Kannankeril v. Terminix Intern., Inc., 128 F.3d 802, 806 (3d Cir. 1997). In assessing the reliability of scientific expert testimony, a court should consider the following:

> (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

FED. R. EVID. 702 advisory committee note.

It is well established, however, that these factors "are neither exhaustive nor applicable in every case." Kannankeril, 128 F.3d at 806-07. The Daubert Court "made clear that its list of factors was meant to be helpful, not definitive." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151 (1999). Indeed, when examining expert testimony that is based on practical experience, rather than academic theories, "the Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable" because the reliability of testimony from a practical experience expert "depends heavily on the knowledge and experience of the expert, rather than the

methodology or theory behind it." States v. Fernwood Hotel and Resort, No. 12-906, 2014 WL 198568, at *3 (M.D. Pa. Jan. 15, 2014) (quoting United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000)).

Furthermore, the Daubert standard of admissibility does not apply only to "scientific" expert testimony. In Kumho Tire Co., Ltd., the Supreme Court of the United States held that "Daubert's general holding . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." 526 U.S. at 141. Thus, the test of reliability is "flexible, and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Id. (quoting Daubert, 509 U.S. at 594–95).

### C.   Fit

To satisfy the "fit" requirement, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Schneider, 320 F.3d at 404. For expert testimony to meet the Daubert "fit" requirement, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (internal quotations omitted) (citing United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)).

Under Daubert, the district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. And the Third Circuit has found that "courts are loath to outright dismiss an expert. Though the burden is on the proponent, we have said Rule 702 . . . has a liberal policy of admissibility." Nursing Home Care Mgmt. Inc., 2025 WL 351599, at *8.

6

### III. ANALYSIS

Here, Dr. Abbaspourrad's opinions contained in his declaration are sufficiently reliable under Daubert.[2] As mentioned above, Defendants submitted Dr. Abbaspourrad's declaration in support of their position on claim construction. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303,1312 (Fed. Cir. 2005) (citation omitted). To determine the meaning of a patent's claims, courts engage in a process called claim construction. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 388 (1996) (finding that claim construction is an issue of law for the court to decide). "The purpose of claim construction is to determine the meaning and scope of the patent claims that the plaintiff alleges have been infringed." Every Penny Counts, Inc. v. Am. Express Co., 563 F.3d 1378, 1381 (Fed. Cir. 2009).

Generally, "the words of a claim 'are . . . given their ordinary and customary meaning.'" Phillips, 415 F.3d at 1313 (citation omitted). And "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Id. When determining the meaning of a disputed claim term, the court begins its analysis by looking to intrinsic evidence, meaning "the words of the claims themselves, the remainder of the specification, [and] the prosecution history," before turning to extrinsic evidence consisting of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Id. at 1314, 1317. But while "evidence extrinsic to the patent document 'can shed useful light on the relevant art,' [it] is less significant than the intrinsic record

---

[2] Plaintiffs do not challenge Dr. Abbaspourrad's qualification as an expert nor the fit of his testimony to the case. (See Doc. No. 72.)

in determining the 'legally operative meaning of disputed claim language.'" C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004) (citation omitted).

In the instant case, Plaintiffs argue Dr. Abbaspourrad's opinions are unreliable under Daubert for three reasons: (1) his opinions rely on materials improper for consideration in the claim construction context; (2) he did not know or apply the proper claim construction methodology; and (3) his opinions include inappropriate legal opinions. (See Doc. No. 72.) The Court will discuss each argument in turn.

### A.  Dr. Abbaspourrad's Opinions Do Not Rely on Improper Materials

First, because Dr. Abbaspourrad's opinions on the meanings of the disputed claim terms are largely based on intrinsic evidence, his opinions do not rely on materials improper for consideration during claim construction. As mentioned above, when conducting a claim construction analysis, a court should first look to the intrinsic evidence but may consider extrinsic evidence to "shed useful light on the relevant art." See C.R. Bard, 388 F.3d at 862. Importantly, however, "[i]n 'claim construction,' the words of the claims are construed independent of the accused product." Scripps Clinic & Rsch. Found. v. Genentech, Inc., 927 F.2d 1565, 1580 (Fed. Cir. 1991).

Based on this principle, Plaintiffs argue Dr. Abbaspourrad's opinions are unreliable because he "expressly considered extrinsic materials that characterize the accused process and product, as well as provide other facts outside the scope of claim construction." (Doc. No. 72 at 9.) Specifically, Plaintiffs point to Dr. Abbaspourrad's reliance on Plaintiffs' press release discussing the accused product, statements about the accused product from the website of the company that manufactures the accused product, and a United States Food and Drug Administration memorandum referencing the accused product. (See id. at 9-10.)

And while Dr. Abbaspourrad did rely to some extent on this extrinsic evidence in forming his opinions on the meanings of the disputed claim terms, he mainly relied on the intrinsic evidence, i.e., the claims themselves, the specification, and the prosecution history.  For example, regarding the disputed term "other juice or material" in Claim 45, Dr. Abbaspourrad explains in the declaration that his opinion that this term has its plain and ordinary meaning is based on the following:

> 134. My opinion is supported by <u>how the claim phrase is used in the claims, and how it is used throughout the specification</u>. For example . . .
>
> 135. In addition, <u>the specification</u> includes a detailed description of exemplary coprocessing materials. For example . . .
>
> 136. In my opinion, a [person of ordinary skill in the art] <u>reading Claim 45 in the context of the specification as a whole</u> would have understood that . . .

(Doc. No. 60 at 52-54 (emphasis added, citation omitted).)  Moreover, when explaining why he does not believe a person of ordinary skill in the art would not construe the term "other juice or material" to have the meaning prescribed to it by Plaintiffs, Dr. Abbaspourrad states this opinion is based on the following:

> 138. For example, as shown above <u>the plain language of Claim 45</u> does not limit how the other juice or material is made or the specific source of amino acid other than it must be "foodgrade," whereas the plain language of other claims in the '695 Patent do . . .
>
> 139. As another example, as shown above, <u>the specification notes</u> . . .
>
> 140. As another example, <u>the specification explains</u> . . .
>
> 141. My opinion is further supported by the fact that <u>the specification does not exclude</u> "synthetic, pure chemicals" when distinguishing the present invention over the prior art . . .
>
> 142. In my opinion, this is consistent with how the Applicant distinguished the prior art <u>during prosecution</u> . . .

> 143. In my opinion, this is also consistent with how <u>Oterra characterizes its Jagua Blue product [i.e. the accused product]</u>, which is accused of infringing Claim 45. Oterra's product literature describes the Jagua Blue product as "derived from the fruit of the jagua tree (also known as huito), offers a safe and vibrant, naturally sourced blue color." Oterra represents that its "natural blue" Jagua Blue product exhibits "robustness towards heat, light, and acidity." This is so even though Oterra has separately asserted that "pure glycine" is used as a co-processing material during the process to make the Jagua Blue. In my opinion, a [person of ordinary skill in the art] would understand these real-world industry descriptions as consistent with the intrinsic evidence above that do not carve out "synthetic, pure chemicals."
>
> 144. For at least the reasons above, a [person of ordinary skill in the art] would have understood the meaning of the claim phrase "other juice or material" as "other juice or material" without further construction.

(<u>Id.</u> at 55-58 (emphasis added, citations omitted).) Thus, as shown above, Dr. Abbaspourrad only references extrinsic evidence discussing the accused product in paragraph 143 as part of his final point in explaining how he reached his opinion. Other than paragraph 143, his explanation is entirely based on intrinsic evidence.

Moreover, besides summarizing the accused product in the background section of the declaration, the only other references Dr. Abbaspourrad makes to similar extrinsic evidence discussing the accused product are a minor part of his explanations for his opinions on three other disputed claim terms. (<u>See</u> <u>id.</u> at ¶¶ 98-101, 157, 167, 178.) As above, he only references this extrinsic evidence as a final point after repeatedly justifying his opinions with intrinsic evidence. (<u>See</u> <u>id.</u> at ¶¶ 157, 167, 178.) Accordingly, because Dr. Abbaspourrad's opinions on the meanings of the disputed claim terms are almost entirely based on intrinsic evidence, the opinions are reliable under <u>Daubert</u>.

That said, because Dr. Abbaspourrad does improperly reference the accused product in the background section of the declaration (paragraphs 98-101) and when justifying several of his opinions (paragraphs 143, 157, 167, and 178), the paragraphs containing these references will be

10

struck from the declaration. See Scripps, 927 F.2d at 1580 ("In 'claim construction,' the words of the claims are construed independent of the accused product[.]")

### B. Dr. Abbaspourrad Applied Proper Claim Construction Methodology

Next, the declaration makes clear that Dr. Abbaspourrad applied proper claim construction methodology when forming his opinions on the meanings of the disputed claim terms. Plaintiffs argue that Dr. Abbaspourrad's declaration should be struck in its entirety as unreliable under Daubert because he mixed up the correct methodology for claim construction during his deposition testimony. (See Doc. No. 72 at 13.) To support this argument, Plaintiffs first point to Dr. Abbaspourrad's deposition testimony that he should consider a patent's prosecution history on claim construction only if the meaning of the claim term is not clear. (See id. (citing 72-2 at 52, 201:3-25).) But, under Federal Circuit precedent, the proper methodology for claim construction may require consideration of the patent's prosecution history. See Phillips, 415 F.3d at 1317 ("[W]e have held that a court "should also consider the patent's prosecution history, if it is in evidence.")

Despite his deposition testimony, however, the declaration is clear that Dr. Abbaspourrad did consider the prosecution history when forming his opinions on the meanings of the disputed claim terms. (See, e.g., Doc. No. 60 at ¶¶ 112, 120, 128, 142, 156, 166, 177.) In addition, as the declaration acknowledges, Dr. Abbaspourrad is not a lawyer and had never been deposed prior to the instant case. (See Doc. No. 60 at ¶¶ 17-18.) As such, it is possible that, as Defendants suggest, the deposition testimony cited by Plaintiffs indicates, at most, "Dr. Abbaspourrad's confusion in dealing with a repetitive line of questioning" at his deposition. (Doc. No. 74 at 15.)

Plaintiffs also contend that Dr. Abbaspourrad applied improper claim construction methodology because he testified at the deposition that he construed the specification in light of the claims rather than construing the claims in light of the specification, as is proper. (See Doc.

11

No. 72-2 at 57-58, 227:20-230:25); see also Phillips, 415 F.3d at 1315 ("[C]laims 'must be read in view of the specification, of which they are a part.'")  But as above, while Dr. Abbaspourrad apparently confused the proper methodology for claim construction at the deposition, the declaration demonstrates that he construed the claims in light of the specification when forming the opinions discussed in the declaration.  For example, when justifying his opinion that the disputed term "other juice material" in Claim 45 has its plain and ordinary meaning, Dr. Abbaspourrad explained that this opinion was based in part on a "reading [of] Claim 45 in the context of the specification as a whole . . . ." (Doc. No. 60 at ¶ 136.)  In other words, he based this opinion on a reading of Claim 45 in view of the specification.

Thus, it is apparent that despite his deposition testimony, when Dr. Abbaspourrad wrote the declaration, he understood and applied the correct claim construction methodology.  Accordingly, Dr. Abbaspourrad's opinions in the declaration are sufficiently reliable under Daubert.

   **C.** **Dr. Abbaspourrad's Opinions Do Not Include Inappropriate Legal Opinions**

Finally, Dr. Abbaspourrad's opinions set forth in the declaration do not include inappropriate legal opinions.  Plaintiffs argue to the contrary, asserting three examples of Dr. Abbaspourrad's alleged inclusion of improper legal opinions:  (1) his summary of the '695 Patent's prosecution history; (2) his failure "to account for legal principles of claim construction, such as claim differentiation and the requirement that the claim be construed in view of the specification," rendering his opinions "inappropriate and incorrect as a matter of law"; and (3) his purporting to know the patentee's intentions as well as "the patent examiner's intentions, findings of fact, or conclusions of law[.]" (Doc. No. 72 at 15-18.)  But none of these examples demonstrate that Dr. Abbaspourrad's declaration exceeded its permissible scope by including inappropriate legal opinions.

First, Dr. Abbaspourrad's summary of the '695 Patent's prosecution history is not an improper legal opinion. Plaintiffs point out that "parties are generally not permitted to explain patent prosecution histories through expert testimony." (Id. at 15 (quoting Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc., No. 08-464, 2010 WL 3907490, at *2 (D. Del. Sept. 21, 2010).) But Dr. Abbaspourrad's summary of the '695 Patent's prosecution history in the declaration was not Defendants' attempt to explain the patent prosecution history through expert testimony. Rather, it served as context to Dr. Abbaspourrad's discussion of the patent's prosecution history when explaining his opinions on the meanings of the disputed claim terms. And as mentioned above, in claim construction, it is proper and even required that claim terms be construed in light of the patent's prosecution history. See Phillips, 415 F.3d at 1314 (explaining that, when determining the meaning of a disputed claim term, the court should look to "the words of the claims themselves, the remainder of the specification, [and] the prosecution history"). Thus, as Defendants argue, "Dr. Abbaspourrad's inclusion of the prosecution history in his expert report is in direct alignment with established law." (Doc. No. 74 at 19.)

Second, Dr. Abbaspourrad's opinions were not rendered inappropriate and incorrect as a matter of law for his failure "to account for legal principles of claim construction, such as claim differentiation and the requirement that the claim be construed in view of the specification." (Doc. No. 72 at 17.) As discussed above, Dr. Abbaspourrad made clear in his declaration that, when forming his opinions, he construed the claims in light of the specification as is proper, despite his mistaken deposition testimony that he construed the specification in light of the claims.

In addition, while Plaintiffs contend that he does not account for claim differentiation in the declaration, Dr. Abbaspourrad explicitly contemplated claim differentiation principles where applicable. "'[C]laim differentiation' refers to the presumption that an independent claim should

13

not be construed as requiring a limitation added by a dependent claim." <u>Curtiss-Wright Flow Control Corp. v. Velan, Inc.</u>, 438 F.3d 1374, 1380 (Fed. Cir. 2006). Said differently, where a dependent claim adds a limitation, such limitation is not to be understood as required by the independent claim on which the dependent claim depends. In the declaration, Dr. Abbaspourrad demonstrates his application of this principle, explaining that his understanding of the term "other juice or material" in Claim 45, an independent claim, is supported by the limitations of that term in certain dependent claims:

> 134. My opinion is supported by how the claim phrase is used in the claims, and how it is used throughout the specification. For example, the term "***other juice or material***" is part of the broader limitation of Claim 45 relating to the co-processing material of (a)(ii): "(ii) other juice or material from a suitable food-grade source that contains at least one component capable of providing the desired color when combined with the Genipa americana fruit juice defined in (a)(i), wherein the food-grade source comprises an amino acid." (Claim 45 (emphasis added).) A [person of ordinary skill in the art] reading Claim 45 would have understood that it does not limit how the other juice or material is made or the specific source of amino acid other than it must be "food-grade." In contrast, other unasserted claims specifically recite "other [juice or liquefied] material [made by the chemical or mechanical liquification of a solid material,] ***from a suitable food-grade source selected from fruits, grains, seeds, beans, nuts, vegetables, plant materials, milk, dairy products, egg, meat, seafood, shellfish, microbial and algal material, and by-products from such sources, the other material comprising juice or liquefied material made by chemical or mechanical liquification of a solid material*** that contain components capable of providing the desired color when combined with the juice defined in (a)(i)" (unasserted Claim 1 (emphasis added)); and "other material ***from a suitable food-grade source selected from fruits, grains, seeds, beans, nuts, vegetables, plant materials, milk, dairy products, egg, meat, seafood, shellfish, microbial and algal material, and by-products from such sources, the other material comprising juice or liquefied material made by chemical or mechanical liquification of a solid material*** that contain components capable of providing the desired color when combined with the juice defined in (a)(i), wherein the food-grade source comprises an amino acid" (unasserted Claim 22 (emphasis added)).

(Doc. No. 60 at ¶ 134 (emphasis in original); <u>see also id.</u> at ¶ 148.) Thus, because Dr. Abbaspourrad applied correct claim construction methodology and explicitly considered claim differentiation

principles where appropriate, his opinions are neither inappropriate nor incorrect as a matter of law.

And third, the declaration cannot be read as Dr. Abbaspourrad purporting to know the patentee's intentions as well as "the patent examiner's intentions, findings of fact, or conclusions of law[.]" (See Doc. No. 72 at 18.) For example, Plaintiffs assert that Dr. Abbaspourrad improperly guessed at the patentee's intentions in paragraph 138 of the declaration when he stated that "the patentee did not intend to similarly limit Claim 45." (See id. at 17.) But in making this argument, Plaintiffs left out a critical portion of the quoted sentence. Read in full, paragraph 138 states the following:

> 138. For example, as shown above the plain language of Claim 45 does not limit how the other juice or material is made or the specific source of amino acid other than it must be "foodgrade," whereas the plain language of other claims in the '695 Patent do. (Compare unasserted Claims 1 and 22 with Claim 45.) <u>In view of this, in my opinion a [person of skill in the art] would have understood that the patentee did not intend to similarly limit Claim 45.</u>

((Doc. No. 60 at ¶ 138 (emphasis added).) Thus, with this context, Dr. Abbaspourrad is not purporting to know the intentions of the patentee. Instead, he is explaining his opinion as a person of skill in the art on what he understands to be the patentee's intentions. As the purpose of his declaration is to offer his expert opinion on what a person of skill in the art would understand the disputed claim terms to mean, this explanation of his understanding of the patentee's intentions is appropriate.

Plaintiffs also contend that Dr. Abbaspourrad purported to know the patent examiner's intentions, findings of fact, or conclusions of law. But the paragraphs in the declaration that Plaintiffs cite in support of this argument, namely paragraphs 89 and 112, merely contain Dr. Abbaspourrad's summary of the prosecution history. And as discussed above, his summary of the prosecution history was properly included in the declaration as background and context for his

15

later explanations of his opinions on the meanings of the disputed claim terms in light of the '695 Patent's prosecution history.

Accordingly, because Dr. Abbaspourrad's opinions set forth in the declaration do not include inappropriate legal opinions, his opinions are sufficiently reliable under Daubert.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Strike the Expert Report of Alireza Abbaspourrad, Ph.D., (Doc. No. 71) will be granted in part and denied in part. Specifically, the Motion to Strike will be granted as to paragraphs 98, 99, 100, 101, 143, 157, 167, and 178 of Dr. Abbaspourrad's declaration but denied as to the remainder of the declaration. An appropriate Order follows.